**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF WEST VIRGINIA**
**Martinsburg Division**

**DAVID FRAZIER, II d/b/a FRAZIER'S PAWN SHOP,**

       **Petitioner,**

v.                             **Civil Docket No.: 3:19-cv-208 (Groh)**
                                          **(CHIEF JUDGE GROH)**

**MICHAEL F. FRONCZAK,**
**DIRECTOR, INDUSTRY OPERATIONS, WFD and**
**BUREAU OF ALCOHOL, TOBACCO, FIREARMS**
  **AND EXPLOSIVES,**

       **Respondents.**

> ELECTRONICALLY FILED
> Dec 09 2019
> U.S. DISTRICT COURT
> Northern District of WV

**PETITION FOR JUDICIAL REVIEW OF DENIAL OF FEDERAL FIREARMS**
**LICENSE, HELD BY PETITIONER, PURSUANT TO 18 U.S.C. § 923(f)(3)**

David Frazier, II, d/b/a Frazier's Pawn Shop, a sole proprietorship (hereinafter referred to as "Petitioner"), is a Federal firearms dealer licensed to sell firearms by the Bureau of Alcohol, Tobacco, Firearms and Explosives ("ATF") under 18 U.S.C. § 923 (f)(3), commenced this action by filing a Petition for Judicial Review[1] regarding the ATF's denial of Petitioner's Application for Renewal of his Federal firearms license.

Regulatory Framework

Under the provisions of section 923(e), Title 18, United States Code, and 27 C.F.R. § 478.73, a Federal Firearms license may be denied renewal of his application to sell firearms or license revoked if the holder of such license has willfully violated any provision of Chapter 44, Title 18, United States Code, or any rule or regulation issued thereunder.

---

[1] 18 U.S.C. § 923(f) (3) provides for de novo review in the United States District Court for the Northern District of West Virginia.

The Petitioner respectfully request for the United States District Court for the Northern District of West Virginia review this case and allow the presentation of additional evidence because this court's review is de novo and the decision of the Secretary is not necessarily "clothed . . . with any presumption of correctness or other advantage." *Weidner v. Kennedy*, 309 F. Supp. 1018, 1019 (C.D. Cal. 1970).

## PROCEDURAL POSTURE OF THE CASE

On January 29, 2019, ATF issued a Notice to Deny (renewal) Application for License ("the Notice"), ATF Form 4498, to the Petitioner.  The Petitioner requested a hearing to review the Notice by email to the Director of Industry Operations, dated February 14, 2019.

In that regard, a hearing was held on August 21, 2019 at 40 Compass Pointe, Martinsburg, West Virginia 25404.[2]

The hearing was conducted by Michael F. Fronczak, Director of Industry Operations, Washington Field Division.  ATF was represented by Associate Chief Counsel, Firearms and Explosives Law Division, James Vann and ATF Division Counsel, Washington Field Division, Michael Boyer. ATF Special Agent (SA) Keith Martin and ATF Industry Operations Investigator (IOI) Eileen Vails appeared as witnesses on behalf of the Government.  ATF Area Supervisor, Cynthia Chuy, Falls Church III Field Office, was present for observational purposes only.

The Petitioner appeared at the hearing *pro se*, and without benefit of legal counsel because he was advised that the hearing was informal and did not know that he was obligated to introduce diverse witnesses, offer countervailing testimony, cross examine witnesses and present exhibits to make a complete record of the proceeding.

---

[2] A copy of a transcript of the hearing is attached hereto and marked for identification purposes as Petitioner's Exhibit A.

Michael F. Fronczak Director of Industry Operations ("DIO") for the Washington Filed Division, presided over the administrative proceedings and on October 8, 2019 made the following findings of fact and conclusions of law.

*Findings of Fact*:

1.      During the summer of 2017, ATF Special Agent (SA) Keith Martin opened an investigation into the Petitioner, and his employees at Petitioner's business establishment regarding the potential illegal sale of firearms.  As part of that investigation, SA Martin utilized an ATF Confidential Informant (CI), who is a convicted felon, to conduct a series of controlled monitoring visits to Petitioner's business establishment.  These controlled monitoring visits involved sending the CI and Undercover ATF Special Agents (UCs) into Petitioner's business establishment to attempt to purchase firearms either "off the books" or through "straw purchases."

2.      The first controlled monitoring visit occurred on August 25, 2017.  On this date, SA Martin sent the CI into Petitioner's business establishment to solicit conversation about an interest in purchasing a firearm without the completion of an ATF Form 4473 and FBI National Instant Criminal Background Check System (NICS) background check.  Prior to the visit, a transmitter was placed on the CI, which allowed for audio recording of the CI's visit to Petitioner's business establishment. During the visit, the CI spoke with Mr. Hoffman, an employee, and made him aware of his prior felony conviction from Forty (40) years ago in Fairfax, Virginia.  The CI also asked Mr. Hoffman whether his cousin could come and complete the paperwork necessary to purchase a firearm for the CI.  In response, Mr. Hoffman demonstrated his knowledge of the Gun Control Act (GCA) by accurately informing the CI that this is what is called a "straw purchase," which carries a

possible penalty of up to ten years if convicted. Mr. Hoffman also advised the CI to go to the West Virginia State Police and have them conduct a criminal background check to confirm whether the CI was prohibited from purchasing a firearm.

3.     A second controlled monitoring visit occurred on September 12, 2017. On this date, SA Martin sent the CI into Petitioner's business establishment to attempt to purchase a firearm. As was done previously, a transmitter was placed on the CI, which allowed for an audio recording of the CI's visit to Petitioner's business establishment. During this visit, the CI informed Mr. Hoffman that he had checked on his prior conviction and confirmed that he was a felon. In response, Mr. Hoffman, once again, demonstrated his knowledge of the GCA by explaining that if the CI had someone else buy a firearm for him and got caught, the CI faced the possibility of ten years in prison. The CI said that he was not worried about that and still wanted to buy a firearm. After suggesting that the CI could potentially purchase a firearm at a flea market, Mr. Hoffman told the CI that if he came across a firearm with "no contracts," he could sell the CI the firearm without having to get someone to buy it for him.

4.     On September 28, 2017, SA Martin received a phone call from the CI who informed him that on September 23, 2017 the CI and a female acquaintance went to the Petitioner's business establishment and spoke with Mr. Hoffman. The CI relayed to SA Martin that Mr. Hoffman had informed him that he had not yet come across any firearms that he could sell to the CI, but then pointed to the CI's female acquaintance and stated that he could sell a firearm to her to give to the CI. The CI responded that he would get back to him and departed the store.

5.     On October 18, 2017, SA Martin sent the CI and an ATF Undercover Special Agent (UC1) into Petitioner's business establishment. A transmitter was placed on the CI, which

allowed for an audio recording of the visit.  During this visit, the Cl made it clear to Mr. Hoffman that he had brought UC1 into the store to purchase a firearm for him.  Mr. Hoffman asked where UC1 was from and she stated Arlington, Virginia.  Mr. Hoffman responded, once again demonstrated his knowledge of gun laws and gun control measures, by describing how the laws differ slightly in Virginia, Maryland and New York, and by accurately informing the Cl of the restrictions on the sale of handguns to out-of-state residents.  After Mr. Hoffman showed the Cl a number of rifles at varying prices, Mr. Hoffman agreed to sell the Cl a black Hi-Point rifle, model 4595, .45 caliber rifle with serial number R55185.  While the Cl paid for the rifle at the cash register, Mr. Hoffman had UC1 complete the ATF Form 4473 to complete the transaction.  Mr. Hoffman also conducted an FBI NICS background check of UC1 for the firearm purchase.  Mr. Hoffman falsely recorded that UC1 was the purchaser of the firearms on the ATF Form 4473 and in his acquisition and disposition records.  Mr. Hoffman also failed to run the National Criminal Instant Background Check (NICS) background check on the actual purchaser of the firearm.

6.      On October 24, 2017, SA Martin once again sent the Cl and another ATF Undercover Special Agent (UC2) into Petitioner's business establishment.  A transmitter was placed on the Cl, which allowed for an audio and video recording of the visit.  During this visit, the Cl spoke with Mr. Hoffman about the rifle he previously purchased at Petitioner's business establishment, on October 18, 2017, and expressed an interest in purchasing a pistol.  The Cl reiterated to Mr. Hoffman that he is a convicted felon, a fact which Mr. Hoffman acknowledged by making a shushing gesture.  Mr. Hoffman and the Cl went through a number of firearms before the Cl agreed to purchase a Springfield pistol, model XD9, 9mm with serial number GM979645, two magazines and a box of Federal 9mm caliber ammunition.  Mr. Hoffman knew

that the Cl was the actual purchaser of the firearm and not UC2.  Nevertheless, while the Cl paid

for the firearm at the cash register, Mr. Hoffman had UC2 complete the ATF Form 4473 and ran

an FBI NICS background check on UC2 to complete the firearm transaction. Mr. Hoffman

falsely recorded that UC2 was the purchaser of the firearms on the ATF Form 4473 and in his

acquisition and disposition records.  Mr. Hoffman also failed to run the NICS background check

on the actual purchaser of the firearm. The Petitioner also, despite being told by Mr. Hoffman

that the Cl was prohibited and that the UC2 was purchasing the firearm for the Cl, approved the

sale and allowed it to proceed.

7.      On January 18, 2018, SA Martin sent two other ATF Special Agents, SA Nasir

Sessoms and SA Sabrina Hager, in an undercover capacity into Petitioner's business

establishment to attempt a straw purchase.  Both agents were given a transmitter recording

device, but only one of the transmitters was recording at the time of the visit.  The one

transmitter that recorded the visit provided an audio and video recording.  During this visit, the

two UC agents spoke with Mr. Hoffman and it was made clear that SA Hager wished to purchase

multiple handguns for SA Sessoms, who represented himself to be an out-of-state resident.  Mr.

Hoffman recognized this to be a straw purchase at the time and even apprised both agents of the

fact.  Nevertheless, Mr. Hoffman facilitated the transaction by allowing SA Hager to fill out the

ATF Form 4473, while SA Sessoms paid for the two firearms at the cash register.  Mr. Hoffman

falsely recorded that SA Hager was the purchaser of the firearms on the ATF Form 4473 and in

his acquisition and disposition records. Mr. Hoffman also failed to run the NICS background

check on the actual purchaser of the firearm.

8.      During the visit on January 18,2018 described above, the Petitioner was in close

enough proximity to where the straw purchase transaction between Mr. Hoffman and the two UC

agents was occurring that the Petitioner would have been able to hear what was taking place. Additionally, Mr. Kevin Kidrick, another employee of Petitioner's business establishment was manning the cash register during this visit, later admitted to law enforcement that he had identified this transaction as a straw purchase but took no action to stop the transaction from going forward.

9.     Following these controlled monitoring visits to Petitioner's business establishment, SA Martin obtained a federal search warrant from a United States Magistrate Judge of the United States District Court for the Northern District of West Virginia.  On January 24, 2018, SA Martin, along with other ATF agents and investigators, executed the federal search warrant of Petitioner's business establishment, during which time numerous items in support of the criminal investigation into the Petitioner and his employees were seized from the premises, to include multiple firearms, ammunition, computers, cellular phones, and the Petitioner's Federal firearms records and documents.

10.     A subsequent inspection of the Petitioner's Federal firearms Petitioner records and documents revealed multiple violations of the Gun Control Act[3] ("GCA"), including two additional straw purchases facilitated by Mr. Hoffman.  The two additional straw purchases were recorded on two separate ATF Form 4473- one dated April 21, 2017 for transaction number 5446 and one dated July 29, 2017 for transaction number 5632.  Both transactions were flagged by ATF investigators because, although both forms indicated that Mr. Hoffman was the "actual purchaser," the handwritten receipts indicated that the firearms went to other individuals.  When confronted by SA Martin about his involvement in transaction number 5446, which involved the

---

[3] The Gun Control Act of 1968 (GCA or GCA68) is a U.S. federal law that regulates the firearms industry and firearms owners.  It primarily focuses on regulating interstate commerce in firearms by generally prohibiting interstate firearms transfers except among licensed manufacturers, dealers and importers.

sale of a Remington Model 870, 20-gauge shotgun with serial number C925158, Mr. Hoffman admitted that, even though Ms. Michele Crews had paid for the firearm, he falsely indicated he was the "actual purchaser" on the ATF Form 4473 and ran the FBI NICS background check on himself to complete the transaction. Likewise for transaction number 5632, which involved the sale of a Clock pistol, Model 19, 9mm with serial number AMCS728, Mr. Hoffman admitted that he falsely listed himself as the "actual purchaser" on the ATF Form 4473 and ran the FBI NICS background check on himself in order to complete the transaction and prior to transferring the firearm to Ms. Audrea Crews.  Mr. Hoffman explained that he did so because Ms. Audrea Crews was 18 years old at the time of the transaction and thus precluded under the GCA from purchasing a handgun firearm.  Mr. Hoffman also informed SA Martin that he informed the Petitioner of both of these transactions, including to whom the firearms would eventually be given, and that the Petitioner approved both transactions.

      11.    In addition to the transactions described above, further violations of the GCA were discovered upon inspection of the Petitioner's Federal firearms Petitioner records and documents.  As such, the Petitioner was cited for the following violations:

      a.    On April 21, 2017, Petitioner's representative falsely completed an ATF Form 4473, entered incorrect information into their acquisition and disposition record and improperly ran a NICS background check on himself for the purchase of a Remington shotgun (Model 870; 20 gauge; S/N C925158), which he actually sold and transferred to Michele CREWS in violation of 18 U.S.C. §§ 923(g)(1)(A), 922(f)(1), and 924(a)(1)(A), and 27 C.F.R. §§ 478.102(a), 478.124(c)(1), 478.125(e) and 478.128(a).

      b.    On July 29, 2017, Petitioner's representative falsely completed an ATF Form 4473,

entered incorrect information into their acquisition and disposition record and improperly ran a NICS background check on himself for the purchase of a Glock pistol (Model 19; 9mm caliber; S/N AMCS728), which he actually sold and transferred to Audra CREWS, who was eighteen years of age at the time of the handgun purchase, in violation of 18 U.S.C. §§ 923(g)(1)(A), 922(t)(l), 924(a)(1)(A), and 922(x), and 27 C.F.R. §§ 478.102(a), 478.124(c)(1), 478.125(e) and 478.128(a).

       c.      On October 18, 2017, Petitioner's representative falsely completed an ATF Form 4473, entered incorrect information into their acquisition and disposition record and improperly ran NICS background check on a person other than the actual purchaser and facilitated the straw purchase of a Hi-Point rifle (Model 4595; .45 caliber; S/N R55185) to an individual with a Virginia driver's license, portrayed by an ATF Undercover (UC) agent, for the actual purchaser, portrayed by an ATF confidential informant (CI) with a felony conviction, who the Petitioner's employee (Mr. Hoffman) knew or reasonable should have known was a prohibited person in violation of 18 U.S.C. §§ 922(d)(1), 923(g)(1)(A), 922(t)(l), and 924(a)(1)(A), and 27 C.F.R. §§ 478.102(a),478.124(c)(1), 478.125(e) and 478.128(a).

       d.      On October 24, 2017, Petitioner's employee (Mr. Hoffman) falsely completed an ATF Form 4473, entered incorrect information into their acquisition and disposition record and improperly ran NICS background check on a person other than the actual purchaser and facilitated the straw purchase of a Springfield pistol (Model XD-9; 9mm caliber, S/N GM979645) to an individual with a West Virginia driver's license, portrayed by an ATF UC agent, for the actual purchaser, portrayed by an ATF CI with a felony conviction, who the Petitioner's employee (Mr. Hoffman) knew or reasonable should have known was a prohibited

person in violation of 18 U.S.C. §§ 922(d)(1), 923 (g)(1)(A),922(t)(l), and 924(a)(1)(A), and 27 C.F.R. §§ 478.102(a), 478.124(c)(1), 478.125 (e) and 478.128(a).

e.  On January 18, 2018, Petitioner's employee (Mr. Hoffman) falsely completed an ATF Form 4473, entered incorrect information into their acquisition and disposition record and improperly ran NICS background check on a person other than the actual purchaser and facilitated the straw purchase of a Springfield pistol (Model XD-45; .45 ACP caliber, S/N GM403521) and an FN pistol (Model FNS-9; 9mm caliber; S/N GKU0026569) to an individual with a West Virginia driver's license, portrayed by an ATF UC agent, for the actual purchaser, portrayed by another ATF UC agent, who the Petitioner's representative knew or reasonable should have known was an out-of-state resident in violation of 18 U.S.C. §§ 922(b)(3), 923(g)(1)(A), 922(t)(l) and 924(a)(1)(A), and 27 C.F.R. §§ 478.102(a), 478.124(c)(1), 478.125(e) and 478.128(a).

f.  Petitioner engaged in approximately forty-seven (47) willful violations (on twenty-nine (29) ATF Form 4473) of 18 U.S.C. §§ 922(m), 923(g)(1)(A), and 27 C.F.R. §§ 478.21(a) and 478.124(c) for transferring a firearm without first completing accurately all appropriate sections (such as questions 11.a, 16, 22, 23 and 29) of ATF Form 4473.

g.  Petitioner engaged in approximately sixty-six (66) violations (on forty (40) ATF Form 4473) of 18 U.S.C. §§ 922(m), 923(g)(1)(A), and 27 C.F.R. § 478.124(c)(1), for transferring a firearm without first requiring the transferee provide the personal identifying information (such as name, residential address, place of birth, citizenship, etc.) required by ATF Form 4473.

h.  Petitioner engaged in approximately five (5) violations (on five (5) ATF Form 4473) of 18 U.S.C. §§ 922(m), 922(t)(l)(c), and 923(g)(1)(A), and 27 C.F.R. § 478.124(c)(3)(i)

for failing to verify and properly record the identity of the transferee by examining a valid government-issued identification document (as defined in 27 C.F.R. §478.11).

      i.     Petitioner engaged in approximately thirty-six (36) violations of 18 U.S.C. §§ 922(m), 922(t), and 923(g)(1)(A), and 27 C.F.R. § 478.124(c)(3)(iv) for failing to record all NICS transaction information on ATF Form 4473 (questions 19.a, 19.c, and 19.d) prior to the transfer of a firearm.

      j.     Petitioner violated 18 U.S.C. §§ 922(m) and 923(g)(1)(A), and 27 C.F.R. § 478.124(c)(4) for failing to enter correct information regarding the manufacturer, serial number, and caliber/gauge of the firearm to be transferred on ATF Form 4473 (question 27) prior to the transfer of the firearm.

      k.     Petitioner engaged in approximately five (5) violations (on five (5) ATF Form 4473) of 18 U.S.C. §§ 922(m), 923(g)(1)(A), and 27 C.F.R. § 478.124(c)(5), for failing to properly sign and/or record the correct date of transfer of a firearm on ATF Form 4473.

      l.     Petitioner engaged in approximately two (2) violations of 18 U.S.C. § 922(g)(3) and 27 C.F.R. § 478.126a, involving four (4) handguns, for failing to timely or correctly report the sale of two or more pistols, or revolvers, or combination thereof, to an unlicensed person on the same day or within five consecutive business days.

      m.     Petitioner engaged in approximately eight (8) violations of 18 U.S.C. § 922(m) and 923(g)(1)(A), and 27 C.F.R. § 478.125(e) for failing to completely, accurately, and timely record information (such as the fact of disposition, the date of disposition, the transferees name and address) into the Acquisition and Disposition record.

      n.     Petitioner violated 18 U.S.C. § 922(t)(l)(A) and 27 C.F.R. § 478.102(a)(1) for failing to conduct a NICS background check on a purchaser of a firearm.

12.     Prior to the events described above, the Petitioner's business underwent multiple inspections, including a qualifications inspection and several compliance inspections, by ATF. As is customary practice, during each of these inspections, the Petitioner and/or his employee signed an acknowledgement form indicating that an ATF investigator had provided them with a general overview of the Federal firearms regulations, including a discussion on "straw purchases," and explained to them their responsibilities as a Federal firearms Petitioner and answered any questions they may have.  Following the compliance inspections conducted of Petitioner in 2010, 2011 and 2014, Petitioner was cited for multiple violations of the GCA and issued warning letters, each of which informed Petitioner of the importance of properly maintaining business records and warned Petitioner that any future violations may be viewed as willful and may result in revocation of his license.  In addition to the issuance of a warning letter, following the 2011 inspection, which covered the period of December 13, 2010 to December 12, 2011, Petitioner attended a warning conference on July 10, 2012 at the ATF Martinsburg Field Office.  At this warning conference, the GCA violations discovered during the inspection were discussed in detail and the importance of complying with the Gun Control Act was explained to the Petitioner.  The Petitioner was given an opportunity to ask any questions about Federal firearms regulations.  The following day, July 11, 2012, ATF sent the Petitioner a letter summarizing the discussions that had taken place at the warning conference and reminded the Petitioner that future violations may be considered willful and may result in revocation of his license.

13.     At the hearing, the Petitioner did not dispute his compliance history, nor did he dispute any of the violations noted within the Notice or that he knew and understood his obligations to comply with the Gun Control Act.  The Petitioner also did not dispute that the

violations were done willfully.  Rather, the Petitioner opted to provide documents that suggested he has taken remedial measures since the execution of the search warrant by ATF at Petitioner's business establishment to ensure he was complying with the GCA - such as, including all firearms in his acquisition and disposition book and ensuring all ATF Form 4473's are properly filled out and accurate.   In addition, the Petitioner provided documentation showing what percentage of his business is comprised of firearms sales and why losing his Federal firearms license would be detrimental to his business.   Finally, the Petitioner suggested that the violations should be attributed to Mr. Hoffman and not himself because "probably 99 percent of the paperwork is under William Hoffman."  However, the Petitioner admitted that he knows of his duties, obligations and responsibilities as a Federal firearms Petitioner and acknowledged that he has responsibility for the actions of his employees, including Mr. Hoffman.

*Conclusions of Law:*

1.      Pursuant to the GCA, ATF may, after notice and opportunity for hearing, revoke a Federal firearms license if the Petitioner has willfully violated any provision of the GCA or the regulations issued thereunder. 18 U.S.C. § 923(e); 27 C.F.R. § 478.73.

2.      For purposes of the regulatory provisions of the GCA, a purposeful disregard of or plain indifference to the laws and regulations imposed on firearms dealers shows willfulness for purposes of § 923(d)(1)(C). Repeated violations after being informed of regulatory obligations constitute plain indifference or deliberate disregard of the GCA. *See RSM* v. *Herbert,* 446 F. 3d 316, 322 (4th Cir. 2006); *American Arms. Int.* v. *Herbert,* 563 F. 3d 78, 87 (4th Cir. 2009).

3.      The Petitioner is liable for the acts of its employees. *Stein's Inc.* v. *Blumenthal,* 649 F.2d 463, 468 (7th Cir. 1980).  Violations committed by employees selling firearms while

13

working within the scope of their employment with the Petitioner are attributable to the Petitioner. *See Bankston* v. *Then*, 615 F.3d 1364, 1368-1369 (11th Cir. 2010).

4.     Having established that the Petitioner violated the GCA and the regulations issued thereunder, it must be determined whether such violations were willfully committed. For the reasons stated below, I conclude that the Petitioner's conduct was willful in relation to all of the stated violations in the Findings of Fact.

5.     The evidence and testimony presented at the hearing clearly shows that the Petitioner understood his duties and responsibilities as a Federal firearms Petitioner, to include but not limited to preventing straw purchases. The Petitioner acknowledged on at least Three (3) separate occasions that an ATF investigator had explained this illegal practice and answered his questions regarding such. These acknowledgements notwithstanding, the evidence suggests that the Petitioner may have not only been aware of but also approved at least one, if not two, straw purchases facilitated by his employee, Mr. Hoffman, on October 24, 2017 and January 18, 2018, respectfully.  The evidence also suggests that the Petitioner was aware of and approved the two additional straw purchases Mr. Hoffman directly engaged in for Ms. Michelle Crews and Ms. Audra Crews.   Importantly, however, even in the absence of such evidence of the Petitioner's complicity in these straw purchases, the Petitioner clearly acknowledged at the hearing that he is responsible for the actions of his employees, including Mr. Hoffman.  This is significant because Mr. Hoffman also acknowledged an understanding of straw purchases.  If there was any doubt as to whether Mr. Hoffman fully understood what is precluded under the law, Mr. Hoffman dispelled all such doubt when he accurately explained to the CI on August 25, 2017, as well as to the two ATF undercover agents on January 18, 2018, not only what qualifies as a straw purchase, but also what one can expect to receive as a punishment under the law should one be caught

participating in such practice.  Nevertheless, Mr. Hoffman willfully facilitated the straw purchase

of multiple firearms on five (5) separate occasions.  On October 18, 2018 and October 25, 2018,

despite knowing that the CI was a convicted felon, Mr. Hoffman allowed for two ATF

undercover agents to mark on the ATF Form 4473 they were the actual purchasers of the

firearms, when in fact they were not and Mr. Hoffman knew they were not.  Likewise, on

January 18, 2018, Mr. Hoffman knew that SA Sessoms, who posed as an out-of-state resident,

could not purchase a handgun in West Virginia and that SA Hager was not the actual

purchaser of the firearms.  In spite of that, Mr. Hoffman allowed SA Hager to complete the ATF

Form 4473 and completed an FBI NICS background check on her to complete the transaction.

Finally, Mr. Hoffman willfully and knowingly engaged in the straw purchase of firearms

for Ms. Michelle Crews and Ms. Audra Crews by falsely listing himself as the actual purchaser

of the firearms on the ATF Form 4473.

Even though Mr. Hoffman knew he was not the actual purchaser of the firearms, he

ran an FBI NICS background check on himself to complete the transaction.  Based on

Mr. Hoffman's acknowledgement and recorded statements, it is clear Mr. Hoffman understood

what he was doing was illegal but proceeded with the sale all the same.

6.      Separate from the straw purchases, the multiple other GCA violations discovered

during the inspection of the Petitioner's Federal firearms Petitioner records and documents

following the execution of the search warrant on Petitioner's business establishment

were also willful.  Prior to this inspection, the Petitioner had been informed of the law and

regulations, and its failure to comply therewith, in 2010, 2011, and 2014.

Following the 2010 and 2014 inspections, the Petitioner was issued a warning letter in

which it was emphasized that future violations may be considered willful and could result in the

revocation of its Federal firearms Petitioner.  The Petitioner was also given the benefit of a

warning conference following the inspection in 2011, where ATF discussed the necessary

corrective actions to be taken, and the Petitioner advised of specific acts it would take to prevent

future violations. Specifically, the Petitioner gave assurances to ATF during this warning

conference that in order to avoid future errors, omissions or discrepancies it would "verify prior

to completing the transfer of firearms to non-Petitioners that all the information called for or

requested on the headers and instructions on the forms are recorded correctly and accurately."

The Petitioner also indicated that it would take corrective action to ensure it would

properly record the acquisition and/or disposition of all firearms in its Acquisition and

Disposition Book in a timely manner.  These assertions proved false, as each of the violations

discovered in the most recent inspection of the Petitioner's Federal firearms Petitioner records

and documents were previously addressed following the 2010, 2011, and 2014 inspections. In

other words, each of the violations in its records and documents are repeat violations, and thus

ATF's inclusion of these violations as part of its basis for denying the renewal of the Petitioner

Federal firearms license is justified.

7.      The Petitioner placed blame for not only the multiple straw purchases, but also its

poor record keeping, principally on its former employee, Mr. Hoffman.  However, this argument

is without merit.  First, the Petitioner openly acknowledged at the hearing that it was responsible

for its employees.  The Petitioner therefore cannot now reasonably expect to be held exempt and

immune from the actions of its employees simply because Mr. Hoffman may, in fact, have

participated in the behavior that gives rise to ATF's decision to deny the renewal of the

Petitioner's Federal firearms license.  Second, there is at least some evidence that suggests the

Petitioner was not wholly "in the dark" concerning Mr. Hoffman's actions particularly as it

relates to the straw purchases in which Mr. Hoffman either facilitated or directly engaged- and may have even authorized the transactions.

Finally, this "rogue employee" defense has been previously rejected by the Federal Circuit Courts that have weighed in on the issue. For example, the Fifth Circuit heard and recently ruled on essentially this exact same argument in *Fairmont Cash, Mgmt., L.L.C.* v. *James,* 858 F.3d 356 (5th Cir. 2017).  In that case, in response to a "rogue employee" argument, the Fifth Circuit relied upon language out of the Seventh Circuit, which establishes, "where . . . the Petitioner is a corporation, it is chargeable with the conduct and knowledge of its employees."

*Id.* at 362-3 *{citing Stein's, Inc. v. Blumenthal,* 649 F.2d 463, 467-68 (7th Cir. 1980).[4]

Based on this reasoning, the Fifth Circuit held, "[the FFL] *is* vicariously liable for the illegal acts of its employees regardless whether it approved of them.  We reject its argument to contrary." *Id.* at 363 (emphasis in original).

Accordingly, I reject these arguments raised by the Petitioner now.

8.      I conclude that the Petitioner willfully violated the provisions of the GCA and the regulations issued thereunder. Accordingly, as provided by 18 U.S.C. § 923(d) and 27 C.F.R. § 478.72, the application for renewal of the Federal firearms license held by the Petitioner, is hereby DENIED.

---

[4] *See also Moreno* v. *Bureau of Alcohol, Tobacco, Firearms, Explosives,* 1 13 F. Supp. 3d 916, 923 (W.D. Tex. 2015) (finding "a business entity's federal firearms license may be revoked . . . because of the willful violations by the company's employees."); *Arwady Hand Trucks Sales, Inc.* v. *Vander Werf,* 507 F. Supp. 2d 754, 763 n. 12 (S.D. Tex. 2007); *Vineland Fireworks Co.* v. *ATF,* 544 F. 3d 509, 521-22 (3d Cir. 2008) (in similar explosives regulatory scheme licensee is responsible for violations attributable to employee).

## ADDITIONAL FACTS IN THE CASE

On November 20, 2018, Mr. William L. Hoffman (Petitioner's employee) was indicted[5] by a Federal grand jury within the Northern District of West Virginia, on the following criminal charges, to-wit:

1. Count One:  Sale to a Prohibited Person

2. Count Two:  Making False Entry in Records by Federal Firearms Dealer

3. Count Three:  Sale to a Prohibited Person

4. Count Four:  Making False Entry in Records by Federal Firearms Dealer

However, the Petitioner was not arrested or indicted regarding this matter, which is consistent with his assertion that he was not aware of Mr. Hoffman's actions and never acquiesced or authorized such conduct, which is evidence that Mr. Hoffman was on a frolic of his own.

## FIRST ARGUMENT

The Petitioner contends that the "rogue employee" holding articulated in *Stein's, Inc. v. Blumenthal*, 649 F.2d 463, 467-68 (7th Cir. 1980), is not well placed in this scenario and clearly distinguished from the facts of this case on grounds that the Petitioner in this case is <u>not</u> a corporate entity.  In *Stein*, the Fifth Circuit relied upon language out of the Seventh Circuit, which establishes, "*where . . . the Petitioner is a corporation, it is chargeable with the conduct and knowledge of its employees.*"

Nevertheless, in *Stein*, the plaintiff, was a Wisconsin corporation with its principal place of business in Milwaukee; and Petitioner pawnbroker dealing in firearms.  Clearly, a corporation is vicariously liable for the illegal acts of its employees regardless whether it approved such acts.

---

[5] A copy of the Indictment is attached hereto and marked for identification purposes as Petitioner's Exhibit B.

However, the Petitioner in this case is legally recognized as a "sole proprietorship", and not a corporation.

The other case cited in number seven (7) of the conclusions of law is *Fairmont Cash Management, LLC, v. Tanarra James*. The petitioner in that case was a Texas company doing business as "Cash Cow Pawn," a corporate entity. Again, the Petitioner in the instant case is recognized as a sole proprietorship, and not a corporate entity.

Therefore, the corporate entity vicarious liability[6] theory to hold the Petitioner responsible for the acts of Mr. Hoffman, his employee, is not present in in this case.

## **SECOND ARGUMENT**

The Petitioner in this case should not be held liable for the actions of Mr. Hoffman because Mr. Hoffman was on a frolic[7] of his own.

Although, the rules and regulations of the Administrative Procedure Act[8] applied during this administrative hearing, all of the testimony adduced at the hearing was hearsay evidence proffered by government agents and/or representatives, which was not corroborated by any other competent evidence in the record. A finding of fact based solely on hearsay in an administrative hearing will not stand.[9]

Clearly, all the uncorroborated testimony adduced at the hearing was elicited through ATF government agents and/or representatives. Mr. Hoffman (employee) was not called as a

---

[6] Vicarious liability is a form of a strict, secondary liability that arises under the common law doctrine of agency, respondeat superior, the responsibility of the superior for the acts of their subordinate or, in a broader sense, the responsibility of any third party that had the "right, ability or duty to control" the activities of a violator.

[7] Frolic – An employee's significant deviation from the employer's business for personal relations. A frolic is outside the scope of employment, and thus the employer is not vicariously liable for the employee's actions. Black's Law Dictionary, Eight Edition.

[8] Pub.L. 79–404, 60 Stat. 237, enacted June 11, 1946, is the United States federal statute that governs the way in which administrative agencies of the federal government of the United States may propose and establish regulations and grants U.S. federal courts oversight over all agency actions. It is one of the most important pieces of United States administrative law and serves as a sort of "constitution" for U.S. administrative law.

[9] *Calcara v. Workers' Compensation Appeal Bd.* (St. Joseph Hosp.), 706 A.2d 1286 (Pa. Commw. Ct. 1998).

witness to corroborate the testimony of ATF government agents and/or representatives.  Mr. Kevin Kidrick (employee) was not called as a witness to corroborate the testimony of ATF government agents and/or representatives.

Furthermore, Mr. Hoffman was indicted by a Federal grand jury on November 20, 2018. On August 9, 2019, Mr. Hoffman pled guilty[10] to Count II of the Indictment, to-wit: Making False Entry in Records by Federal Firearms Dealer; and Counts I, III and IV were dismissed by the government.

On September 23, 2019, Mr. Hoffman was sentenced to Six (6) months incarceration by the Honorable Gina Groh, Judge of the United States District Court for the Northern District of West Virginia.[11]

Petitioner's hearing was held on August 21, 2019 at 40 Compass Pointe, Martinsburg, West Virginia; Mr. Hoffman signed a plea agreement on August 9, 2019.

Mr. Hoffman's testimony was the best evidence to be presented at the administrative hearing instead of ATF Federal agents and/or representatives providing hearsay testimony of Mr. Hoffman alleged assertions to them during their respective investigations.

Clearly, eliciting testimony from such witnesses often requires that a "deal" be struck, whereby the government promises the guilty witness some degree of leniency for his cooperation.  "Bargaining" for witness testimony in this fashion has long been recognized as a legitimate, necessary practice.  However, the ramifications of such agreements have always caused concern for those involved with defendants' rights, as the cooperating witness has a

---

[10] A copy of the executed Pela Agreement is attached hereto and marked for identification purposes as Petitioner's Exhibit C.
[11] A copy of the executed Pela Agreement is attached hereto and marked for identification purposes as Petitioner's Exhibit D.

strong incentive to commit perjury to reap the full benefit of the "contract." This is especially true now that agreements are becoming more liberal with respect to what the government may offer the cooperating witness, what the witness is obligated to do in return, and how the witness is to suffer in the event he fails to perform or fails to secure the desired effect. Clearly the most important safeguard against false testimony is the defendant's right to cross-examine the cooperating witness as to bias. The defendant's discretion to probe into cooperation agreements, however, is not on par with the government's increasing discretion in what it may offer a criminal witness in exchange for his testimony. This note explores the risk that a criminal witness will lie on the stand when he testifies pursuant to a cooperation agreement.

Clearly, the Petitioner should have an opportunity to cross-examine Mr. Hoffman to corroborate the ATF government agents and/or representative's assertions and have access to the government's discovery provided in Mr. Hoffman's case. Mr. Hoffman lacked sufficient credibility to tell the truth during the debriefing sessions and had a strong incentive to mimic the government's desires.

## THIRD ARGUMENT

The Petitioner argues that claims of his violations of the Gun Control Act were not willful, as applied to him. Clearly, based on the testimony of ATF Federal agents and/or representatives, Mr. Hoffman was on a frolic of his own and Petitioner had no reason to believe the entries made by Mr. Hoffman were in violation of the GCA.

The Petitioner further argues that his conduct was not "willful," as required for revocation of its license under 18 U.S.C. § 923(e), because willfulness requires proof that he acted "'intentionally and purposely and with the intent to do something the law forbids, that is, with

the bad purpose to disobey or to disregard the law.'" *Bryan v. United States*, 524 U.S. 184, 190 (1998) (quoting the district court's jury instruction).

The Bryan Court characterized the few cases which construed "willfully" to require a showing that the defendant "knew the specific law he was violating" to be narrow exceptions to this general rule.   524 U.S. at 194-95, 118 S.Ct. 1939 (emphasis added).   However, these cases involved criminal violations of the tax laws, see e.g., *Cheek v. United States*, 498 U.S. 192, 199-200, 111 S.Ct. 604, 112 L.Ed.2d 617 (1991), and the structuring of cash transactions to avoid a reporting requirement, see *Ratzlaf,* 510 U.S. at 137, 114 S.Ct. 655.

In other similar cases, such as *RSM, Inc. v. Herbert,* the government attorneys contend that "willful" as used in § 923(e) can be demonstrated if a firearms dealer, "with knowledge of what the regulations require, . . . repeatedly violated these regulations."  However, a simple inspection the record in the instant case, the standard is not satisfied.

The statute provides in relevant part:

"The Attorney General may, after notice and opportunity for hearing, revoke any license issued under this section if the holder of such license has willfully violated any provision of this chapter or any rule or regulation prescribed by the Attorney General under this chapter.

18 U.S.C. § 923(e) (emphasis added). The regulation promulgated under this section provides similarly:

Whenever the Director of Industry Operations has reason to believe that a licensee has willfully violated any provision of the Act or this part, a notice of revocation of the license, ATF Form 4500, may be issued. 27 C.F.R. § 478.73(a) (emphasis added).  Accordingly, to resolve this case, we must interpret "willfully," as used in 18 U.S.C. § 923(e) and 27 C.F.R. § 478.73(a).

The Bryan Court stated, "we, of course, recognize that 'willfully' is "a word of many meanings whose construction is often dependent on the context in which it appears." *Bryan*, 524 U.S. at 191. At its core, however, the term describes conduct that results from an exercise of the will, distinguishing "intentional, knowing, or voluntary" action from that which is "accidental" or inadvertent. *United States v. Illinois Central R.R.*, 303 U.S. 239, 243 (1938) (internal quotation marks and citations omitted); *see also Bryan*, 524 U.S. at 191 ("Most obviously, [willfully] differentiates between deliberate and unwitting conduct . . . ."); *Prino v. Simon*, 606 F.2d 449, 451 (4th Cir. 1979) (noting that "a conscious, intentional, deliberate, voluntary decision properly is described as willful").

Moreover, "willfully" has been held to denote a mental state of greater culpability than the closely related term, "knowingly." *See Illinois Central R.R.*, 303 U.S. at 242-43 (explaining that "'[w]illfully' means something not expressed by 'knowingly'" (citation omitted)). "Knowingly" typically refers only to one's knowledge of the facts that make his conduct unlawful, not to one's knowledge of the law. *See Bryan*, 524 U.S. at 193; *United States v. Bailey*, 444 U.S. 394, 404 (1980) (finding that a prison escapee acted "knowingly" because he "knew his actions would result in his leaving physical confinement").

Whereas "willfully," especially when used in a criminal statute, usually requires a showing of a "bad purpose" — proof that "'the defendant acted with knowledge that his conduct was unlawful.'" *Bryan*, 524 U.S. at 192 (emphasis added) (quoting *Ratzlaf v. United States*, 510 U.S. 135, 137 (1994)).

Accommodating the fundamental principle that ignorance of the law is no excuse, the Supreme Court in *Bryan* — construing "willfully" in § 924(a)(1)(D) — rejected a definition of "willfully" that required the defendant to have knowledge of the law which he is accused of

violating. 524 U.S. at 196. Rather, a more general knowledge "that the conduct is unlawful is all that is required." The Court recognized, though, that the willfulness requirement was also satisfied by a showing of, among other things, a disregard of or an indifference to known legal obligations. Id. at 197-99; see also *Article II Gun Shop, Inc. v. Gonzales*, 441 F.3d 492, 497 (7th Cir. 2006) (finding "willfulness" when a licensee "knew of his legal obligation and purposefully disregarded or was plainly indifferent to the recordkeeping requirements"); *Appalachian Res. Dev. Corp. v. McCabe*, 387 F.3d 461, 464-65 (6th Cir. 2004) ("[W]here a licensee understands his or her legal obligations under the GCA, yet fails to abide by those obligations, his or her license can be denied or revoked on the basis that the dealer 'willfully' violated the GCA"); cf. *Willingham Sports, Inc. v. Bureau of Alcohol, Tobacco, Firearms & Explosives*, 415 F.3d 1274, 1277 (11th Cir. 2005) ("[A] showing of purposeful disregard of or plain indifference to the laws and regulations imposed on firearms dealers shows willfulness for purposes of § 923(d)(1)(C)").

Thus, when determining the willfulness of conduct, we must determine whether the acts were committed in deliberate disregard of, or with plain indifference toward, either known legal obligations or the general unlawfulness of the actions. But when applying such a formulation of willfulness to an omission — the failure to act — there is seldom direct evidence that a person intentionally failed to do something that was legally required. Thus, when evaluating omissions alleged to be deliberate, it is often necessary to ascertain whether the failure to act resulted from a conscious consideration of the legal requirement to act. While evidence of willfulness in this context may be more elusive than in the context of affirmative actions, a court may infer willful omission from a defendant's plain indifference to a legal requirement to act if the defendant (1) knew of the requirement or (2) knew generally that his failure to act would be unlawful.

24

However, the Supreme Court implicitly overruled *Stein's* in *Bryan v. United States*, 524 U.S. 184, 118 S. Ct. 1939, 141 L. Ed. 2d 197 (1998).   In *Article II Gun Shop, Inc. v. Gonzales,* the licensee argued that *Bryan* eliminated the "plain indifference standard" and held that willfulness requires a "bad purpose to disobey or to disregard the law." The Court disagreed.  In *Bryan*, the defendant had been convicted of conspiring to sell firearms without a license and engaging in the sale of firearms without a license, in violation of provisions of the Gun Control Act that contained a willfulness requirement. *See* 18 U.S.C. §§ 922(a) (1) and 924.  The defendant claimed that he had no knowledge of the Act's requirements, so that his violations could not be willful.  The Court held that the defendant's bad purpose was sufficient to satisfy the willfulness requirement under the facts of that case, where the defendant had used straw purchases, filed off guns' serial numbers, and sold guns on the black market. *Bryan*, 524 U.S. at 189, 194-96, 118 S. Ct. 1939.

The *Bryan* Court recognized that the Court in *Stein's* "stated that willfulness in § 923(d) (1) is satisfied by a disregard of a known legal obligation." *Id.* at 196-97, 118 S. Ct. 1939. The Court found that while cases like *Stein's* "support the notion that disregard of a known legal obligation is sufficient to establish a willful violation, they in no way stand for the proposition that it is required." *Id.* at 197-98, 118 S. Ct. 1939.  The *Bryan* Court did not hold that a showing of "bad purpose" is required before ATF can revoke the license of a gun dealer who violates the Act despite knowledge of its requirements. *Id.* Rather, the Court simply held that a bad purpose may be sufficient to demonstrate purposeful disregard for or plain indifference to the law, where there is no evidence a party was aware of the requirements of the law.

The Petitioner contends that the material facts developed at the administrative hearing did not justified nonrenewal and that Petitioner believed the hearing to be informal, and was without

benefit of legal counsel, was not astute in legal formalities, had failed to introduce evidence raising substantial questions contained herein about those facts.

The ATF has the authority to deny an application for a firearms dealer license only on specified grounds.   One of those grounds is that the applicant has "willfully violated any of the provisions of [the Gun Control Act] or regulations issued thereunder."   18 U.S.C. § 923(d)(1)(C).

It is undisputed that Mr. Hoffman, Petitioner's employee, had violated the firearms dealer regulations.   This fact was substantiated ATF Federal agents and/or representatives during the ATF's CI undercover investigation, which also resulted in numerous recordkeeping errors and other violations of the federal regulations were uncovered.

Four of the five circuits that have addressed the matter have concluded that a violation is "willful" for purposes of § 923 where a firearms dealer "knew of his legal obligation and purposefully disregarded or was plainly indifferent to the recordkeeping requirements." *Lewin v. Blumenthal*, 590 F.2d 268, 269 (8th Cir.1979);   accord *Appalachian Res. Dev. Corp. v. McCabe*, 387 F.3d 461, 464-65 (6th Cir.2004);   *Perri v. Dep't of the Treasury*, 637 F.2d 1332, 1336 (9th Cir.1981);   *Stein's, Inc. v. Blumenthal*, 649 F.2d 463, 467 (7th Cir.1980).   The definition of "willful" adopted by the other of the five circuits to consider the issue differs only in that the term "plain indifference" is not explicitly used.   *Prino v. Simon*, 606 F.2d 449, 451 (4th Cir.1979) ( " 'Willful' means action taken knowledgeably by one subject to the statutory provisions in disregard of the action's legality.   A conscious, intentional, deliberate, voluntary decision properly is described as willful, regardless of venal motive." (internal marks and citation omitted)).

In all five of these circuits, a bad purpose or evil motive is not required.  *Appalachian Res. Dev. Corp.*, 387 F.3d at 464-65;  Stein's, Inc., 649 F.2d at 467;  *Cucchiara v. Sec'y of the Treasury*, 652 F.2d 28, 30 (9th Cir.1981);  *Lewin,* 590 F.2d at 269;  see also *Prino*, 606 F.2d at 451.

Instead, the firearms dealer is considered to have acted willfully under §  923 if, with knowledge of what the regulations require, the dealer repeatedly violates those regulations.  See *Appalachian Res. Dev. Corp.*, 387 F.3d at 464 (agreeing with the district court's determination that violations of firearm regulations were "willful" because the dealer had knowledge of its obligations and repeatedly violated them); *Stein's, Inc.*, 649 F.2d at 468 (same); *Cucchiara*, 652 F.2d at 30 (same);  Lewin, 590 F.2d at 269 (same);  see also *Prino,* 606 F.2d at 450-51.

The Fourth Circuit has held that a dealer's repeated violations after it has been informed of the regulations and warned of violations does show purposeful disregard or plain indifference.  See *Prino*, 606 F.2d at 451.  However, in *Prino*, the licensee was represented by legal counsel.

Nonetheless, there was no credible evidence adduced at the administrative hearing that Petitioner was aware of Mr. Hoffman's conduct other than the hearsay testimony from ATF Federal agents and/or representatives, which was without any corroboration.

The Petitioner respectfully request that this Honorable Court allow him to submit such additional evidence as they may deem relevant before ruling upon any subsequent motion filed by Respondent.

In *Prino*, the Court stated, "while the Secretary maintains on this appeal that the appropriate standard for judicial review by the district court was the familiar "substantial evidence" one, the district court instead considered itself bound to conduct De novo review. In doing so it considered the evidence in the administrative record plus additional evidence received in affidavit form from both parties.  We think that De novo review is the appropriate standard.

27

See *Rich v. United States*, 383 F. Supp. 797 (S.D. Ohio 1974); *Weidner v. Kennedy*, 309 F. Supp. 1018 (C.D.Cal.1970).  In view of the fact that *Prino* made no objection to the particular form of proceeding ordered by the district court, either when it was ordered or subsequently, and that he participated in it without requesting any evidentiary hearing to supplement the record or to conduct cross-examination, we hold that the procedure employed here afforded proper judicial review.

WHEREFORE, the Petitioner respectfully request that this Honorable Court grant this petition.

By: "s/" Sherman L. Lambert, Sr.
Sherman L. Lambert, Sr., Esquire
SHERMAN L. LAMBERT, SR., P.L.L.C.
WVSB No.: 2129
P.O. Box 3200
Shepherdstown, WV 25443
sherman@shermanlambertlaw.com