# EXHIBIT A
# "Part 1"

1

**BEFORE THE UNITED STATES DEPARTMENT OF JUSTICE
BUREAU OF ALCOHOL, TOBACCO, FIREARMS, AND EXPLOSIVES**

In the matter of:

DAVID FRAZIER II dba
FRAZIER'S PAWN SHOP

                    ATF Martinsburg Satellite Office
                    40 Compass Pointe
                    Martinsburg, WV 25404

                    Wednesday,
                    August 21, 2019

          The above-entitled matter came on for

hearing, pursuant to notice, at 10:00 a.m.

          BEFORE:   MICHAEL FRONCZAK, DIO
                    Hearing Officer

                    Free State Reporting, Inc.
                    1378 Cape St. Claire Road
                    Annapolis, MD 21409
                    (410) 974-0947

**A P P E A R A N C E S**

On behalf of the Government:

    MICHAEL BOYER, Division Counsel
    Bureau of Alcohol, Tobacco, Firearms & Explosives
    Washington Field Division
    (202) 648-8098
    Michael.Boyer@atf.gov

    JAMES VANN, Associate Chief Counsel
    Firearms and Explosive Law Division
    Bureau of Alcohol, Tobacco, Firearms & Explosives

On behalf of the Licensee:

    DAVID M. FRAZIER II, Pro se

Also Present:

    CYNTHIA CHUY, Area Supervisor
    Bureau of Alcohol, Tobacco, Firearms & Explosives
    Falls Church Field Office

## I N D E X

| NAME | DIRECT | CROSS | REDIRECT | RECROSS |
|------|--------|-------|----------|---------|
| Keith W. Martin | 11 | 60 | 63 | 70 |
| Eileen Valls | 73 | 122 | 122 | -- |
| David M. Frazier II | 129 | -- | -- | -- |

Free State Reporting, Inc.
1378 Cape St. Claire Road
Annapolis, MD 21409
(410) 974-0947

4

1
## E X H I B I T S

2    EXHIBIT NUMBER                 MARKED          RECEIVED

3    GOVERNMENT'S

| | | | |
|---|---|---|---|
| 4 | G-1 | 10 | 10 |
| 5 | G-2 | 10 | 10 |
| 6 | G-3 | 11 | 11 |
| 7 | G-4 | 11 | 11 |
| 8 | G-5 | 24 | 24 |
| 9 | G-6 | 55 | 55 |
| 10 | G-7 | 77 | 77 |
| 11 | G-8 | 80 | 80 |
| 12 | G-9 | 81 | 81 |
| 13 | G-10 | 86 | 87 |
| 14 | G-11 | 91 | 91 |
| 15 | G-12 | 92 | 92 |
| 16 | G-13 | 98 | 98 |
| 17 | G-14 | 102 | 102 |
| 18 | G-15 | 106 | 106 |
| 19 | G-16 | 109 | 109 |
| 20 | G-17 | 112 | 113 |
| 21 | G-18 | 114 | 114 |
| 22 | G-19 | 116 | 117 |
| 23 | G-20 | 119 | 119 |

24

25

Free State Reporting, Inc.
1378 Cape St. Claire Road
Annapolis, MD 21409
(410) 974-0947

5

| **E X H I B I T S** | | |
| --- | --- | --- |
| EXHIBIT NUMBER | MARKED | RECEIVED |
| APPLICANT'S | | |
| A-1 | 124 | 125 |
| A-2 | 127 | 127 |

6

1                    P R O C E E D I N G S

2                                              (9:58 a.m.)

3              HEARING OFFICER FRONCZAK:  The hearing has

4    officially begun.  It is 9:58 a.m.  The date is August

5    21, 2019.  We are located at 40 Compass Pointe,

6    Martinsburg, West Virginia 25404.

7              My name is Michael Fronczak.  I am the

8    Director of Industry Operations for the Washington

9    Field Division and will be the officer presiding over

10   this hearing by the direction and under the authority

11   of the Bureau of Alcohol, Tobacco, Firearms and

12   Explosives, United States Department of Justice.

13             The hearing is an administrative proceeding

14   and is informal in nature.  The hearing is to review

15   the Notice to Deny Application for License of David

16   Frazier trading as Frazier's Pawn Shop, ATF Form

17   5300.43, issued under the provisions of Title 27, Code

18   of Federal Regulations, Part 478, Subpart E.

19             As the result of the issuance of ATF Form

20   5300.43, you requested in writing that a hearing be

21   granted.  The focus of this hearing will be on the

22   evidence regarding whether the application should be

23   denied.

24             There are a couple of procedural issues I

25   will address before we get started.  As you can see, a

7

1   transcript is being made of these proceedings for the

2   record.  Because of this, I ask that each person speak

3   one at a time so that a clear and accurate record can

4   be made.  Answers must be audible.  Please do not nod

5   or shake your head in response to a question.

6           At this time, I will ask the Licensee,

7   Mr. Frazier, to introduce himself, and please give your

8   full name and spell your last name for the record.

9           MR. FRAZIER:  My name is David Milton

10  Frazier, F-r-a-z-i-e-r.

11          HEARING OFFICER FRONCZAK:  Thank you.  ATF

12  attorney, Michael Boyer, will be presiding for the

13  Government producing evidence on behalf of ATF.

14          Introduce yourself, ATF representatives in

15  the room and any observers.

16          MR. BOYER:  Sure thing.  Michael Boyer,

17  Division Counsel for Washington Field Division, Bureau

18  of Alcohol, Tobacco, Firearms and Explosives,

19  representing ATF here today.  And along with me is

20  James Vann, Associate Chief Counsel of the Firearms and

21  Explosives Law Division of the ATF.

22          HEARING OFFICER FRONCZAK:  James, spell your

23  last name.

24          MR. VANN:  My last name is spelled V as in

25  Victor, a-n-n.

1      MR. BOYER:  And here observing the

2  proceedings, we have Cynthia Chuy visiting from the

3  Falls Church Field Office who is an area supervisor.

4      HEARING OFFICER FRONCZAK:  Cynthia, spell

5  your last name for the record.

6      MS. CHUY:  C-h-u-y.

7      HEARING OFFICER FRONCZAK:  And, Mr. Boyer,

8  you can now proceed with the Government's presentation.

9      MR. BOYER:  Thank you, Mr. Hearing Officer.

10     Sir, before I begin, it may be helpful for

11  the record to simply establish why we are here today

12  and what we intend on introducing into the record.

13     We're here today simply because Mr. Frazier,

14  operating under the license Frazier's Pawn Shop, has

15  proven to be a threat to public safety insofar as he's

16  shown reckless disregard and plain indifference toward

17  the federal firearms laws and regulations.  And the

18  evidence will show that Mr. Frazier received his

19  license back in 2009, at which time he received an

20  acknowledgement form acknowledging the rules and

21  regulations associated with the dealing of firearms.

22     Since that time, he has gone through three

23  prior compliance inspections, one in 2010, one in 2010,

24  and one in 2014.  The result of each of those

25  compliance inspections was a warning.  In 2010 the

1  inspection was followed up with a warning letter to

2  Mr. Frazier, letting him know that any further

3  violations could result in revocation.

4          Following the 2012 compliance inspection,

5  Mr. Frazier came in for a warning conference, and that

6  was also accompanied with a warning letter, both of

7  which put again Mr. Frazier on notice of potential

8  revocation.

9          Finally, in 2014, following that inspection,

10  an additional warning letter was issued.

11          Following that time, in fast forward, in May

12  of 2017, ATF's office here in Martinsburg received a

13  call, and due to the information that was received, as

14  will be relayed by Special Agent Keith Martin, they

15  opened up an investigation into Mr. Frazier over

16  concerns about potential firearms being sold backdoor

17  or without paperwork, and that following this

18  information, they opened up and sent in a confidential

19  informant who subsequently went into Frazier's Pawn

20  Shop and was able to purchase using by way of straw

21  purchase, an individual to obtain firearms.  That was

22  again two times and then again on January 18 of 2018,

23  and additional straw purchase was performed by the ATF

24  office.

25          We'll go ahead and proceed from there, and as

1   we call in the witnesses, we will insert the exhibits

2   in chronological order.  But before calling the first

3   witness, we can take care of the first few Government

4   exhibits here.

5             MR. BOYER:  The first exhibit is going to be

6   the Notice to Deny Application for License.  This is a

7   nine-page document, and I will provide a copy of

8   Government Exhibit 1 to Mr. Frazier, the Hearing

9   Officer and to the court reporter.

10             HEARING OFFICER FRONCZAK:  Government Exhibit

11   Number 1 is accepted.

12   **(Government's Exhibit 1 marked and received in**

13   **evidence.)**

14             MR. BOYER:  Government Exhibit 2 is a one-

15   page document.  It's an email from Mr. Frazier to the

16   Hearing Officer requesting a hearing.  I'm handing a

17   copy of Government Exhibit 2 to Mr. Frazier, to the

18   Hearing Officer, and court reporter.

19             HEARING OFFICER FRONCZAK:  Government Exhibit

20   2 is accepted for the record.

21   **(Government's Exhibit 2 marked and received in**

22   **evidence.)**

23             MR. BOYER:  Government Exhibit 3 is the

24   Notice of Hearing.  It's a two-page document with cover

25   letter, and the second page contains the initial

1   hearing date.  I'm handing a copy of Government Exhibit

2   3 to Mr. Frazier, the court reporter, and one to the

3   Hearing Officer.

4        HEARING OFFICER FRONCZAK:  Government Exhibit

5   3 is accepted for the record.

6   **(Government's Exhibit 3 marked and received in**

7   **evidence.)**

8        MR. BOYER:  Government Exhibit 4 again is a

9   two-page document.  This was a Notice of Hearing

10  Change, a two-page document.  And as noted on the

11  second page, Mr. Frazier was put on notice that the

12  hearing would be changed and scheduled for today,

13  August 21, 2019.  A copy for Mr. Frazier, the Hearing

14  Officer, and court reporter.

15       HEARING OFFICER FRONCZAK:  Government Exhibit

16  4 is accepted for the record.

17  **(Government's Exhibit 4 marked and received in**

18  **evidence.)**

19       MR. BOYER:  And with that, we'd go ahead and

20  call the first witness.

21  (Whereupon,

22              **KEITH W. MARTIN**

23  was called as a witness by and on behalf of the

24  Government and was examined and testified as follows:)

25              **DIRECT EXAMINATION**

1          BY MR. BOYER:

2          Q.   Would you state your full name and occupation

3    for the record?

4          A.   My name is Keith Wade Martin, last name

5    spelling M-a-r-t-i-n.  I am employed with the Bureau of

6    Alcohol, Tobacco, Firearms and Explosives, or ATF, and

7    my title is Special Agent.  I am assigned to the ATF

8    Martinsburg, West Virginia Field Office.

9          Q.   Agent Martin, how long have you been working

10   with ATF?

11         A.   I have been working with ATF for

12   approximately 5 years.  Prior to that, I have 12 years

13   with the West Virginia State Police and 9 years in

14   federal law enforcement.

15         Q.   And as part of that, prior to coming in, did

16   you receive any training?

17         A.   Yes, sir, I did.

18         Q.   And what was that training?

19         A.   That training was at the Federal Law

20   Enforcement Training Center which is located in

21   Georgia.

22         Q.   Okay.  How long was that training?

23         A.   That training was approximately 7½ months.

24         Q.   And did you at any point receive training in

25   federal firearms laws and regulations?

1       A.    Yes, sir, I did.

2       Q.    Can you tell us a little bit about that?

3       A.    I received extensive training at the ATF

4   National Academy, which is located at the -- we call it

5   the FLETC facility, and that involved again extensive

6   training on federal firearms laws, federal firearms

7   violations, and also including violations by federal

8   firearms licensees with regard to federal firearms

9   laws.

10      Q.    And, Agent Martin, are you familiar with what

11  straw purchases are?

12      A.    Yes, sir, I am.

13      Q.    Okay.  And you may have heard me note it

14  earlier that one of the reasons we are here is because

15  several straw purchases were done at Frazier's Pawn

16  Shop.  But before we go into the details of those, can

17  you just give us an idea, what is a straw purchase and

18  why are they done?

19      A.    Yes, sir.  There are actually two common

20  terms that are utilized, the first one being a straw

21  purchase.  And when we say straw purchase, we refer to

22  as an individual which is often prohibited will have

23  another individual actually go in and make the firearm

24  purchase for the other person.  And the person who

25  makes the firearm purchase will complete the ATF Form

14

1  4473 and go through the FBI NICS, which is the National

2  Instant Background Check System, background check,

3  knowing though that the firearm is intended for the

4  other party, which like I said is typically a

5  prohibited person.  So we refer to that as a straw

6  purchase.

7           And we also refer to firearm sales that are

8  considered off the books, that is, a firearm sale by a

9  federal firearms licensee that is completed without the

10 completion of the ATF Form 4473 and the NICS background

11 check.  And it is basically not documented as required

12 by federal law.

13     Q.   I appreciate that.  And is there anything --

14 I understand, you know, as part of a purchase from a

15 licensee, an individual's required to fill out a Form

16 4473; is that correct?

17     A.   Yes, sir.  That's correct.

18     Q.   Okay.  And is there anything on that Form

19 4473 that tries to combat this, what you're referring

20 to as a straw purchase?

21     A.   Yes, sir.  There are multiple questions on

22 the front page of the ATF Form 4473.  That's under

23 Question 11, and it's a through l.  These questions

24 consist of asking if you are the actual transferee or

25 buyer of the firearm listed on this form; if you are

1   under indictment or information in any court for a

2   felony or other crime for which a judge could imprison

3   you for more than a year; if you have ever been

4   convicted in any court of a felony or any crime for

5   which the judge could have imprisoned you for more than

6   a year; if you are a fugitive from justice; if you are

7   an unlawful user of or addicted to marijuana or any

8   depressant, stimulant, narcotic drug or any other

9   controlled substance which is a violation of law; if

10  you have ever been adjudicated mentally defective; if

11  you have ever been discharged from the Armed Forces

12  under dishonorable conditions; if you are subject to a

13  court order restraining you from harassing, stalking,

14  or threatening your child or an intimate partner or

15  child of such partner; if you have ever been convicted

16  in any court of a misdemeanor crime of domestic

17  violence; if you have ever renounced your United States

18  citizenship; if you are an illegal alien in the United

19  States; and if you are an illegal alien, are you an

20  illegal alien admitted to the United States or --

21  correction -- if you are an alien admitted to the

22  United States under a non-immigrant visa.

23       Q.   Right.  And that's good.  I didn't mean for

24  you to go through all of it, but thank you for doing

25  that for us.  But the main one that I wanted you to

1    identify, and which you did, was that in Form 4473, as

2    11.a, the question is whether the individual is an

3    actual transferee or buyer or not, correct?

4         A.   Yes, sir.  That's correct.

5         Q.   All right.  And are you familiar with

6    Mr. Frazier?

7         A.   Yes.  Yes, I am.

8         Q.   And Frazier's Pawn Shop?

9         A.   Yes, I am.

10        Q.   Okay.  And I'm going to turn your attention

11   now to May 3, 2017.  I understand you received a call

12   that day?

13        A.   Yes, sir, I did.

14        Q.   Okay.  Can you tell us a little bit about

15   that, what happened?

16        A.   Well, on May 3, 2017, I received a referral

17   from the Industry Operations, Martinsburg Office here,

18   in reference to Frazier's Pawn Shop, receiving a

19   suspected modified machine gun as part of a pawn

20   transaction.  I was advised by Industry Operations

21   Investigator Eileen Valls that William Hoffman, an

22   employee of Frazier's Pawn Shop, had contacted her to

23   report receipt of a suspected machine gun.  At that

24   point I initiated an ATF investigation into that, and

25   went to Frazier's Pawn Shop and spoke with Mr. Hoffman.

1    Q.   All right.  And did you, in fact, upon

2  receipt of this information from IOI Eileen Valls go

3  out to Frazier's Pawn Shop?

4    A.   Yes, I did.

5    Q.   And did you speak with Mr. Hoffman?

6    A.   Yes, I did.

7    Q.   And what did he tell you?

8    A.   Mr. Hoffman had informed me that on March 8,

9  2017, a Christopher Rebish had pawned a FN rifle, model

10  PS90, 5.7 caliber, with serial number FN083685, several

11  Pister (ph.) magazines, and assorted ammunition.

12  Mr. Hoffman advised me that after the 30 days, when

13  Mr. Rebish had failed to renew the pawn transaction,

14  that Frazier's Pawn Shop had assumed ownership of this

15  property.  Mr. Hoffman, he advised me upon inspecting

16  the weapon, discovered that it had been modified and

17  was a fully automatic rifle.

18    Q.   I see.  And was the firearm there at the

19  premises?

20    A.   At the time that I was there, no, it was not.

21    Q.   And do you know where it was?

22    A.   Mr. Hoffman had provided me a copy of a pawn

23  receipt and provided me a trigger mechanism.  I refer

24  to it as a trigger pack.  Inside this trigger

25  mechanism, it had the sear, the hammer, and the

1   detractor as part of the trigger system on the firearm.

2   This particular firearm, you can remove that trigger

3   mechanism and replace it with other trigger mechanisms.

4            So what I discovered, based on the pawn

5   receipt, based on the credit card transaction, that the

6   firearm had, and Mr. Hoffman advised me, they had

7   removed the fully auto trigger pack system, placed in a

8   semi-auto trigger pack system, and had sold the firearm

9   to an individual.  And I noticed that this was prior to

10  normal business hours.

11       Q.   And did this take you by surprise that the

12  firearm was not there?

13       A.   Yes, it did.

14       Q.   Okay.  And why is that?

15       A.   Because what I explained to Mr. Hoffman was,

16  they basically modified that firearm from an illegal

17  NFA weapon to a GCA weapon, a Gun Control Act weapon,

18  and had sold it.  They should have maintained control

19  of the entire firearm and contacted us.

20       Q.   You mentioned that they had sold the firearm

21  prior to reaching out and making that call to IOI

22  Eileen Valls; is that correct?

23       A.   Yes.  The credit card transaction was the

24  normal business day for Frazier's Pawn Shop.  It opens

25  at 10 a.m.  The credit card receipt for that

1  transaction was approximately a half hour to an hour

2  prior to that.  And so Mr. Hoffman had advised he had

3  modified this machine gun and sold it to an individual

4  prior to the store opening.

5      Q.  I see.  When Hoffman called IOI Valls, did he

6  inform her that he had already sold this firearm then?

7      A.  No, he did not.

8      Q.  All right.  Now, following this information,

9  did you have an opportunity to talk with this

10 individual, Christopher Rebish, who Hoffman had

11 mentioned?

12     A.  Yes, I did.  On July 17, 2017, myself and

13 Agent Donald Lockhart interviewed Christopher Rebish at

14 the Eastern Regional Jail here in Martinsburg.  And

15 during the course of that interview, Mr. Rebish

16 admitted to manufacturing and possessing a machine gun,

17 pawning it at Frazier's Pawn Shop.  Mr. Rebish stated

18 to us that when he was at Frazier's Pawn Shop and was

19 in the process of pawning that firearm, he initially

20 removed the trigger pack from the rifle and attempted

21 to pawn the rifle without the trigger pack.

22         After advising Mr. Hoffman the rifle was a

23 machine gun, Mr. Rebish stated that Mr. Hoffman had

24 told him he still wanted the firearm and he also wanted

25 the fully automatic trigger pack.  Mr. Rebish admitted

20

1    to putting the trigger pack back into the rifle and

2    giving it to Mr. Hoffman.

3        Q.   I see.  And so Hoffman had requested, based

4    on what Rebish had told you, is that Hoffman had

5    requested that he reinstall the trigger pack and bring

6    it in as a fully automatic weapon?

7        A.   That's correct.

8        Q.   Did Mr. Rebish also mention anything about

9    off-the-book sales at Frazier's Pawn Shop?

10       A.   Yes.  Mr. Rebish provided details that he had

11   purchased several firearms off the books, as I

12   explained earlier, from Frazier's Pawn Shop over a

13   3-year period and that Mr. Rebish had informed

14   Mr. Hoffman that he was a prohibited person from

15   possessing firearms.  Mr. Rebish informed us that

16   Mr. Hoffman had firearms in the rear of the store that

17   he regularly sells with no paperwork.  Mr. Rebish said

18   with cash, he explained that Mr. Hoffman would sell

19   firearms off the books to practically anyone.

20       Q.   Now, just to be clear for the record, when

21   you say prohibited person, that essentially covers

22   those categories that we discussed there on the 4473

23   that would prohibit an individual from possessing a

24   firearm; is that correct?

25       A.   Yes, sir.  So that's why I went through each

1   one individually. So those categories there, if you

2   fall within one of those categories, you are prohibited

3   from possessing firearms.

4       Q.   I see. And Mr. Rebish had informed Hoffman

5   that he was, in fact, a prohibited person?

6       A.   That's correct.

7       Q.   Now, based on this information, then, what

8   did you do?

9       A.   Based on that information, we opened an

10  investigation into Frazier's Pawn Shop and began an

11  investigation into potentially illegal firearm sales.

12      Q.   Okay. And what were your first steps? What

13  was the approach that you were going to take with this

14  criminal investigation?

15      A.   Our, well, first steps were we -- I had

16  submitted and received approval through ATF to begin an

17  investigation into a FFL, and then the second step was

18  we -- I utilized an ATF confidential informant who was

19  a convicted felon to go into Frazier's Pawn Shop to

20  attempt to purchase firearms either off the books or

21  through straw purchases.

22      Q.   I see. And can you tell us a little bit, the

23  confidential informant, how did that work and how did

24  you know this individual?

25      A.   A confidential informant through ATF is

1  typically someone who is a prohibited person.  It can
2  be a number of reasons for someone to be a confidential
3  informant with us.  It could be that they are working
4  with us and at times will receive payment in the form
5  of subsistence for their actions.  Other times, it is a
6  cooperating defendant in another ATF case and, at that
7  point, to receive the benefit of cooperating with us
8  for the court's consideration for leniency on their
9  sentences.  And typically what happens is we have to
10  vet these individuals and complete various paperwork
11  for ATF, obtain their fingerprints and again thoroughly
12  vet these individuals, and at that point submit
13  approval which is -- and have to gain approval for us
14  to be able to use them as an ATF confidential
15  informant.
16      Q.   I see.  And in this case, you mentioned that
17  you had received permission from ATF to use a
18  confidential informant.  How did you use the
19  confidential informant in this case then?
20      A.   So in moving forward, I'll just address him
21  as a CI, but --
22      Q.   Sure.
23      A.   -- it was ATF Confidential Informant Number
24  15213 which we had received approval to utilize.  And
25  basically as a convicted felon, which was confirmed, we

23

1    conducted a series of controlled monitorings and sent

2    the informant into Frazier's Pawn Shop with the intent

3    to try to buy either a firearm off the books or through

4    what we call straw purchases that had been explained

5    earlier.

6        Q.   All right.  And just to be clear, so when you

7    say he's a convicted felon, it means that he was

8    prohibited under 18 U.S.C. 19(g)(1) from possession of

9    a firearm, correct?

10       A.   Yes, sir, that's correct.

11       Q.   Okay.  Now, on August 25, 2017, then, did you

12   send this confidential informant into Frazier's Pawn

13   Shop?

14       A.   Yes.  On August 25, 2017, myself and agents

15   out of the Martinsburg, West Virginia Field Office,

16   facilitated the controlled monitoring, utilizing our

17   CI, and sent the CI to Frazier's Pawn Shop to solicit a

18   conversation about an interest in purchasing a firearm

19   without the completion of an ATF Form 4473 or an FBI

20   NICS background check.

21       Q.   And did you send him in with any kind of

22   recording device?

23       A.   Yes.  We placed a recording device on the CI

24   when we sent him in.

25           MR. BOYER:  And at this time, I'd like to

1  offer Government Exhibit 5, and I'll provide a copy to

2  the court reporter, to the Hearing Officer, and to

3  Mr. Frazier.

4           HEARING OFFICER FRONCZAK:  Government Exhibit

5  Number 5 is accepted into the record.

6  **(Government's Exhibit 5 marked and received in**

7  **evidence.)**

8           BY MR. BOYER:

9      Q.   And before we continue then with the events

10 on August 25, 2017, just to speak to this Government

11 Exhibit 5 briefly, Special Agent Martin, you prepared

12 this CD for purposes of this hearing today, correct?

13     A.   Yes, sir, I did.

14     Q.   All right.  And what is contained on this

15 Government exhibit CD?

16     A.   It is going to be audio and video recordings

17 of our controlled monitorings that we're going to

18 discuss moving forward as part of this investigation

19 involving our confidential informant and ATF undercover

20 agents.

21     Q.   And so the audio recording that was done then

22 on August 25th, when you sent in the CI into Frazier's

23 Pawn Shop, that recording is on Government Exhibit 5,

24 correct?

25     A.   That's correct.

1        Q.   Okay.  All right.  We'll go ahead and just

2   have you speak to what happened then on August 25,

3   2017, obviously knowing that the full account is

4   recorded on Government Exhibit 5, but if you could,

5   just tell us what happened then on August 25th?

6        A.   Yes, sir.  I will provide a synopsis of what

7   transpired that day and of the recording, but I would

8   say that it is not intended to be verbatim or

9   transcribed account of the controlled monitoring, and

10  an examination of the original recording of this

11  controlled monitoring is the best evidence of its

12  content.

13       Q.   Sure.  I appreciate that.

14       A.   So the confidential informant arrived at

15  Frazier's Pawn Shop and entered the store and began

16  walking around the store looking at merchandise.  The

17  CI then approached the firearms counter and began a

18  conversation with William Hoffman, again an employee of

19  Frazier's Pawn Shop.  The CI and Hoffman initially

20  spoke about knives and swords.  The CI spoke about his

21  interest in purchasing a firearm.  The CI and Hoffman

22  discussed firearms, and the CI asked Hoffman for

23  recommendations on firearms to potentially purchase.

24       Q.   Was there at some point a discussion between

25  the CI and Hoffman that he may be a prohibited person?

1       A.     That's correct.  The CI had mentioned to

2    Hoffman that he had a prior conviction from

3    approximately 40 years ago and --

4       Q.     How did Hoffman respond to that?

5       A.     Hoffman explained to the CI about felony

6    convictions versus misdemeanor convictions.  Hoffman

7    asked where his conviction occurred at, and the CI

8    replied Fairfax County, Virginia.  The CI asked Hoffman

9    if their cousin could come and complete the paperwork

10   and purchase the firearm.  Hoffman then explained that

11   that is a straw purchase with a possible penalty of up

12   to 10 years for the CI and their cousin.

13      Q.     So just to be clear, so Mr. Hoffman, did he

14   use the word "straw purchase"?

15      A.     Yes, he did.

16      Q.     And he actually informed the CI at that point

17   that the possible penalty for a straw purchase or straw

18   sale in this case would be 10 years?

19      A.     That's correct.

20      Q.     Okay.  Is it, in fact, a 10-year punishment

21   for a straw purchase?

22      A.     Yes, that's correct.

23      Q.     All right.  What happens after Hoffman

24   informs the CI of that?

25      A.     Hoffman informed the CI that them and their

1  cousin not to get caught.  Hoffman discussed his

2  previous criminal convictions and that one of the

3  employees at Frazier's Pawn Shop was involved in a

4  domestic violence incident.

5      Q.   Was there any discussion of a no paperwork

6  sale or purchasing a firearm without paperwork?

7      A.   Yes.  Hoffman explained to the CI that a

8  private party sale involved no paperwork or paper

9  trail.

10     Q.   All right.  And was that -- did the CI

11  express an interest in purchasing a firearm without

12  paperwork?

13     A.   I don't believe at that time the CI has

14  stated that he would be interested in a private party

15  sale, but Mr. Hoffman further suggested that the CI

16  take their cousin with them for a private party sale

17  and have the cousin conduct the transaction for the CI.

18     Q.   I see.  I see.  Anything further from that

19  meeting?

20     A.   Mr. Hoffman advised the CI to go to the West

21  Street (ph.) State Police Office, have them conduct a

22  criminal background check to determine that prior

23  conviction from 40 years ago.  And the CI and

24  Mr. Hoffman discussed the price of swords, and then the

25  CI departed the store.

1      Q.   Okay.  And upon departing the store, the CI

2  returned to this office?

3      A.   That's correct.

4      Q.   Okay.  And returned the transmitting device;

5  is that correct?

6      A.   Yes, that's correct, and was debriefed by

7  myself.

8      Q.   Okay.  Now, that was on August 25th.  Now, on

9  September 12, 2017, you send the confidential informant

10 back into Frazier's Pawn Shop; is that correct?

11     A.   That's correct, and again, with agents out of

12 the ATF Martinsburg, West Virginia Field Office.  The

13 informant was sent back in, and again, as I previously

14 stated, this is just a synopsis.  It's not a verbatim

15 or transcribed account of this recording.

16     Q.   Yeah.  So you again had the CI have a

17 transmitter on him during the visit?

18     A.   That's correct.

19     Q.   And that full recording's on Government

20 Exhibit 5?

21     A.   That's correct.

22     Q.   Okay.  So just the shortened version then,

23 what happens when the CI goes back into Frazier's Pawn

24 Shop on September 12th?

25     A.   Again entered Frazier's Pawn Shop, goes to

1    the firearms counter and greets William Hoffman.  The

2    CI informs Mr. Hoffman that they checked and their

3    prior conviction is confirmed that it is a felony.

4        Q.   All right.  And how did Hoffman respond?

5        A.   Mr. Hoffman suggested to the CI about getting

6    the felony conviction expunged and explained if the CI

7    had someone else buy the firearm for the CI and the CI

8    got caught, that it is 10 years.

9        Q.   So, again, explaining to him the straw

10   purchase?

11       A.   That's correct.

12       Q.   All right.  What did the CI say, and how did

13   the conversation go from there?

14       A.   The CI replied that they weren't worried

15   about that and still wanted to buy a firearm.

16   Mr. Hoffman began to tell the CI that he has a couple

17   of friends that are in the same situation as the CI,

18   and when they go fishing, Mr. Hoffman will place or

19   will give those friends a pistol.  And if they would

20   ever get involved in a shooting, that Mr. Hoffman would

21   get the pistol back afterwards and would wipe the

22   fingerprints off the pistol and would do this to stay

23   alive and would deal with repercussions later.

24       Q.   Just to be clear -- sorry.  I didn't mean to

25   cut you off.

1        A.   No.

2        Q.   But when you say the same situation as the

3   CI, he has friends that are prohibited persons under

4   the Gun Control Act and are not able to lawfully

5   possess a firearm; is that correct?

6        A.   I'm assuming based on his statement that

7   that's what he was insinuating, yes.

8        Q.   All right.  Was again it discussed then no

9   paperwork or a potential for that?

10       A.   Yes.  Mr. Hoffman suggested to the CI about

11  buying a firearm from off the streets or at a flea

12  market, and the CI informed Mr. Hoffman that firearms

13  for sale at the flea market are a little high priced.

14       Q.   Okay.  Did the CI talk to Hoffman about

15  potentially purchasing a firearm through Mr. Hoffman

16  with no paperwork?

17       A.   Yes.  Mr. Hoffman advised the CI that he will

18  occasionally get a firearm off the street.  Mr. Hoffman

19  handed the CI a piece of paper to write the CI's name

20  and phone number on it.  Mr. Hoffman then wrote above

21  the CI's name and phone number, no paper, and placed it

22  in his wallet.

23       Q.   All right.  And what happens after that?

24       A.   The CI advises Mr. Hoffman to contact them as

25  soon as possible, again insinuating when he gets a

1   firearm, that he could sell to the informant.

2   Mr. Hoffman replied that it might be a little while

3   because it's hit or miss when he comes across firearms.

4   The CI stated to Mr. Hoffman that they could have a

5   cousin come in and complete the paperwork, and

6   Mr. Hoffman replied that if he gets something that has

7   no contacts.  So he's insinuating if he gets a firearm

8   and he's calling it no contacts, that Mr. Hoffman can

9   sell the CI a firearm and not have to go that route of

10  having someone buy it for him.

11      Q.   I see.  All right.  And does that essentially

12  wrap up the visit there, the second visit of CI to

13  Frazier's Pawn Shop?

14      A.   Yes.  The CI informs Mr. Hoffman that he has

15  cash, and he departs the store.

16      Q.   And as the previous time, does the CI return

17  and turn in the recording device and is debriefed by

18  yourself?

19      A.   That's correct.

20      Q.   Now, the CI ends up going back into Frazier's

21  Pawn Shop after the second visit but this time without

22  a recording device; is that correct?

23      A.   Yes, that's correct.

24      Q.   And what happened exactly, and how did you

25  find out about it?

1      A.   On September 28, 2017, I was contacted by the

2  CI by telephone.  I was advised that the CI on

3  Saturday, September 23, 2017, had gone into Frazier's

4  Pawn Shop with a female acquaintance with the

5  anticipation of purchasing a sword on their own, you

6  know, personally.

7      Q.   So this was not part of the ATF criminal

8  investigation necessarily?

9      A.   That's correct.

10      Q.   Okay.  And what happened when the CI was in

11  the store?

12      A.   The CI advised that they were approached by

13  and spoke with Mr. Hoffman, and Mr. Hoffman informed

14  the CI that he had not come across any firearms that he

15  could sell to the CI, but Mr. Hoffman pointed to the

16  female acquaintance that was with the CI and stated

17  that he, Mr. Hoffman, could sell a firearm to her --

18  through her, I'm sorry, through her to the CI in the

19  form of a straw purchase.

20      Q.   All right.  And what did the CI do at that

21  point?

22      A.   The CI advised Mr. Hoffman he would get back

23  with him and then departed the store and later

24  telephoned me and advised me of this.

25      Q.   Okay.  Did you then at a later point send the

33

1   CI in with a friend who performed the straw purchase?

2        A.   That's correct.

3        Q.   When was that?

4        A.   On October 18, 2017, myself and again members

5   of the ATF Martinsburg Field Office, we did a

6   controlled monitoring with the CI and with ATF

7   undercover Special Agent Rebecca Tomlinson.

8        Q.   And Rebecca Tomlinson then was the friend of

9   the CI that was going to accompany him into --

10       A.   That's correct.

11       Q.   -- Frazier's Pawn Shop?  Okay.  What happens

12  when they go into Frazier's Pawn Shop?

13       A.   Again, the recording device was placed on the

14  CI.

15       Q.   And, again, was this audio and video?

16       A.   This was just audio, audio recording.

17       Q.   Audio recording.  And that audio recording is

18  again part of Government Exhibit 5?

19       A.   That's correct.

20       Q.   Okay.

21       A.   And, again, my synopsis will not be a

22  verbatim or transcribed account of this controlled

23  monitoring.

24       Q.   Sure thing.  So just in your own words then,

25  what happens when Mr. Hoffman goes -- or excuse me,

34

1  when the CI goes back in with the agent?

2      A.   Agent Rebecca Tomlinson will be referred to

3  here as the UC.  So the CI and UC entered the store and

4  approached the firearms counter and greeted Mr. Hoffman

5  at the firearms counter.  The CI informed Mr. Hoffman

6  that they had told him previously on the 23rd that they

7  would be back and that they had brought a friend.

8      Q.   Okay.  Referring back to that conversation

9  then on October 23rd when the CI was in there with his

10 own friend; is that correct?

11     A.   September 23rd, yes.

12     Q.   September 23rd.

13     A.   That's correct.

14     Q.   Excuse me.  What happened then?

15     A.   The CI told Mr. Hoffman that it took an arm

16 and a leg to get the UC there to purchase a firearm for

17 him and that he had to buy the UC lunch and dinner.

18 Mr. Hoffman asked the UC if she hit the CI up hard for

19 lunch and dinner.  The UC stated that, yes, since she

20 had to come all the way out here.  So there was some

21 more exchange about the arrangement between the CI and

22 the UC, and Mr. Hoffman asked the UC where she was

23 from, and she stated Arlington, Virginia.  Mr. Hoffman

24 then discussed gun laws and gun control in Virginia,

25 Maryland, and New York with the CI and the UC.

1    Q.   So the point of this conversation, then, is

2  the CI making it clear to Hoffman that he was prepared

3  to purchase a firearm?

4    A.   Yes, that she is there to purchase a firearm

5  for the CI, yes.

6    Q.   For the CI.  But the CI would be the actual

7  buyer?

8    A.   That's correct.

9    Q.   Okay.  After they have this conversation then

10  and Hoffman discusses the various gun laws in Virginia,

11  Maryland, and New York, what happens?

12    A.   The CI asked Mr. Hoffman if the UC having a

13  Virginia driver's license was going to be a problem.

14  Mr. Hoffman advises that handguns would have to be

15  transferred to a FFL in Virginia, but that the UC could

16  buy any long guns, which are rifles, shotguns, that she

17  wanted, and Mr. Hoffman then began showing the CI

18  different rifles at varying prices.

19    Q.   Is that, in fact, the case?  Can a member who

20  is from out of state purchase a handgun in --

21    A.   No, they cannot.

22    Q.   Okay.  But can they purchase a long gun?

23    A.   If the state that they're coming from, if

24  it's not a violation of state law, yes, they can

25  purchase long guns.  So in this case, a Virginia

36

1  resident can come into West Virginia to a FFL in West

2  Virginia and purchase a long gun.

3      Q.   Okay.   So, again, Hoffman accurately then

4  relayed the -- stated the law?

5      A.   That's correct.

6      Q.   What happened then?

7      A.   The CI stated that they don't want to spend

8  more than $600, asked Mr. Hoffman if Mr. Hoffman could

9  work with them, and this would be with regard to AR-15

10  type rifles that were there present at the shop.

11  Mr. Hoffman stated that he could not come down that low

12  on price on AR-15s.

13      The CI then asked about a Hi-Point rifle.

14  This Hi-Point rifle was going to be a model 4595, .45

15  caliber rifle with serial number R55185.  So the CI

16  chose that rifle, and then they -- Mr. Hoffman obtained

17  the box for that rifle, and the CI and Mr. Hoffman then

18  arranged for pricing for ammunition and for the rifle.

19      Q.   I see.  And so the discussion over the Hi-

20  Point rifle then is between Hoffman and the CI?

21      A.   That's correct.

22      Q.   And the undercover agent is simply standing

23  by?

24      A.   That's correct.

25      Q.   Okay.  At some point, did the CI inform

1    Hoffman that he wanted to purchase it?

2        A.   Yes, he did.

3        Q.   Okay.  And what happened at that point?

4        A.   The CI, again they negotiated a price for the

5    rifle and ammunition.  The CI goes over to the cashier

6    and pays cash for the rifle, and Mr. Hoffman then has

7    the UC complete the ATF 4473.

8        Q.   All right.  And does the undercover agent

9    fill out the Form 4473?

10       A.   Yes, she does.

11       Q.   All right.  And what happens after that?

12       A.   Mr. Hoffman goes and calls in the FBI NICS

13   background check on the UC for the firearm purchase and

14   then comes back out and tells the UC -- calls the UC by

15   her undercover name.  The CI asked Mr. Hoffman if the

16   UC was good.  Mr. Hoffman then stated that she was

17   good.

18       Q.   Who actually went over to the cash register

19   and paid for the rifle?

20       A.   The CI did.

21       Q.   Okay.  And did the cashier accept the CI's

22   money and complete the transaction?

23       A.   Yes, they did.

24       Q.   All right.  What happens after the

25   transaction is complete and he comes back?

1    A.   At the conclusion, the CI picks up the rifle

2  and begins to walk out with it.  Mr. Hoffman stated

3  that the rifle was in the UC's name and indicated that

4  the UC is the one that needed to carry it out of the

5  store.  The CI says that the rifle is heavy for the UC,

6  and Mr. Hoffman stated that the UC doesn't look that

7  helpless.  So the CI gives the UC the rifle, and the UC

8  carries the rifle out into the parking lot.

9    Q.   And as on previous occasions, does the CI and

10  UC return to this office?

11    A.   That's correct.  They returned to this

12  office.  I collected the evidence and the recordings

13  and again debriefed the CI.

14    Q.   Now, before moving on, during this visit, did

15  the CI also mention that he still wanted to buy a

16  pistol?

17    A.   That's correct.  During the exchange, the CI

18  does indicate that they would like to buy a pistol,

19  yes.

20    Q.   Okay.  All right.  Then do you send the CI

21  back into Frazier's Pawn Shop?

22    A.   Yes.  On October 24, 2017.

23    Q.   Okay.  And tell us about that.

24    A.   Again, this is with the CI and another ATF

25  undercover special agent.  Her name is Sabrina Hager,

1   and she will hereafter be referred to as the UC.  So,

2   again, we sent the CI and the UC into Frazier's Pawn

3   Shop on October 24, 2017.  This is a controlled

4   monitoring.  There is a recording device on the CI, and

5   this was facilitated by myself and agents here at the

6   Martinsburg Field Office.

7        Q.   Okay.  And, again, was this audio,

8   audio/video?

9        A.   This was audio and video which both are

10  included in Exhibit 5.

11       Q.   In Government Exhibit 5.  All right.  What

12  happens when the CI and the UC agent goes into

13  Frazier's Pawn Shop?

14       A.   When they go in, they again make contact and

15  are greeted by Mr. Hoffman at the firearms counter.

16  The CI states to Mr. Hoffman that the rifle that they

17  had purchased on October 18, 2017 works pretty good,

18  but it felt like it was trying to jam after a few

19  rounds.  So the CI had to oil the rifle.  Mr. Hoffman

20  replied that there is a break-in point on most

21  firearms, and Mr. Hoffman had an exchange and greeted

22  the UC.  So if there's any question on the previous

23  encounter on October 18th of whether the CI actually

24  came into possession of that firearm, that would have

25  been cleared up at that time, correct?

40

1      A.   That's correct.

2      Q.   Okay.  Did the CI then state that he's

3  interested in purchasing a pistol as he had done

4  previously?

5      A.   Yes, that's correct.

6      Q.   And what happens after that?

7      A.   The CI asked Mr. Hoffman to show them a

8  pistol that would be easy to work with and asked if

9  Mr. Hoffman had any holsters.  Mr. Hoffman stated that

10  he had holsters for some of the pistols, and

11  Mr. Hoffman asked the CI if it was for home defense.

12  The CI stated that they would need a pistol to starting

13  running a cab service in the Martinsburg/Hagerstown

14  area.

15      Q.   Okay.  Now, was the CI, in fact, starting up

16  a cab service in Martinsburg?

17      A.   No, they were not.

18      Q.   Okay.  Was this a ruse then?

19      A.   That's correct.  Yes.

20      Q.   Okay.  And had this been agreed upon before

21  the visit, or is this --

22      A.   No, this is something that the CI had

23  mentioned -- on their own to solicit conversation.

24      Q.   How did Hoffman reply to this?

25      A.   Again, the CI explained to Mr. Hoffman that

Free State Reporting, Inc.
1378 Cape St. Claire Road
Annapolis, MD 21409
(410) 974-0947