# EXHIBIT A
## "Part 2"

1   they were going to start a cab service and run it out

2   of Martinsburg and Hagerstown.  Mr. Hoffman replied to

3   the CI that they cannot carry a firearm in Hagerstown,

4   but here in Martinsburg, they could constitutionally

5   carry.  The CI stated that they weren't too worried

6   about Martinsburg, but here is where they were going to

7   make the money in the Martinsburg area for this cab

8   service.  Hoffman stated that if the CI got caught up

9   in Hagerstown, that that's an instantaneous 5 years.

10  The CI started to inform Mr. Hoffman that and began

11  saying that if they get caught anywhere -- Mr. Hoffman

12  interrupted the CI and made a shush gesture or a

13  shushing gesture.

14      Q.   So when you say the CI mentioned getting

15  caught anywhere, did you take that to mean the CI is

16  saying if I get caught possessing a firearm anywhere?

17      A.   Alluding to I'm a convicted felon, if I get

18  caught anywhere, I'm in trouble, and again, Mr. Hoffman

19  interrupted the CI with a shush gesture.

20      Q.   I understand.  What happens after that?

21      A.   The CI stated that they don't want to get

22  into a cab and have someone pull a gun on them, which

23  is why they wanted the pistol.  Mr. Hoffman asked the

24  CI for a price range.  The CI advised that they would

25  like to get a pistol and hold and a box of ammunition

1   all together.  Mr. Hoffman explained and they were

2   looking -- while this exchange was going on, the CI was

3   looking at a particular firearm, and Mr. Hoffman

4   advised that the CI would have to order a holster

5   online, and the CI informs Mr. Hoffman that they don't

6   want to go over 8, which is insinuated as $800.

7   Mr. Hoffman says that gives the CI lots of options, and

8   Mr. Hoffman showed the CI several pistols at that

9   point.

10       Q.   Okay.  And at that point then, Hoffman and

11   the CI go through a number of firearms, correct?

12       A.   That's correct.

13       Q.   And, again, this conversation is happening

14   between Hoffman and the CI?

15       A.   That's correct.

16       Q.   And it's the CI who is expressing interest in

17   purchasing the firearm?

18       A.   Yes, that's correct.

19       Q.   Does the CI eventually decide on a firearm

20   that he wishes to purchase?

21       A.   Yes, they do.

22       Q.   And what happens at that point?

23       A.   The CI and Mr. Hoffman come to an agreement

24   on a Springfield pistol, model XD9, 9mm with serial

25   number GM979645, two magazines, and a box of Federal

1   9mm caliber ammunition.

2      Q.   Does the CI at that point fill out the Form

3   4473?

4      A.   No.   Prior to that though, Mr. Hoffman asked

5   the UC to try something.   The UC asked what do you want

6   me to do?   Mr. Hoffman hands the UC the pistol, and the

7   UC says it's going to hurt her nails -- is it going to

8   hurt her nails?   Mr. Hoffman replied no.   Mr. Hoffman

9   basically asks that the UC pull the slide action back

10  to the rear and stated now you know how to use the

11  pistol.

12     Q.   All right.   And then was it the UC, did she

13  state she had an interest in the firearm?

14     A.   No, the UC states she is a knife girl and

15  doesn't know anything about firearms.

16     Q.   Nevertheless, at that point, does the UC fill

17  out the Form 4473?

18     A.   Yes, and again, as in the previous

19  transaction, the CI goes over to the cashier, pays for

20  the firearm while the UC completes the ATF Form 4473

21  with Mr. Hoffman's assistance.

22     Q.   And as the UC begins to fill out the Form

23  4473, or just before, the CI actually makes a comment

24  to the undercover agent, correct?

25     A.   Makes a comment to them.

44

```
 1          Q.   Yes, the CI says to --

 2          A.   Oh, yes.  As Mr. Hoffman hands the UC the ATF

 3   Form 4473, the CI looks at the UC and says, this is

 4   your job, honey.

 5          Q.   Loud enough, and Hoffman is there?

 6          A.   That's correct.

 7          Q.   All right.  And as done on the previous

 8   occasions, does the CI actually go to the cash register

 9   and complete the transaction?

10          A.   Yes, that's correct.

11          Q.   And does Hoffman call in the background

12   check?

13          A.   Yes.  At this time, Hoffman went into a

14   backroom, out of view, and based on the CI and the UC's

15   statement, Mr. Frazier walks back with Mr. Hoffman.

16          Q.   At any point, did you -- following

17   Mr. Hoffman going into the backroom, he comes back out,

18   correct, Hoffman?

19          A.   That's correct.

20          Q.   At any point in time did you find out or

21   learn more about this conversation or if anything

22   happened in the backroom with Mr. Hoffman and

23   Mr. Frazier?

24          A.   Yes, we did later, yes.

25          Q.   Okay.  Can you tell us about that?
```

1        A.    In subsequent interviews with Mr. Hoffman, by
2    myself, Mr. Hoffman advised us that Mr. Frazier had
3    accompanied Mr. Hoffman back into a back room there at
4    the shop, that Mr. Hoffman had informed Mr. Frazier
5    that the CI had a criminal record and that the UC was
6    purchasing the firearm for the CI and was given a
7    proceed by Mr. Frazier to continue with the firearm
8    transaction.

9        Q.    Given the green line in other words?

10       A.    That's correct.

11       Q.    All right.  So Hoffman comes back out then,
12    and what happens upon his return to the store?

13       A.    The CI makes a mention to Mr. Hoffman that
14    they would want one more firearm.  They would like a
15    shotgun with a pistol grip.  Mr. Hoffman says that it
16    had been a while -- it had been a long time since he
17    had come across one of those.  Once Mr. Hoffman comes
18    out, he informs them that the sale or that the UC is
19    good as far as the background check, and Hoffman
20    returned to the counter and handed the UC a receipt.
21    Hoffman tells the undercover agent to have the CI go
22    get her nails done.  The CI and UC then depart with the
23    UC carrying the pistol out of the shop and return here
24    to this office.

25       Q.    And as done previously, they turn into you

1    then the recording device?

2        A.    That's correct.  And the evidence associated

3    with the purchase.

4        Q.    Now, you don't send the CI into Frazier's

5    Pawn Shop again, correct?

6        A.    No, that's correct.

7        Q.    Do you send in an undercover agent or two at

8    a later point?

9        A.    Yes.

10       Q.    Okay.  And then tell us a little bit about

11   that.

12       A.    So what we wanted to establish was that

13   Mr. Hoffman wasn't just solely dealing with our

14   confidential informant, that he was willing to deal

15   with other people as far as straw purchases.  So on

16   January 18, 2018, we sent in Special Agent Nasir

17   Sessoms and Special Agent Sabrina Hager to Frazier's

18   Pawn Shop to conduct a multiple sales straw purchase,

19   and when I say multiple sales, that's two pistols with

20   between -- with Agent Sabrina Hager posing as she is

21   the one that's going to complete the ATF Form 4473 but

22   that the firearms are going to Agent Sessoms.

23       Q.    Okay.  And Agent Hager then, is she a

24   resident of West Virginia?

25       A.    Her undercover driver's license shows that

1    she is a resident of West Virginia.

2        Q.   Okay.  And how about Agent Sessoms and his

3    undercover driver's license?

4        A.   Agent Sessoms's undercover driver's license

5    shows him to be a resident of Maryland.

6        Q.   And so what happens?  You again use a

7    transmitter recording device when sending them in?

8        A.   Yes, that's correct.

9        Q.   And this time it's audio and visual as done

10   previously?

11       A.   Yes.  The audio recording device was places

12   with Agent Hager, and the video recording device was

13   with Agent Sessoms.

14       Q.   Okay.  And are both of those recordings

15   included on Government Exhibit 5?

16       A.   Yes, that's correct.

17       Q.   Okay.  Let's just have you then summarize for

18   us what happens when the two agents go in on January

19   18, 2018.

20       A.   If I could please correct.  The video

21   recording of this transaction, so Agent Sessoms had a

22   video recording device on him.  Agent Hager had a

23   transmitting device that we could listen to but was not

24   recording.  So on Exhibit 5 is only a video recording

25   of this transaction.

48

1      Q.   Okay.

2      A.   I apologize.

3      Q.   Okay.  But is there -- there's no audio to --

4      A.   There is audio on the video recording.

5      Q.   I see.

6      A.   Yeah.

7      Q.   Okay.  What happens when they go in?

8      A.   The two UCs go in and are at the firearms

9   counter.  Mr. Frazier is present.  He's having a

10  conversation with the cashier.  He then ends that

11  conversation, walks over, ask the UCs if they needed

12  some help.  Agent Hager replied she was just looking

13  around.  Frazier then asks the UCs if they were waiting

14  on Mr. Hoffman, and they replied that they were.

15     Q.   Okay.  At that point or at some point

16  thereafter, does Mr. Hoffman come over and talk with

17  the undercover agents?

18     A.   Yes.  Mr. Hoffman comes over and speaks with

19  both of the UCs.

20     Q.   Okay.  And Hoffman asks the UCs something to

21  the effect of what you looking for today, correct?

22     A.   Yes, that's correct.  And Agent Hager replied

23  she was looking for some handguns while using hand

24  gestures to say that they were -- that Mr. Hoffman

25  needed to speak with Agent Sessoms with regard to the

Case 3:19-cv-00208-GMG   Document 1-2   Filed 12/09/19   Page 10 of 47   PageID #: 79

1  firearms.

2      Q.   Okay.   Now, Special Agent Hager, had she been

3  in there before?

4      A.   That's correct.   She was in there with the CI

5  on the previous transaction.

6      Q.   I see.   But she indicated again that she

7  would be there again purchasing a firearm for the other

8  agent?

9      A.   That's correct.

10     Q.   All right.   What happens after this happens,

11 the gesture's made?

12     A.   Agent Sessoms than at that point points to a

13 FN 9mm handgun.   There is some exchange between Agent

14 Sessoms and Hoffman about the functionality of the

15 firearm, and Agent Sessoms then also points to a

16 Springfield .45 caliber handgun which is located in the

17 display case.

18     Q.   Okay.   At some point, does it become clear to

19 Hoffman that Agent Sessoms is not from the state of

20 Virginia or not a resident of the state of West

21 Virginia, excuse me?

22     A.   Yes.   Mr. Hoffman asks Agent Sessoms where

23 are you from, and Agent Hager then interjects and says

24 that she would be handling the transaction.   Hoffman

25 then basically demands that the UCs listen to him and

Free State Reporting, Inc.
1378 Cape St. Claire Road
Annapolis, MD 21409
(410) 974-0947

1   explained to them and wanted them to understand he was

2   basically giving them some cautionary advice and

3   explained that -- again asks Agent Sessoms where he was

4   from.  Agent Sessoms advises Mr. Hoffman he is from

5   Maryland.

6         Mr. Hoffman then warns Agent Sessoms that if

7   he gets it under Agent Sessoms's name or -- I'm sorry.

8   He looks at Agent Hager and says, if you get the

9   firearm under your name and you give it to Agent

10  Sessoms and it's not registered in Maryland, that it's

11  a felony in Maryland and that it has to be at some

12  point transferred to him as a Maryland resident.  And

13  if it isn't transferred to him as a Maryland resident,

14  he turned and then looked at Agent Hager and said,

15  that -- or I'm sorry -- Agent Sessoms and says, if you

16  get caught with it and it's unregistered, you're going

17  to jail for a long time in Maryland.

18        He then turned back to Agent Hager and said

19  if you buy it, it is classified as a straw purchase,

20  and then if he gets caught with it and it's under your

21  name, you are looking at 10 years.

22     Q.   So, again, based on this cautionary note that

23  Hoffman tells the two undercover agents, does he

24  accurately capture the law?

25     A.   That's correct.

51

```
 1        Q.    Okay.

 2        A.    They --

 3        Q.    What happens after -- yeah.

 4        A.    They have some more exchange of the legality

 5  and the consequences of illegal firearm transfers.  At

 6  the conclusion of that, Mr. Hoffman asks Special Agent

 7  Sessoms what do you want to do today with the fact that

 8  I just explained all this to you, and Agent Hager

 9  looked over at Agent Sessoms and said, are you

10  satisfied with the firearms previously chosen?  And

11  Agent Sessoms said yes or, you know, responded in

12  affirmation of that, in the presence of Mr. Hoffman.

13  And so then Agent Hager then advised Mr. Hoffman that

14  she wanted to purchase the two firearms chosen by Agent

15  Sessoms.

16        Q.    Okay.  Based on the recording and your

17  watching the recording, watching the encounter, was it

18  clear to you that the individual who was going to be

19  purchasing them, the actual buyer was going to be Agent

20  Sessoms?

21        A.    That's correct.

22        Q.    And that would have been made clear to

23  Mr. Hoffman?

24        A.    Yes, it was.

25        Q.    Nevertheless, Agent Hager fills out the Form
```

52

1   4473?

2        A.    That's correct.

3        Q.    And the transaction is completed as before at

4   the cash register?

5        A.    Yes, it was.

6        Q.    With Hoffman shouting out the price?

7        A.    Yes.

8        Q.    Okay.  And on that occasion, who pays for the

9   two firearms?

10       A.    Agent Sessoms pays for the firearms, and to

11   note, that the employee that was the cashier and rang

12   up Agent Sessoms was Kevin Kidrick, an employee of

13   Frazier's Pawn Shop.

14       Q.    Okay.  What happens after, you know,

15   completing the transaction?

16       A.    The agents leave with the firearms, and

17   again, Agent Sessoms attempts to take possession of the

18   firearm cases, and Hoffman advises that Agent Hager

19   needs to carry the firearms out of the store because

20   she was the purchaser of record, and so Agent Hager

21   then took possession of the firearms, and they exited

22   the store.  Once outside, Agent Hager then hands Agent

23   Sessoms the firearms, they're placed in the vehicle,

24   and they both depart Frazier's Pawn Shop.

25       Q.    Now, was Mr. Frazier around at all during

53

1    this transaction?

2         A.    Yes, he was.

3         Q.    And can you tell us about that?

4         A.    The undercover agents advised that

5    Mr. Frazier was in the vicinity of where the

6    transactions were occurring, and they felt that

7    Mr. Frazier would have been able to have heard what was

8    taking place.  And also to note, too, in a subsequent

9    interview with Kevin Kidrick, the cashier, Kevin

10   Kidrick admitted that he identified this transaction as

11   a straw purchase but did nothing to stop it.

12        Q.    All right.  And so following this, at some

13   point you conducted a search warrant at Frazier's Pawn

14   Shop; is that correct?

15        A.    Yes.  I obtained a federal search warrant

16   through the U.S. Magistrate Court here in Martinsburg,

17   West Virginia, and on January 24, 2018, we executed a

18   federal search warrant of Frazier's Pawn Shop.

19        Q.    All right.  And was anything seized during

20   that search warrant?

21        A.    Yes.  Numerous items in support of this

22   investigation were seized from the business premises to

23   include 11 firearms, ammunition, computers, cellular

24   telephones, and FFL records and documents.

25        Q.    And you had an opportunity then to go through

1  those records that you had seized?

2      A.   Yes, I did.

3      Q.   Okay.  And did you have an opportunity to

4  examine whether all the firearms that were there were

5  correctly annotated and included on their acquisition

6  and disposition record?

7      A.   Yes, I was.

8      Q.   And were there any firearms there at

9  Frazier's Pawn Shop that were not included on what's

10  known as the A&D book?

11      A.   So the Industry Operations part would be

12  better able to answer that question.  I can tell you

13  from my examination, the Industry Operations

14  investigators did a much thorough check of that, but

15  there were two firearms that I identified that I was

16  able to show were taken in just prior to the execution

17  of the federal search warrant that were not documented

18  on the acquisition and disposition books that should

19  have been within a timely manner.

20      Q.   Okay.  You also identified another 4473

21  that -- or a couple of 4473s that gave you some

22  concern.

23           MR. BOYER:  And I'll include this as

24  Government Exhibit 6.  This is a two-page document --

25  I'm sorry.  It's an eight-page document which contains

1    two complete Form 4473s and the receipts associated

2    with those transactions.  I'm handing a copy of

3    Government's Exhibit 6 to the Hearing Officer, to Mr.

4    Frazier, and the court reporter.

5            HEARING OFFICER FRONCZAK:  Government's

6    Exhibit 6 is accepted into the record.

7    **(Government's Exhibit 6 marked and received in**

8    **evidence.)**

9            BY MR. BOYER:

10       Q.   And, Agent Martin, I'll allow you to take a

11   look at Government Exhibit 6 as well.  Do these look

12   familiar to you?

13       A.   Yes, they do.

14       Q.   What are these?

15       A.   These are two ATF Form 4473s that we

16   discovered during a thorough examination of

17   Mr. Frazier's FFL records, and what had brought it to

18   our attention was both of these ATF Form 4473s were

19   completed in Mr. Hoffman's name.  However, there were

20   handwritten receipts showing that these firearms went

21   to other individuals.

22       Q.   I see.  Did you have an opportunity to ask

23   Mr. Hoffman about these transactions?

24       A.   Yes, I did.  So for the ATF Form 4473 with a

25   transaction record number of 5446, that's involving the

1  sale of a Remington Model 870, 20-gauge shotgun with

2  serial number C925158.  That transfer date to

3  Mr. Hoffman was on April 21, 2017.  When confronted

4  with this -- and there was a handwritten receipt that

5  was made out for this firearm to a Michele Crews.

6           When confronted with this, Mr. Hoffman

7  advised that Michele Crews at the time was his

8  girlfriend, that she had came in to Frazier's Pawn

9  Shop, had paid for the firearm and was given a

10  handwritten receipt, and that Mr. Hoffman later

11  completed the ATF Form 4473 in his name and went

12  through the NICS background check and then gave the

13  firearm to Mrs. Crews.

14     Q.   Okay.  And did he also, Mr. Hoffman, speak to

15  the other number, the 5632, this other --

16     A.   Yes.  So the other ATF Form 4473 with a

17  transaction number of 5632, that was involving a Glock

18  pistol, Model 19, 9mm, with serial number AMCS728.

19  That was transferred to Mr. Hoffman on July 29, 2017.

20  There was a handwritten receipt that was for this

21  firearm to an Audrea Crews.  Mr. Hoffman advised that

22  Audrea Crews was Michele Crews's daughter.  Mr. Hoffman

23  identified her as like a stepdaughter and advised that

24  Audrea Crews was 18 years old at the time of this

25  purchase and that she paid for half the firearm, that

1    Mr. Hoffman completed the ATF Form 4473 for this

2    firearm, went through the background check, and then

3    gave it to Audrea Crews.

4         Q.   So Audrea Crews is underage and is unable

5    then to lawfully purchase a handgun?

6         A.   That's correct.  At 18 years of age, this is

7    a violation of federal law, yes.

8         Q.   And because she is underage, then Hoffman

9    says that he was then putting his name down as the

10   actual purchaser?

11        A.   That's correct.

12        Q.   When, in fact, he was not?

13        A.   That's correct.

14        Q.   And did Mr. Hoffman say that Mr. Frazier was

15   aware of these transactions?

16        A.   Yes.  In subsequent interviews, Mr. Hoffman

17   says that any time there were any kind of transactions

18   at the pawn shop there involving employees, that those

19   transactions had to go through and be approved by

20   Mr. Frazier so that there wasn't any, you know, low

21   pricing or to ensure that it was beneficial for the

22   pawn shop.

23        Q.   So that makes sense.  You don't want to give

24   your employees an incredible deal on firearms.

25        A.   That's correct.  So Mr. Hoffman advised both

1  of these firearm purchases that we just described, that

2  Mr. Frazier were aware of them and approved them.

3    Q.   Okay.  And did he mention other occasions

4  where he had talked to Mr. Frazier about, you know,

5  concerns that he may have had or other transactions

6  that may have been questionable?

7    A.   So in subsequent interviews, Mr. Hoffman

8  advised that Mr. Frazier was aware and facilitated all

9  the firearms transactions at Frazier's Pawn Shop.

10  Mr. Hoffman explained that during the first purchase on

11  October 18th, when he went to the back office -- now

12  Mr. Hoffman explains this, but based on our recordings

13  and based on our undercover agents' testimonies, we

14  believe it's going to be -- that he's mistaken and it

15  is the second firearms straw purchase that we did on

16  October 24th.

17      Mr. Hoffman says again that when they went to

18  the back, Mr. Frazier came back with him.  Hoffman

19  advised Mr. Frazier that the CI had a record and that

20  the female undercover agent was purchasing the firearm.

21  Mr. Frazier directed Mr. Hoffman to still proceed with

22  the firearm sale.

23      Mr. Hoffman says approximately 20 times over

24  the course of his employment there at Frazier's Pawn

25  Shop, that he asked Mr. Frazier for guidance on

1    questionable firearms transactions and that Mr. Frazier

2    always gave Mr. Hoffman a proceed.  Mr. Hoffman advised

3    that Mr. Frazier at no point during his employment

4    there, when he came to him with these questionable

5    firearms transactions, that at no point did Mr. Frazier

6    decline a firearm sale.

7           MR. BOYER:  That's all the questions I have

8    for you, Agent Martin.

9           HEARING OFFICER FRONCZAK:  At this time, do

10   you have any questions that you would like to ask --

11          MR. FRAZIER:  Yeah, maybe a couple.

12          HEARING OFFICER FRONCZAK:  -- regarding

13   Exhibit 5 and Exhibit 6?

14          MR. FRAZIER:  Five and six.

15          HEARING OFFICER FRONCZAK:  Five is the --

16          MR. FRAZIER:  Five is --

17          HEARING OFFICER FRONCZAK:  Right.

18          MR. FRAZIER:  A lot of this is just news to

19   me as far as recordings and everybody coming in here,

20   besides everybody coming in on the 24th of '18 with a

21   search warrant, a lot of this stuff.

22          And I do see that it looked like Bill bought

23   this first rifle that he's got a receipt to -- I guess

24   it's Michele somebody.  He personally -- it look like

25   he bought it in April of '17, and then why he would

1   have a receipt, July of '17, that's kind of weird to

2   me.  I mean he bought the gun himself in his name and

3   then the receipt is 3 months later.  And as far as what

4   he's saying is news to me also.

5        But a couple of -- and I apologize for not

6   having paper and pen to write on, to write questions

7   down.  I'm trying to recall from memory.  Once again, I

8   didn't know this was going to be a hearing.  I thought

9   it was going to be a hearing, well, like previous

10  hearings in the past where I went in and talked about

11  the violations.  Anyways.

12                    **CROSS-EXAMINATION**

13       BY MR. FRAZIER:

14       Q.   But you had mentioned one that Bill was

15  selling guns out of the back.  Did you mean out of the

16  back of the building, out on the back parking lot, or

17  out of the back somewhere else?

18       A.   So when I indicated that there was

19  information that there were firearm sales that were

20  taking place out the back door, that is not me being

21  specific of literally at the rear entrance of the shop

22  or in the rear parking lot.  But it was -- the

23  information obtained was that there were basically

24  firearm transactions that were occurring there with, as

25  I explained earlier, off the books with no completion

61

```
 1   of an ATF Form 4473 or NICS background check.  So

 2   that's what I meant by that.

 3        Q.   Did I guess Mr. Hoffman say where those guns

 4   came from?

 5        A.   As far as the off-the-book transactions?

 6        Q.   Right.

 7        A.   The only thing, and has been testified to

 8   earlier, that during the exchange with the confidential

 9   informant, all Mr. Hoffman said was that he would

10   occasionally get firearms off the streets.  He

11   references that he would get a firearm with no

12   contacts, and that if he came across one of those

13   firearms, that he would sell the firearm again off the

14   books to the informant.  That's all he referenced.

15        Q.   But he never said he sold them out of the

16   building off the books where the gun would -- he's

17   selling it to someone else, one of the pawn shop's

18   personal guns that came in through the system?

19        A.   So your question is he's saying that he would

20   be selling the firearm that didn't come in and wasn't

21   entered into your acquisition and disposition books or

22   a part of your inventory?

23        Q.   Yes.

24        A.   Yes, that's what we assumed he was referring

25   to.
```

62

1        MR. FRAZIER:  Besides that, I don't have any

2   questions right now.

3        HEARING OFFICER FRONCZAK:  I just wanted to

4   add one thing.  A hearing brochure describing the

5   hearing was provided you on February 14 of 2019.  It

6   described the whole procedure, what was going to take

7   place.

8        MR. FRAZIER:  Yeah, and like I say, I just --

9   when I talked, and I don't remember who I talked to,

10  whether it was you or it could have been, just that you

11  had said it would be an informal hearing, and I mean I

12  guess at this point, I'm thinking it's not an informal

13  hearing.  I probably would have brought an attorney if

14  I thought it was like this, but yeah.

15        HEARING OFFICER FRONCZAK:  Informal hearing

16  means it's not a court proceeding.  It's not a court

17  proceeding.  It's just an informal hearing.

18        BY MR. FRAZIER:

19     Q.  I guess I have one more question about Bill.

20  And he's saying that I personally knew of all the

21  transactions that went through there.  When did he give

22  you that information?

23     A.  He gave me this information in several

24  interviews throughout the course of this investigation.

25     Q.  You don't have the time frame?

Free State Reporting, Inc.
1378 Cape St. Claire Road
Annapolis, MD 21409
(410) 974-0947

1    A.   It's -- so we interviewed him -- let me see

2  here.  I can tell you when we sat down with him.  So I

3  sat down with him here on July 11th at this office and

4  interviewed Mr. Hoffman, and then I sat down with him

5  again on March -- so July 11 of -- let me see here.

6  Bear with me.  I apologize.  July 11 of 2018, I sat

7  down with Mr. Hoffman for an interview, and then March

8  20, 2019, we sat down with Mr. Hoffman here in an

9  interview.  And so most of what I stated that

10  Mr. Hoffman provided us was during the course of those

11  interviews.

12    Q.   But when he said that I personally knew that,

13  you don't know which date it was, whether it was March

14  or July?

15    A.   He definitely -- that part he stated was on

16  March 20, 2019.  During that interview, he stated to us

17  that you were aware of these transactions.

18        HEARING OFFICER FRONCZAK:  Anything else?

19        MR. FRAZIER:  No, sir.

20        MR. BOYER:  Just very quick follow-up if I

21  can.

22              **REDIRECT EXAMINATION**

23        BY MR. BOYER:

24    Q.   Sir, as far as this conversation of what was

25  relayed to you by Mr. Hoffman concerning Mr. Frazier's

1    knowledge of these transactions, was that, in fact,

2    corroborated by the undercover agent that was within

3    the store during that transaction?

4         A.   What was corroborated was that Mr. Frazier

5    went back with Mr. Hoffman into a back office or an

6    area outside of view from the shop area and at the time

7    of the transactions.

8         Q.   At the time Mr. Hoffman was going back to run

9    the NICS background check for that particular

10   transaction?

11        A.   That's correct.

12             MR. FRAZIER:  And for the record, just so you

13   know, that I have another office for another business

14   that goes through that office, and that's where I would

15   have been heading in the first place.

16             HEARING OFFICER FRONCZAK:  Does anybody need

17   to take a break at this time?

18             MR. VANN:  Why don't we take a break and

19   we'll get --

20             HEARING OFFICER FRONCZAK:  At this time at

21   11:22, we'll be off the record.

22             (Off the record at 11:22 a.m.)

23             (On the record at 11:36 a.m.)

24             HEARING OFFICER FRONCZAK:  It is 11:36, and

25   we are back on the record.

Free State Reporting, Inc.
1378 Cape St. Claire Road
Annapolis, MD 21409
(410) 974-0947

65

1          MR. BOYER:  Before we jump into it, I

2    understand the court reporter had some additional

3    questions in terms of spelling for the witness.

4          COURT REPORTER:  FLETC is one.

5          THE WITNESS:  That is the Federal Law

6    Enforcement Training Center, FLETC.

7          MR. BOYER:  FLETC.

8          THE WITNESS:  Yep.

9          COURT REPORTER:  NICS.

10         THE WITNESS:  Is N-I-C-S.

11         COURT REPORTER:  Okay.

12         THE WITNESS:  And that stands for National

13   Instance Background Check System.

14         COURT REPORTER:  Rebish.

15         THE WITNESS:  Rebish is R-e-b-i-s-h.

16         COURT REPORTER:  You mentioned parts of the

17   trigger.  Sear.

18         THE WITNESS:  Yeah, sear is s-e-a-r.

19         COURT REPORTER:  Okay.  That's good.  Thank

20   you.

21         THE WITNESS:  Okay.

22         COURT REPORTER:  Tomlinson.  T -- Tomlinson.

23         THE WITNESS:  Yeah, and her spelling is T-o-

24   m --

25         MR. VANN:  l-i-n-s-o-n.

66

```
 1              THE WITNESS:  -- l-i-n-s-o-n.

 2              MR. VANN:  Yeah.

 3              THE WITNESS:  I couldn't remember if there

 4    was a B there.

 5              COURT REPORTER:  Hager.

 6              THE WITNESS:  Is H-a-g-a-r or no wait, e-r,

 7    I'm sorry, e-r, yeah, Hager, H-a-g-e-r.

 8              COURT REPORTER:  And then there was Nasir --

 9              THE WITNESS:  And his first name spelling is

10    N-a-s-i-r, and his last name spelling is S-e-s-s-o-m-s.

11              COURT REPORTER:  Kidrick, Kevin.

12              THE WITNESS:  Yes, it's K-i-d-r-i-c-k.

13              COURT REPORTER:  And Cruz, C-r-u-z?

14              THE WITNESS:  Yes, oh, I'm sorry.  Crews

15    is -- the receipt is -- I think it's C --

16              MR. BOYER:  C-r-e-w-s.

17              THE WITNESS:  Yes, that's it.

18              COURT REPORTER:  Okay.  That's good.  Thank

19    you.

20              MR. BOYER:  Yeah, Hearing Officer, I just

21    wanted to ask just clarification with Agent Martin here

22    concerning the firearms that were initially recovered

23    as part of the search warrant, seized as part of the

24    search warrant at Frazier's Pawn Shop but were not

25    properly annotated within the acquisition and
```

67

1    disposition book.

2         BY MR. BOYER:

3         Q.    Agent Martin, let's go back and hit upon that

4    real quick.  Initially, there were 10 firearms; is that

5    correct?  That initially did not appear on Frazier's

6    acquisition and disposition book?

7         A.    That's correct.

8         Q.    All right.  And were you able to find out

9    when those were taken into his inventory?

10        A.    So I can speak for the eight firearms that we

11   showed.  The other two firearms, we eventually found in

12   the A&D book.  We had to do some checking though to

13   find those.

14        Q.    Okay.

15        A.    So after a review of the FFL records and

16   computer evidence --

17        Q.    Well, before going through this specific

18   phase, let me just --

19        A.    Yes, sir.

20        Q.    -- ask.  The search warrant was performed

21   when?

22        A.    On January 24, 2018.

23        Q.    Okay.  Were any of those then taken into

24   inventory let's say 30 days prior to the execution of

25   the search warrant?

1    A.   Yes, that's -- yes.

2    Q.   Okay.  How soon in time would any of those

3  have been brought into inventory?

4    A.   The soonest was January 10, 2018.

5    Q.   So that's outside of the 30-day window,

6  right?

7    A.   No, those two were not.

8    Q.   Okay.  I'm sorry.  Okay.  So were any of them

9  taken in the prior 2 days?

10    A.   Yes, yes, they were.  All 10 were taken in 2

11  days before, or longer than 2 days.

12    Q.   Longer than 2 days?

13    A.   Yes.

14    Q.   That's what I'm going for.  All of these were

15  at the outside of the 2-day window?

16    A.   That's correct.

17    Q.   And then just a clarification, initially

18  there were 10 but then 2 were later identified or --

19    A.   That's correct.

20    Q.   -- accounted for?

21    A.   Yes.

22    Q.   And can you tell us about that?

23    A.   So with a review of the FFL records, and

24  particularly the acquisition and disposition books, and

25  with the computer evidence that we seized, the Pawn

1   Master Program, we were able to determine that it was

2   just a matter of two of the firearms were accounted in

3   the acquisition and disposition books but just like off

4   dates.  So those were accounted for that were showing

5   in the book.

6        Q.   I see.  But eight of them were not accounted

7   for within those within those --

8        A.   Yes, eight firearms were not properly

9   recorded in Frazier's Pawn Shop acquisition and

10  disposition books.

11            MR. BOYER:  Thank you, Agent Martin.

12            HEARING OFFICER FRONCZAK:  For my

13  clarification purposes, you're talking about a 2-day

14  window.  Can you please explain that 2-day window?

15            MR. BOYER:  Absolutely.  So I didn't do that

16  very artfully.  So let me try that again.

17            BY MR. BOYER:

18       Q.   Were any of these firearms taken into

19  inventory for the first time within 2 days of the

20  execution of the search warrant?

21       A.   No, they were not.

22       Q.   All of the firearms then, these 10 firearms

23  that we're referring to, would have been taken into

24  inventory well before the execution of the search

25  warrant?

```
 1      A.    That's correct.

 2            MR. BOYER:  And so, Mr. Hearing Officer, the

 3   specific reference and the reason why that's pertinent

 4   for the hearing is that referring to 27 C.F.R.

 5   478.125(e), which requires that any firearms basically

 6   have until the close of the next business day when

 7   taking firearms into the inventory to annotate them

 8   within their A&D book.

 9            That's all the questions we have.

10   Mr. Frazier, any follow up?
```

**RECROSS-EXAMINATION**

```
12            BY MR. FRAZIER:

13      Q.    The firearms that are in question, you're

14   talking about the 10 firearms.  Two of those you found

15   in the logbooks like they were supposed to be, and the

16   other eight, they were not in the logbooks but they

17   were in our Pawn Master Program, where we bought and

18   had a contract on.  That's correct, right?

19      A.    Honestly, I cannot say which -- but, yes, I

20   believe most of them were.  I don't think that there

21   were any firearms that weren't.  I honestly cannot

22   recall, to answer your question, which firearms out of

23   these eight were in your Pawn Master Program.  All I

24   can say is that based on my review of your FFL records,

25   along with that computer evidence, that these eight
```

1  firearms were not properly recorded in the acquisition

2  and disposition books.  But to say which ones were in

3  that Pawn Master Program and not in your A&D books at

4  this time, I can't answer that with what I have in

5  front of me.

6      Q.   And just a couple of questions previously,

7  when you said earlier that when Mr. Hoffman bought a

8  handgun for his stepdaughter, is a father allowed to

9  buy a gun for someone under 21 that is at least 18 and

10 give as a gift?

11     A.   A biological parent can buy a pistol for a

12 child, but in this particular case, based on the

13 circumstances, this was not a gift.  Mr. Hoffman

14 admitted that Audrea Crews paid for half of the

15 firearm, and Mr. Hoffman admitted that he conducted

16 that transaction in his name because she could not go

17 in and legally purchase the pistol at the age of 18.

18 But I believe under West Virginia state law, that a

19 parent can provide their biological child a pistol for

20 the purposes of, you know, farming and that nature, and

21 that they can possess it, but as we've indicated

22 earlier though, this transaction would have been -- is

23 a violation of federal firearms laws.

24     Q.   Was he charged with any one of those and his

25 girlfriend or his stepdaughter?

72

1    A.   I recommended charges for those two

2  transactions to the U.S. Attorney's Office, but he was

3  not charged with that, no.

4    Q.   One more question about Christopher Rebish.

5    A.   Yes.

6    Q.   You had said earlier that he had said he had

7  bought quite a few guns from I guess out the back.  As

8  far as did he say, was it -- did he come in the

9  building to get those guns, or did he buy them just

10  from Bill Hoffman somewhere else?

11    A.   He didn't indicate a specific location.  He

12  did indicate though that he did purchase firearms there

13  at the pawn shop, but he didn't indicate a specific

14  location like in the back parking lot or where exactly

15  on the premises, but he just stated that he had

16  purchased several firearms off the books with no

17  paperwork in a 3-year time frame from Frazier's Pawn

18  Shop.

19    Q.   Did he have any records of that, what he

20  bought?

21    A.   No.

22    MR. FRAZIER:  Okay.  That's all I've got

23  right now.

24    HEARING OFFICER FRONCZAK:  Thank you.

25    MR. BOYER:  Just to clarify, Mr. Hearing

1    Officer, I just want to note that those transactions

2    that were mentioned as part of Agent Martin's testimony

3    relating to Rebish and off-the-book sales are not part

4    of the revocation, are not part of the notice for the

5    denial of application, renewal application.

6              HEARING OFFICER FRONCZAK:  Noted.  Thank you.

7              MR. BOYER:  That's all we have.

8              (Witness excused.)

9              MR. BOYER:  Should we call our next witness?

10             HEARING OFFICER FRONCZAK:  Sure.  Go right

11   ahead.

12   (Whereupon,

13                        **EILEEN VALLS**

14   was called as a witness by and on behalf of the

15   Government and was examined and testified as follows:)

16                     **DIRECT EXAMINATION**

17             BY MR. BOYER:

18        Q.   Can you please state your full name and

19   occupation for the record?

20        A.   Eileen Valls.  Do you want me to spell my

21   last name?

22        Q.   Please.

23        A.   V as in Victor, a-l-l-s as in Sam, and my

24   occupation is Industry Operations Investigator.

25        Q.   Okay.  What is an Industry Operations

74

1   Investigator?

2       A.   I go out and perform compliance inspections

3   as well as qualifications on federal firearms

4   licensees, people who want federal firearms licenses or

5   who want federal explosive licenses and permits.

6       Q.   Then are you employed by the Bureau, Alcohol,

7   Tobacco and Explosives?

8       A.   Yes, that's right.

9       Q.   Okay.  How long have you been with ATF?

10      A.   I've been with ATF since 1992.  I've been in

11  my current position since 2001.

12      Q.   Prior to assuming this current position in

13  2001, did you receive any training?

14      A.   Yes, I did.

15      Q.   And what did that training entail?

16      A.   They sent us to the Federal Law Enforcement

17  Training Center in Glynco, Georgia, for 8 weeks, and

18  then we had on-the-job training after that.

19      Q.   Did a portion of either the training received

20  at FLETC or this on-the-job training include training

21  on federal firearms laws and regulations?

22      A.   Yes, it did.

23      Q.   Can you speak -- I know that's very broad,

24  but can you speak generally to the training that you

25  received as it pertained to laws and regulations?

1          A.    In FLETC, they went over mock compliance

2    inspections, they went over the regulations in detail,

3    they gave us the regulations book.  We went through it

4    and had tests on it.  We had to pass with a certain

5    GPA.  Otherwise, we wouldn't graduate from FLETC.  When

6    we did on-the-job training, we also extensively had to

7    go through the regulations, read them, get to know them

8    so that we could apply them in our position.

9          Q.    In the course of your time then as an IOI,

10   since 2001, how many, and again this is not a firm

11   figure but just an estimate, how many inspections have

12   you performed?

13         A.    Thousands.  I couldn't even begin to guess.

14         Q.    All right.

15         A.    Thousands.

16         Q.    And what does -- there are two types of

17   inspections, right?  If an individual applies for an

18   application, is that going to involve an inspection

19   or --

20         A.    It's qualifications.  So we're going to

21   basically qualify that they have a business premises,

22   what they're going to be doing with their license, that

23   they actually have a valid business.  That would be the

24   qualification.  And the compliance inspection would be

25   if they currently hold a license, we would go in and

76

1   complete an inventory, review forms and give violations

2   if there are any, and also go over the rules and

3   regulations at the end of each inspection.

4        Q.   All right.  So whether it's a qualification

5   inspection or a compliance inspection, then you engage

6   with the individual or the licensee what the federal

7   firearms laws and regulations are?

8        A.   Absolutely, yes.

9        Q.   And you go over them in detail?

10       A.   Yes.

11       Q.   And how is it that you can -- is there a way

12  to account for the fact that you've gone over these

13  federal firearms laws and regulations with them?

14       A.   Yes.  ATF has an acknowledgement form that we

15  go over, and everything that applies to that particular

16  licensee, I will go through and I will check off each

17  one of them as I'm talking about it, and then both the

18  licensee and I will sign at the bottom of the second

19  page.

20            MR. BOYER:  Great.  I'm going to go ahead and

21  admit Government's Exhibit 7.  So it will be the

22  acknowledgement of the federal firearms regulations.

23  It's a two-page document, dated on the second page June

24  30, 2009.  I'm giving a copy to the Hearing Officer,

25  Mr. Frazier, and to the court reporter.

77

1    (Government's Exhibit 7 marked and received in

2    evidence.)

3             BY MR. BOYER:

4        Q.   As well as I'll show you a copy of

5    Government's Exhibit 7 as well.  Is this the form that

6    you are referring to?

7        A.   This is.  This was not one of mine, but this

8    is, yes.

9        Q.   Okay.  And I notice here on the left, are you

10   able to -- well, you said it's not yours.  Are you able

11   to tell from the document whose it is?  There's a

12   signature there.  It's hard to make out.

13       A.   I really don't know whose signature that is.

14   I could guess, but I don't know for sure.

15       Q.   Okay.  And, likewise, there's an applicant's

16   licensee signature.  Are you able to make that out at

17   all?

18       A.   Not particularly.

19       Q.   Okay.  Okay.  But on the front page, it looks

20   like under licensee name --

21       A.   Yes.

22       Q.   -- that indicates that you've got David

23   Frazier among those who are on this?

24       A.   That's correct.

25       Q.   Okay.

1    A.   Yes.

2    Q.   And taking a look on, I notice on the front

3  page, there are boxes right next to each term there.

4  What are those, and what is the handwritten notes in

5  each of them?

6    A.   The handwritten that's in the boxes, the

7  boxes I usually just check as I go through.  This one

8  actually looks to be initialed, and the initials are

9  DF.  So that would be David Frazier.

10    Q.   And included in those I notice that there is

11  under 2, there's also a box and there is straw

12  purchase.

13    A.   Yes, that's correct.

14    Q.   All right.  And in preparation for this

15  hearing today, you assisted me in tracking this

16  document down.

17    A.   That's correct, yes.

18    Q.   Where did you find this document?

19    A.   We requested it from the Licensing Center,

20  from Kim Rowland who is one of the supervisors at the

21  Licensing Center.

22    Q.   And did it come from Frazier's Pawn Shop's

23  official file?

24    A.   As far as I understand.  I received it from

25  Kim Rowland.  So she would have had to go into his file

79

 1  to get that in microfiche.

 2      Q.   But you requested that they go into his

 3  official file --

 4      A.   Yes.

 5      Q.   -- and retrieve this document for you?

 6      A.   Yes.

 7      Q.   All right.  Fantastic.  And you've had

 8  some -- you're aware of Frazier's Pawn Shop?

 9      A.   Yes.

10      Q.   Okay.  And would this date then, this 2009,

11  does that correspond with when the qualification and

12  inspection would have occurred?

13      A.   I believe so.

14      Q.   Okay.  He received his --

15      A.   I'd have to check my files, but I believe so.

16      Q.   He received his license in 2009?

17      A.   Yes.

18      Q.   Okay.

19           HEARING OFFICER FRONCZAK:  I have one.  I

20  have a question.  Mr. Frazier, is that your signature

21  on page 2?

22           MR. FRAZIER:  Yes.

23           HEARING OFFICER FRONCZAK:  Thank you.

24           MR. BOYER:  Mr. Hearing Officer, I'll admit

25  Government Exhibit 8.  Again, a two-page document.

80

1   This again is an acknowledgement of federal firearms

2   regulations, dated on the second page, signature, ATF

3   Investigator Katherine Lang dated May 7, 2010.  And,

4   again, that will be Government Exhibit 8.  A copy for

5   the Hearing Officer.

6           HEARING OFFICER FRONCZAK:  Government Exhibit

7   8 is entered for the record.

8           MR. BOYER:  Court reporter and Ms. Valls.

9   **(Government's Exhibit 8 marked and received in**

10  **evidence.)**

11          BY MR. BOYER:

12      Q.  Again, it looks similar to the Government

13  Exhibit 7.  Again, is this the same form that is gone

14  through on a compliance inspection?

15      A.  Yes, this is the same form.

16      Q.  Okay.  And who is -- do you know Katherine

17  Lang?

18      A.  I do.

19      Q.  Okay.  Who is Katherine Lang?

20      A.  She is an Industry Operations Investigator as

21  well.

22      Q.  And, again, on the front page, those initials

23  then indicate DF.

24      A.  They do.

25      Q.  Okay.  And the licensing name listed on this

1    is David Frazier?

2        A.   Yes, it is.

3        Q.   Okay.

4            HEARING OFFICER FRONCZAK:  I have a follow-up

5    question, too.  Mr. Frazier, that's your signature on

6    page 2 again?

7            MR. FRAZIER:  Yes.

8            HEARING OFFICER FRONCZAK:  Thank you.

9            MR. BOYER:  Mr. Hearing Officer, I'm marking

10   Government Exhibit 9.  This is another acknowledgement

11   of federal firearms regulations, a two-page document,

12   second page dated March 14, 2012.  I'm handing a copy

13   to the Hearing Officer, Mr. Frazier, and to the court

14   reporter.

15           HEARING OFFICER FRONCZAK:  Government Exhibit

16   Number 9 is accepted into the record.

17   **(Government's Exhibit 9 marked and received in**

18   **evidence.)**

19           BY MR. BOYER:

20       Q.   And Ms. Valls.  Ms. Valls, does this look

21   familiar to you?

22       A.   Yes, it does.

23       Q.   What is this?

24       A.   This is an acknowledgement of federal

25   firearms regulations that I completed on one of the

82

1   compliance inspections, one of Mr. Frazier's compliance

2   inspections.

3       Q.   And how do we know that this was -- how do

4   you know that this is one that you completed?

5       A.   It has my signature on the bottom of the

6   second page.  It's also my handwriting on the first

7   page.

8       Q.   All right.  And you had mentioned before, you

9   said, and it looks like there's a handwritten note

10  there in the licensing name.

11      A.   Yes.

12      Q.   Is that your handwriting --

13      A.   It is.

14      Q.   -- written in, David Frazier?

15      A.   Yes.

16      Q.   Okay.  And you had mentioned earlier these

17  slashes through these boxes.  What is that?

18      A.   As I go through and I cover each topic with

19  the licensee, I make a slash mark so that I know that

20  I've already covered that topic.

21      Q.   Okay.  Meaning that you would have talked in

22  detail about each one of these provision?

23      A.   Yes, and I also have handouts that I give

24  them as well.  So, yes.

25      Q.   And do you recall having this conversation

1   with Mr. Frazier?

2        A.   I've had several of these conversations with

3   Mr. Frazier.

4        Q.   Okay.

5        A.   So, yes.

6        Q.   So you have discussed with him in the past

7   his responsibilities as it pertains to federal firearms

8   regulations?

9        A.   Yes, many times.

10       Q.   Okay.

11            HEARING OFFICER FRONCZAK:  And, again,

12   Mr. Frazier, that's your signature on page 2?

13            MR. FRAZIER:  Yes.

14            HEARING OFFICER FRONCZAK:  Thank you.

15            BY MR. BOYER:

16       Q.   And this was -- I'll note, this was in --

17   this Government Exhibit 9, dated 2012.

18       A.   Yes.

19       Q.   Was there a compliance inspection done around

20   2012?

21       A.   Yes.

22       Q.   Okay.  And did you perform that inspection,

23   or were you involved in that inspection?

24       A.   I was the lead for it, yes.

25       Q.   Okay.  What did you find in your inspection?

84

1      A.   I may have to go check my report of

2  violations for that.

3      Q.   Okay.  Well, I guess without --

4      A.   I can't tell you off the top of my head.

5      Q.   Were there any violations noted in your

6  inspection?

7      A.   Again, I'd have to go check.

8      Q.   Okay.  I'm going to go ahead and show you

9  what's been marked as Government's Exhibit 1.

10          MR. BOYER:  Mr. Frazier, you've got a copy of

11  Government Exhibit 1 already.

12          MR. FRAZIER:  Yes.  Sorry.

13          BY MR. BOYER:

14      Q.   Okay.  Ms. Valls, if you would, this is the

15  Notice to Deny Application that was issued to

16  Mr. Frazier.  Would you mind taking a quick moment.

17  You'll notice on page 3, it starts compliance

18  inspection.

19      A.   Page 2, compliance inspection.

20      Q.   I'm sorry.  Well, on the top, it's marked

21  page 2, but it's, in fact, for the exhibit, page 3.

22      A.   It is, yes.

23      Q.   But if you would, take a minute and review

24  the compliance inspection.

25      A.   We're talking about the 2012 inspection,

1  correct?

2      Q.   Correct.

3      A.   Okay.  So on page -- well, there's 4 at the

4  top.  Number 7, this would be March 14, 2012 --

5      Q.   Um-hum.

6      A.   -- which should correspond with the -- I'm

7  sorry -- March 14, 2012, which corresponds with your

8  acknowledgement of federal firearms regulations, and it

9  does say that Mr. Frazier was provided with a copy of a

10  report of violations.  So there was a report of

11  violations given at that inspection.

12      Q.   Okay.

13      A.   Yes.

14      Q.   And can you give us an idea, and you

15  certainly don't need to read them all from the exhibit,

16  but there's a list of violations there on that page.

17      A.   Yes.

18      Q.   Can you give us an idea of some of the

19  violations that were noted?

20      A.   We have acquisition/disposition violations,

21  as well as 4473 violations that we found during that

22  inspection.

23      Q.   As a result of this inspection and on finding

24  these violations, did ATF take action?

25      A.   Yes, we held a warning conference with

86

1    Mr. Frazier.

2         MR. BOYER:  All right.  I'm going to mark

3    this as Government Exhibit 10.  This is a six-page

4    document, making up three two-page letters, the first

5    letter dated July 11, 2012, second letter July 10,

6    2012, third letter included within this exhibit is June

7    20, 2012.  I'll hand Government Exhibit 10 to the

8    Hearing Officer, one to Mr. Frazier --

9    **(Government's Exhibit 10 marked for identification.)**

10        HEARING OFFICER FRONCZAK:  What are these

11   exhibits specifically?

12        MR. BOYER:  It's all in one.  So these three

13   letters will make up Government Exhibit 10.

14        HEARING OFFICER FRONCZAK:  So Government

15   Exhibit 10 will be --

16        MR. BOYER:  It will be a six-page document.

17        HEARING OFFICER FRONCZAK:  -- a six-page

18   document.  What is the document of -- relating to?

19        MR. BOYER:  Oh, I'm sorry.  It's related to

20   the warning conference.  And a copy to Ms. Valls.

21        BY MR. BOYER:

22   Q.   If you could, Ms. Valls, for us --

23        HEARING OFFICER FRONCZAK:  Can you pause one

24   second?

25        MR. BOYER:  Yes.