**BEFORE THE UNITED STATES DEPARTMENT OF JUSTICE**
**BUREAU OF ALCOHOL, TOBACCO, FIREARMS, AND EXPLOSIVES**

―――――――――――――――――――― |
                                     |
In the matter of:                    |
                                     |
DAVID FRAZIER II dba                 |
FRAZIER'S PAWN SHOP                  |
                                     |
―――――――――――――――――――― |

                         ATF Martinsburg Satellite Office
                         40 Compass Pointe
                         Martinsburg, WV 25404

                         Wednesday,
                         August 21, 2019

            The above-entitled matter came on for

hearing, pursuant to notice, at 10:00 a.m.

            BEFORE:  MICHAEL FRONCZAK, DIO
                     Hearing Officer

Free State Reporting, Inc.
1378 Cape St. Claire Road
Annapolis, MD 21409
(410) 974-0947

## **A P P E A R A N C E S**

On behalf of the Government:

      MICHAEL BOYER, Division Counsel
      Bureau of Alcohol, Tobacco, Firearms & Explosives
      Washington Field Division
      (202) 648-8098
      Michael.Boyer@atf.gov

      JAMES VANN, Associate Chief Counsel
      Firearms and Explosive Law Division
      Bureau of Alcohol, Tobacco, Firearms & Explosives

On behalf of the Licensee:

      DAVID M. FRAZIER II, Pro se

Also Present:

      CYNTHIA CHUY, Area Supervisor
      Bureau of Alcohol, Tobacco, Firearms & Explosives
      Falls Church Field Office

3

## **I N D E X**

| NAME | DIRECT | CROSS | REDIRECT | RECROSS |
|------|--------|-------|----------|---------|
| Keith W. Martin | 11 | 60 | 63 | 70 |
| Eileen Valls | 73 | 122 | 122 | -- |
| David M. Frazier II | 129 | -- | -- | -- |

Free State Reporting, Inc.
1378 Cape St. Claire Road
Annapolis, MD 21409
(410) 974-0947

4

1                          **E X H I B I T S**

2    EXHIBIT NUMBER                 MARKED              RECEIVED

3    GOVERNMENT'S

4        G-1                          10                    10

5        G-2                          10                    10

6        G-3                          11                    11

7        G-4                          11                    11

8        G-5                          24                    24

9        G-6                          55                    55

10       G-7                          77                    77

11       G-8                          80                    80

12       G-9                          81                    81

13       G-10                         86                    87

14       G-11                         91                    91

15       G-12                         92                    92

16       G-13                         98                    98

17       G-14                        102                   102

18       G-15                        106                   106

19       G-16                        109                   109

20       G-17                        112                   113

21       G-18                        114                   114

22       G-19                        116                   117

23       G-20                        119                   119

24

25

5

1                            **E X H I B I T S**

2      EXHIBIT NUMBER                    MARKED          RECEIVED

3      APPLICANT'S

4          A-1                            124             125

5          A-2                            127             127

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                   **P R O C E E D I N G S**

2                                          (9:58 a.m.)

3              HEARING OFFICER FRONCZAK:  The hearing has

4   officially begun.  It is 9:58 a.m.  The date is August

5   21, 2019.  We are located at 40 Compass Pointe,

6   Martinsburg, West Virginia 25404.

7              My name is Michael Fronczak.  I am the

8   Director of Industry Operations for the Washington

9   Field Division and will be the officer presiding over

10  this hearing by the direction and under the authority

11  of the Bureau of Alcohol, Tobacco, Firearms and

12  Explosives, United States Department of Justice.

13              The hearing is an administrative proceeding

14  and is informal in nature.  The hearing is to review

15  the Notice to Deny Application for License of David

16  Frazier trading as Frazier's Pawn Shop, ATF Form

17  5300.43, issued under the provisions of Title 27, Code

18  of Federal Regulations, Part 478, Subpart E.

19              As the result of the issuance of ATF Form

20  5300.43, you requested in writing that a hearing be

21  granted.  The focus of this hearing will be on the

22  evidence regarding whether the application should be

23  denied.

24              There are a couple of procedural issues I

25  will address before we get started.  As you can see, a

1    transcript is being made of these proceedings for the

2    record.  Because of this, I ask that each person speak

3    one at a time so that a clear and accurate record can

4    be made.  Answers must be audible.  Please do not nod

5    or shake your head in response to a question.

6              At this time, I will ask the Licensee,

7    Mr. Frazier, to introduce himself, and please give your

8    full name and spell your last name for the record.

9              MR. FRAZIER:  My name is David Milton

10    Frazier, F-r-a-z-i-e-r.

11              HEARING OFFICER FRONCZAK:  Thank you.  ATF

12    attorney, Michael Boyer, will be presiding for the

13    Government producing evidence on behalf of ATF.

14              Introduce yourself, ATF representatives in

15    the room and any observers.

16              MR. BOYER:  Sure thing.  Michael Boyer,

17    Division Counsel for Washington Field Division, Bureau

18    of Alcohol, Tobacco, Firearms and Explosives,

19    representing ATF here today.  And along with me is

20    James Vann, Associate Chief Counsel of the Firearms and

21    Explosives Law Division of the ATF.

22              HEARING OFFICER FRONCZAK:  James, spell your

23    last name.

24              MR. VANN:  My last name is spelled V as in

25    Victor, a-n-n.

8

1          MR. BOYER:  And here observing the

2    proceedings, we have Cynthia Chuy visiting from the

3    Falls Church Field Office who is an area supervisor.

4          HEARING OFFICER FRONCZAK:  Cynthia, spell

5    your last name for the record.

6          MS. CHUY:  C-h-u-y.

7          HEARING OFFICER FRONCZAK:  And, Mr. Boyer,

8    you can now proceed with the Government's presentation.

9          MR. BOYER:  Thank you, Mr. Hearing Officer.

10          Sir, before I begin, it may be helpful for

11   the record to simply establish why we are here today

12   and what we intend on introducing into the record.

13          We're here today simply because Mr. Frazier,

14   operating under the license Frazier's Pawn Shop, has

15   proven to be a threat to public safety insofar as he's

16   shown reckless disregard and plain indifference toward

17   the federal firearms laws and regulations.  And the

18   evidence will show that Mr. Frazier received his

19   license back in 2009, at which time he received an

20   acknowledgement form acknowledging the rules and

21   regulations associated with the dealing of firearms.

22          Since that time, he has gone through three

23   prior compliance inspections, one in 2010, one in 2010,

24   and one in 2014.  The result of each of those

25   compliance inspections was a warning.  In 2010 the

1   inspection was followed up with a warning letter to

2   Mr. Frazier, letting him know that any further

3   violations could result in revocation.

4           Following the 2012 compliance inspection,

5   Mr. Frazier came in for a warning conference, and that

6   was also accompanied with a warning letter, both of

7   which put again Mr. Frazier on notice of potential

8   revocation.

9           Finally, in 2014, following that inspection,

10  an additional warning letter was issued.

11          Following that time, in fast forward, in May

12  of 2017, ATF's office here in Martinsburg received a

13  call, and due to the information that was received, as

14  will be relayed by Special Agent Keith Martin, they

15  opened up an investigation into Mr. Frazier over

16  concerns about potential firearms being sold backdoor

17  or without paperwork, and that following this

18  information, they opened up and sent in a confidential

19  informant who subsequently went into Frazier's Pawn

20  Shop and was able to purchase using by way of straw

21  purchase, an individual to obtain firearms.  That was

22  again two times and then again on January 18 of 2018,

23  and additional straw purchase was performed by the ATF

24  office.

25          We'll go ahead and proceed from there, and as

1    we call in the witnesses, we will insert the exhibits

2    in chronological order.  But before calling the first

3    witness, we can take care of the first few Government

4    exhibits here.

5              MR. BOYER:  The first exhibit is going to be

6    the Notice to Deny Application for License.  This is a

7    nine-page document, and I will provide a copy of

8    Government Exhibit 1 to Mr. Frazier, the Hearing

9    Officer and to the court reporter.

10             HEARING OFFICER FRONCZAK:  Government Exhibit

11   Number 1 is accepted.

12   **(Government's Exhibit 1 marked and received in**

13   **evidence.)**

14             MR. BOYER:  Government Exhibit 2 is a one-

15   page document.  It's an email from Mr. Frazier to the

16   Hearing Officer requesting a hearing.  I'm handing a

17   copy of Government Exhibit 2 to Mr. Frazier, to the

18   Hearing Officer, and court reporter.

19             HEARING OFFICER FRONCZAK:  Government Exhibit

20   2 is accepted for the record.

21   **(Government's Exhibit 2 marked and received in**

22   **evidence.)**

23             MR. BOYER:  Government Exhibit 3 is the

24   Notice of Hearing.  It's a two-page document with cover

25   letter, and the second page contains the initial

1    hearing date.  I'm handing a copy of Government Exhibit

2    3 to Mr. Frazier, the court reporter, and one to the

3    Hearing Officer.

4              HEARING OFFICER FRONCZAK:  Government Exhibit

5    3 is accepted for the record.

6    **(Government's Exhibit 3 marked and received in**

7    **evidence.)**

8              MR. BOYER:  Government Exhibit 4 again is a

9    two-page document.  This was a Notice of Hearing

10   Change, a two-page document.  And as noted on the

11   second page, Mr. Frazier was put on notice that the

12   hearing would be changed and scheduled for today,

13   August 21, 2019.  A copy for Mr. Frazier, the Hearing

14   Officer, and court reporter.

15             HEARING OFFICER FRONCZAK:  Government Exhibit

16   4 is accepted for the record.

17   **(Government's Exhibit 4 marked and received in**

18   **evidence.)**

19             MR. BOYER:  And with that, we'd go ahead and

20   call the first witness.

21   (Whereupon,

22                          **KEITH W. MARTIN**

23   was called as a witness by and on behalf of the

24   Government and was examined and testified as follows:)

25                      **DIRECT EXAMINATION**

1          BY MR. BOYER:

2          Q.   Would you state your full name and occupation

3     for the record?

4          A.   My name is Keith Wade Martin, last name

5     spelling M-a-r-t-i-n.  I am employed with the Bureau of

6     Alcohol, Tobacco, Firearms and Explosives, or ATF, and

7     my title is Special Agent.  I am assigned to the ATF

8     Martinsburg, West Virginia Field Office.

9          Q.   Agent Martin, how long have you been working

10    with ATF?

11         A.   I have been working with ATF for

12    approximately 5 years.  Prior to that, I have 12 years

13    with the West Virginia State Police and 9 years in

14    federal law enforcement.

15         Q.   And as part of that, prior to coming in, did

16    you receive any training?

17         A.   Yes, sir, I did.

18         Q.   And what was that training?

19         A.   That training was at the Federal Law

20    Enforcement Training Center which is located in

21    Georgia.

22         Q.   Okay.  How long was that training?

23         A.   That training was approximately 7½ months.

24         Q.   And did you at any point receive training in

25    federal firearms laws and regulations?

13

1     A.   Yes, sir, I did.

2     Q.   Can you tell us a little bit about that?

3     A.    I received extensive training at the ATF

4  National Academy, which is located at the -- we call it

5  the FLETC facility, and that involved again extensive

6  training on federal firearms laws, federal firearms

7  violations, and also including violations by federal

8  firearms licensees with regard to federal firearms

9  laws.

10     Q.   And, Agent Martin, are you familiar with what

11  straw purchases are?

12     A.   Yes, sir, I am.

13     Q.   Okay.  And you may have heard me note it

14  earlier that one of the reasons we are here is because

15  several straw purchases were done at Frazier's Pawn

16  Shop.  But before we go into the details of those, can

17  you just give us an idea, what is a straw purchase and

18  why are they done?

19     A.   Yes, sir.  There are actually two common

20  terms that are utilized, the first one being a straw

21  purchase.  And when we say straw purchase, we refer to

22  as an individual which is often prohibited will have

23  another individual actually go in and make the firearm

24  purchase for the other person.  And the person who

25  makes the firearm purchase will complete the ATF Form

14

1   4473 and go through the FBI NICS, which is the National

2   Instant Background Check System, background check,

3   knowing though that the firearm is intended for the

4   other party, which like I said is typically a

5   prohibited person.  So we refer to that as a straw

6   purchase.

7          And we also refer to firearm sales that are

8   considered off the books, that is, a firearm sale by a

9   federal firearms licensee that is completed without the

10  completion of the ATF Form 4473 and the NICS background

11  check.  And it is basically not documented as required

12  by federal law.

13      Q.   I appreciate that.  And is there anything --

14  I understand, you know, as part of a purchase from a

15  licensee, an individual's required to fill out a Form

16  4473; is that correct?

17      A.   Yes, sir.  That's correct.

18      Q.   Okay.  And is there anything on that Form

19  4473 that tries to combat this, what you're referring

20  to as a straw purchase?

21      A.   Yes, sir.  There are multiple questions on

22  the front page of the ATF Form 4473.  That's under

23  Question 11, and it's a through l.  These questions

24  consist of asking if you are the actual transferee or

25  buyer of the firearm listed on this form; if you are

1   under indictment or information in any court for a

2   felony or other crime for which a judge could imprison

3   you for more than a year; if you have ever been

4   convicted in any court of a felony or any crime for

5   which the judge could have imprisoned you for more than

6   a year; if you are a fugitive from justice; if you are

7   an unlawful user of or addicted to marijuana or any

8   depressant, stimulant, narcotic drug or any other

9   controlled substance which is a violation of law; if

10  you have ever been adjudicated mentally defective; if

11  you have ever been discharged from the Armed Forces

12  under dishonorable conditions; if you are subject to a

13  court order restraining you from harassing, stalking,

14  or threatening your child or an intimate partner or

15  child of such partner; if you have ever been convicted

16  in any court of a misdemeanor crime of domestic

17  violence; if you have ever renounced your United States

18  citizenship; if you are an illegal alien in the United

19  States; and if you are an illegal alien, are you an

20  illegal alien admitted to the United States or --

21  correction -- if you are an alien admitted to the

22  United States under a non-immigrant visa.

23       Q.   Right.  And that's good.  I didn't mean for

24  you to go through all of it, but thank you for doing

25  that for us.  But the main one that I wanted you to

1    identify, and which you did, was that in Form 4473, as

2    11.a, the question is whether the individual is an

3    actual transferee or buyer or not, correct?

4         A.   Yes, sir.  That's correct.

5         Q.   All right.  And are you familiar with

6    Mr. Frazier?

7         A.   Yes.  Yes, I am.

8         Q.   And Frazier's Pawn Shop?

9         A.   Yes, I am.

10         Q.   Okay.  And I'm going to turn your attention

11    now to May 3, 2017.  I understand you received a call

12    that day?

13         A.   Yes, sir, I did.

14         Q.   Okay.  Can you tell us a little bit about

15    that, what happened?

16         A.   Well, on May 3, 2017, I received a referral

17    from the Industry Operations, Martinsburg Office here,

18    in reference to Frazier's Pawn Shop, receiving a

19    suspected modified machine gun as part of a pawn

20    transaction.  I was advised by Industry Operations

21    Investigator Eileen Valls that William Hoffman, an

22    employee of Frazier's Pawn Shop, had contacted her to

23    report receipt of a suspected machine gun.  At that

24    point I initiated an ATF investigation into that, and

25    went to Frazier's Pawn Shop and spoke with Mr. Hoffman.

17

1      Q.   All right.  And did you, in fact, upon

2  receipt of this information from IOI Eileen Valls go

3  out to Frazier's Pawn Shop?

4      A.   Yes, I did.

5      Q.   And did you speak with Mr. Hoffman?

6      A.   Yes, I did.

7      Q.   And what did he tell you?

8      A.   Mr. Hoffman had informed me that on March 8,

9  2017, a Christopher Rebish had pawned a FN rifle, model

10  PS90, 5.7 caliber, with serial number FN083685, several

11  Pister (ph.) magazines, and assorted ammunition.

12  Mr. Hoffman advised me that after the 30 days, when

13  Mr. Rebish had failed to renew the pawn transaction,

14  that Frazier's Pawn Shop had assumed ownership of this

15  property.  Mr. Hoffman, he advised me upon inspecting

16  the weapon, discovered that it had been modified and

17  was a fully automatic rifle.

18      Q.   I see.  And was the firearm there at the

19  premises?

20      A.   At the time that I was there, no, it was not.

21      Q.   And do you know where it was?

22      A.   Mr. Hoffman had provided me a copy of a pawn

23  receipt and provided me a trigger mechanism.  I refer

24  to it as a trigger pack.  Inside this trigger

25  mechanism, it had the sear, the hammer, and the

1    detractor as part of the trigger system on the firearm.

2    This particular firearm, you can remove that trigger

3    mechanism and replace it with other trigger mechanisms.

4         So what I discovered, based on the pawn

5    receipt, based on the credit card transaction, that the

6    firearm had, and Mr. Hoffman advised me, they had

7    removed the fully auto trigger pack system, placed in a

8    semi-auto trigger pack system, and had sold the firearm

9    to an individual.  And I noticed that this was prior to

10   normal business hours.

11        Q.   And did this take you by surprise that the

12   firearm was not there?

13        A.   Yes, it did.

14        Q.   Okay.  And why is that?

15        A.   Because what I explained to Mr. Hoffman was,

16   they basically modified that firearm from an illegal

17   NFA weapon to a GCA weapon, a Gun Control Act weapon,

18   and had sold it.  They should have maintained control

19   of the entire firearm and contacted us.

20        Q.   You mentioned that they had sold the firearm

21   prior to reaching out and making that call to IOI

22   Eileen Valls; is that correct?

23        A.   Yes.  The credit card transaction was the

24   normal business day for Frazier's Pawn Shop.  It opens

25   at 10 a.m.  The credit card receipt for that

1    transaction was approximately a half hour to an hour

2    prior to that.  And so Mr. Hoffman had advised he had

3    modified this machine gun and sold it to an individual

4    prior to the store opening.

5        Q.   I see.  When Hoffman called IOI Valls, did he

6    inform her that he had already sold this firearm then?

7        A.   No, he did not.

8        Q.   All right.  Now, following this information,

9    did you have an opportunity to talk with this

10   individual, Christopher Rebish, who Hoffman had

11   mentioned?

12       A.   Yes, I did.  On July 17, 2017, myself and

13   Agent Donald Lockhart interviewed Christopher Rebish at

14   the Eastern Regional Jail here in Martinsburg.  And

15   during the course of that interview, Mr. Rebish

16   admitted to manufacturing and possessing a machine gun,

17   pawning it at Frazier's Pawn Shop.  Mr. Rebish stated

18   to us that when he was at Frazier's Pawn Shop and was

19   in the process of pawning that firearm, he initially

20   removed the trigger pack from the rifle and attempted

21   to pawn the rifle without the trigger pack.

22            After advising Mr. Hoffman the rifle was a

23   machine gun, Mr. Rebish stated that Mr. Hoffman had

24   told him he still wanted the firearm and he also wanted

25   the fully automatic trigger pack.  Mr. Rebish admitted

1   to putting the trigger pack back into the rifle and

2   giving it to Mr. Hoffman.

3        Q.   I see.  And so Hoffman had requested, based

4   on what Rebish had told you, is that Hoffman had

5   requested that he reinstall the trigger pack and bring

6   it in as a fully automatic weapon?

7        A.   That's correct.

8        Q.   Did Mr. Rebish also mention anything about

9   off-the-book sales at Frazier's Pawn Shop?

10        A.   Yes.  Mr. Rebish provided details that he had

11   purchased several firearms off the books, as I

12   explained earlier, from Frazier's Pawn Shop over a

13   3-year period and that Mr. Rebish had informed

14   Mr. Hoffman that he was a prohibited person from

15   possessing firearms.  Mr. Rebish informed us that

16   Mr. Hoffman had firearms in the rear of the store that

17   he regularly sells with no paperwork.  Mr. Rebish said

18   with cash, he explained that Mr. Hoffman would sell

19   firearms off the books to practically anyone.

20        Q.   Now, just to be clear for the record, when

21   you say prohibited person, that essentially covers

22   those categories that we discussed there on the 4473

23   that would prohibit an individual from possessing a

24   firearm; is that correct?

25        A.   Yes, sir.  So that's why I went through each

1   one individually.  So those categories there, if you

2   fall within one of those categories, you are prohibited

3   from possessing firearms.

4        Q.   I see.  And Mr. Rebish had informed Hoffman

5   that he was, in fact, a prohibited person?

6        A.   That's correct.

7        Q.   Now, based on this information, then, what

8   did you do?

9        A.   Based on that information, we opened an

10  investigation into Frazier's Pawn Shop and began an

11  investigation into potentially illegal firearm sales.

12       Q.   Okay.  And what were your first steps?  What

13  was the approach that you were going to take with this

14  criminal investigation?

15       A.   Our, well, first steps were we -- I had

16  submitted and received approval through ATF to begin an

17  investigation into a FFL, and then the second step was

18  we -- I utilized an ATF confidential informant who was

19  a convicted felon to go into Frazier's Pawn Shop to

20  attempt to purchase firearms either off the books or

21  through straw purchases.

22       Q.   I see.  And can you tell us a little bit, the

23  confidential informant, how did that work and how did

24  you know this individual?

25       A.   A confidential informant through ATF is

1 | typically someone who is a prohibited person.  It can
2 | be a number of reasons for someone to be a confidential
3 | informant with us.  It could be that they are working
4 | with us and at times will receive payment in the form
5 | of subsistence for their actions.  Other times, it is a
6 | cooperating defendant in another ATF case and, at that
7 | point, to receive the benefit of cooperating with us
8 | for the court's consideration for leniency on their
9 | sentences.  And typically what happens is we have to
10 | vet these individuals and complete various paperwork
11 | for ATF, obtain their fingerprints and again thoroughly
12 | vet these individuals, and at that point submit
13 | approval which is -- and have to gain approval for us
14 | to be able to use them as an ATF confidential
15 | informant.
16 |     Q.   I see.  And in this case, you mentioned that
17 | you had received permission from ATF to use a
18 | confidential informant.  How did you use the
19 | confidential informant in this case then?
20 |     A.   So in moving forward, I'll just address him
21 | as a CI, but --
22 |     Q.   Sure.
23 |     A.   -- it was ATF Confidential Informant Number
24 | 15213 which we had received approval to utilize.  And
25 | basically as a convicted felon, which was confirmed, we

1   conducted a series of controlled monitorings and sent

2   the informant into Frazier's Pawn Shop with the intent

3   to try to buy either a firearm off the books or through

4   what we call straw purchases that had been explained

5   earlier.

6       Q.   All right.  And just to be clear, so when you

7   say he's a convicted felon, it means that he was

8   prohibited under 18 U.S.C. 19(g)(1) from possession of

9   a firearm, correct?

10      A.   Yes, sir, that's correct.

11      Q.   Okay.  Now, on August 25, 2017, then, did you

12  send this confidential informant into Frazier's Pawn

13  Shop?

14      A.   Yes.  On August 25, 2017, myself and agents

15  out of the Martinsburg, West Virginia Field Office,

16  facilitated the controlled monitoring, utilizing our

17  CI, and sent the CI to Frazier's Pawn Shop to solicit a

18  conversation about an interest in purchasing a firearm

19  without the completion of an ATF Form 4473 or an FBI

20  NICS background check.

21      Q.   And did you send him in with any kind of

22  recording device?

23      A.   Yes.  We placed a recording device on the CI

24  when we sent him in.

25          MR. BOYER:  And at this time, I'd like to

1    offer Government Exhibit 5, and I'll provide a copy to

2    the court reporter, to the Hearing Officer, and to

3    Mr. Frazier.

4             HEARING OFFICER FRONCZAK:  Government Exhibit

5    Number 5 is accepted into the record.

6    **(Government's Exhibit 5 marked and received in**

7    **evidence.)**

8             BY MR. BOYER:

9        Q.   And before we continue then with the events

10   on August 25, 2017, just to speak to this Government

11   Exhibit 5 briefly, Special Agent Martin, you prepared

12   this CD for purposes of this hearing today, correct?

13       A.   Yes, sir, I did.

14       Q.   All right.  And what is contained on this

15   Government exhibit CD?

16       A.   It is going to be audio and video recordings

17   of our controlled monitorings that we're going to

18   discuss moving forward as part of this investigation

19   involving our confidential informant and ATF undercover

20   agents.

21       Q.   And so the audio recording that was done then

22   on August 25th, when you sent in the CI into Frazier's

23   Pawn Shop, that recording is on Government Exhibit 5,

24   correct?

25       A.   That's correct.

1      Q.   Okay.  All right.  We'll go ahead and just

2  have you speak to what happened then on August 25,

3  2017, obviously knowing that the full account is

4  recorded on Government Exhibit 5, but if you could,

5  just tell us what happened then on August 25th?

6      A.   Yes, sir.  I will provide a synopsis of what

7  transpired that day and of the recording, but I would

8  say that it is not intended to be verbatim or

9  transcribed account of the controlled monitoring, and

10 an examination of the original recording of this

11 controlled monitoring is the best evidence of its

12 content.

13     Q.   Sure.  I appreciate that.

14     A.   So the confidential informant arrived at

15 Frazier's Pawn Shop and entered the store and began

16 walking around the store looking at merchandise.  The

17 CI then approached the firearms counter and began a

18 conversation with William Hoffman, again an employee of

19 Frazier's Pawn Shop.  The CI and Hoffman initially

20 spoke about knives and swords.  The CI spoke about his

21 interest in purchasing a firearm.  The CI and Hoffman

22 discussed firearms, and the CI asked Hoffman for

23 recommendations on firearms to potentially purchase.

24     Q.   Was there at some point a discussion between

25 the CI and Hoffman that he may be a prohibited person?

1   A. That's correct.  The CI had mentioned to

2 Hoffman that he had a prior conviction from

3 approximately 40 years ago and --

4   Q. How did Hoffman respond to that?

5   A. Hoffman explained to the CI about felony

6 convictions versus misdemeanor convictions.  Hoffman

7 asked where his conviction occurred at, and the CI

8 replied Fairfax County, Virginia.  The CI asked Hoffman

9 if their cousin could come and complete the paperwork

10 and purchase the firearm.  Hoffman then explained that

11 that is a straw purchase with a possible penalty of up

12 to 10 years for the CI and their cousin.

13   Q. So just to be clear, so Mr. Hoffman, did he

14 use the word "straw purchase"?

15   A. Yes, he did.

16   Q. And he actually informed the CI at that point

17 that the possible penalty for a straw purchase or straw

18 sale in this case would be 10 years?

19   A. That's correct.

20   Q. Okay.  Is it, in fact, a 10-year punishment

21 for a straw purchase?

22   A. Yes, that's correct.

23   Q. All right.  What happens after Hoffman

24 informs the CI of that?

25   A. Hoffman informed the CI that them and their

27

1    cousin not to get caught.  Hoffman discussed his

2    previous criminal convictions and that one of the

3    employees at Frazier's Pawn Shop was involved in a

4    domestic violence incident.

5         Q.   Was there any discussion of a no paperwork

6    sale or purchasing a firearm without paperwork?

7         A.   Yes.  Hoffman explained to the CI that a

8    private party sale involved no paperwork or paper

9    trail.

10        Q.   All right.  And was that -- did the CI

11   express an interest in purchasing a firearm without

12   paperwork?

13        A.   I don't believe at that time the CI has

14   stated that he would be interested in a private party

15   sale, but Mr. Hoffman further suggested that the CI

16   take their cousin with them for a private party sale

17   and have the cousin conduct the transaction for the CI.

18        Q.   I see.  I see.  Anything further from that

19   meeting?

20        A.   Mr. Hoffman advised the CI to go to the West

21   Street (ph.) State Police Office, have them conduct a

22   criminal background check to determine that prior

23   conviction from 40 years ago.  And the CI and

24   Mr. Hoffman discussed the price of swords, and then the

25   CI departed the store.

1       Q.   Okay.  And upon departing the store, the CI

2   returned to this office?

3       A.   That's correct.

4       Q.   Okay.  And returned the transmitting device;

5   is that correct?

6       A.   Yes, that's correct, and was debriefed by

7   myself.

8       Q.   Okay.  Now, that was on August 25th.  Now, on

9   September 12, 2017, you send the confidential informant

10   back into Frazier's Pawn Shop; is that correct?

11       A.   That's correct, and again, with agents out of

12   the ATF Martinsburg, West Virginia Field Office.  The

13   informant was sent back in, and again, as I previously

14   stated, this is just a synopsis.  It's not a verbatim

15   or transcribed account of this recording.

16       Q.   Yeah.  So you again had the CI have a

17   transmitter on him during the visit?

18       A.   That's correct.

19       Q.   And that full recording's on Government

20   Exhibit 5?

21       A.   That's correct.

22       Q.   Okay.  So just the shortened version then,

23   what happens when the CI goes back into Frazier's Pawn

24   Shop on September 12th?

25       A.   Again entered Frazier's Pawn Shop, goes to

1   the firearms counter and greets William Hoffman.  The

2   CI informs Mr. Hoffman that they checked and their

3   prior conviction is confirmed that it is a felony.

4        Q.   All right.  And how did Hoffman respond?

5        A.   Mr. Hoffman suggested to the CI about getting

6   the felony conviction expunged and explained if the CI

7   had someone else buy the firearm for the CI and the CI

8   got caught, that it is 10 years.

9        Q.   So, again, explaining to him the straw

10  purchase?

11       A.   That's correct.

12       Q.   All right.  What did the CI say, and how did

13  the conversation go from there?

14       A.   The CI replied that they weren't worried

15  about that and still wanted to buy a firearm.

16  Mr. Hoffman began to tell the CI that he has a couple

17  of friends that are in the same situation as the CI,

18  and when they go fishing, Mr. Hoffman will place or

19  will give those friends a pistol.  And if they would

20  ever get involved in a shooting, that Mr. Hoffman would

21  get the pistol back afterwards and would wipe the

22  fingerprints off the pistol and would do this to stay

23  alive and would deal with repercussions later.

24       Q.   Just to be clear -- sorry.  I didn't mean to

25  cut you off.

1      A.   No.

2      Q.   But when you say the same situation as the

3 CI, he has friends that are prohibited persons under

4 the Gun Control Act and are not able to lawfully

5 possess a firearm; is that correct?

6      A.   I'm assuming based on his statement that

7 that's what he was insinuating, yes.

8      Q.   All right.  Was again it discussed then no

9 paperwork or a potential for that?

10      A.   Yes.  Mr. Hoffman suggested to the CI about

11 buying a firearm from off the streets or at a flea

12 market, and the CI informed Mr. Hoffman that firearms

13 for sale at the flea market are a little high priced.

14      Q.   Okay.  Did the CI talk to Hoffman about

15 potentially purchasing a firearm through Mr. Hoffman

16 with no paperwork?

17      A.   Yes.  Mr. Hoffman advised the CI that he will

18 occasionally get a firearm off the street.  Mr. Hoffman

19 handed the CI a piece of paper to write the CI's name

20 and phone number on it.  Mr. Hoffman then wrote above

21 the CI's name and phone number, no paper, and placed it

22 in his wallet.

23      Q.   All right.  And what happens after that?

24      A.   The CI advises Mr. Hoffman to contact them as

25 soon as possible, again insinuating when he gets a

1    firearm, that he could sell to the informant.

2    Mr. Hoffman replied that it might be a little while

3    because it's hit or miss when he comes across firearms.

4    The CI stated to Mr. Hoffman that they could have a

5    cousin come in and complete the paperwork, and

6    Mr. Hoffman replied that if he gets something that has

7    no contacts.  So he's insinuating if he gets a firearm

8    and he's calling it no contacts, that Mr. Hoffman can

9    sell the CI a firearm and not have to go that route of

10   having someone buy it for him.

11        Q.   I see.  All right.  And does that essentially

12   wrap up the visit there, the second visit of CI to

13   Frazier's Pawn Shop?

14        A.   Yes.  The CI informs Mr. Hoffman that he has

15   cash, and he departs the store.

16        Q.   And as the previous time, does the CI return

17   and turn in the recording device and is debriefed by

18   yourself?

19        A.   That's correct.

20        Q.   Now, the CI ends up going back into Frazier's

21   Pawn Shop after the second visit but this time without

22   a recording device; is that correct?

23        A.   Yes, that's correct.

24        Q.   And what happened exactly, and how did you

25   find out about it?

 1        A.   On September 28, 2017, I was contacted by the

 2   CI by telephone.  I was advised that the CI on

 3   Saturday, September 23, 2017, had gone into Frazier's

 4   Pawn Shop with a female acquaintance with the

 5   anticipation of purchasing a sword on their own, you

 6   know, personally.

 7        Q.   So this was not part of the ATF criminal

 8   investigation necessarily?

 9        A.   That's correct.

10        Q.   Okay.  And what happened when the CI was in

11   the store?

12        A.   The CI advised that they were approached by

13   and spoke with Mr. Hoffman, and Mr. Hoffman informed

14   the CI that he had not come across any firearms that he

15   could sell to the CI, but Mr. Hoffman pointed to the

16   female acquaintance that was with the CI and stated

17   that he, Mr. Hoffman, could sell a firearm to her --

18   through her, I'm sorry, through her to the CI in the

19   form of a straw purchase.

20        Q.   All right.  And what did the CI do at that

21   point?

22        A.   The CI advised Mr. Hoffman he would get back

23   with him and then departed the store and later

24   telephoned me and advised me of this.

25        Q.   Okay.  Did you then at a later point send the

1   CI in with a friend who performed the straw purchase?

2        A.   That's correct.

3        Q.   When was that?

4        A.   On October 18, 2017, myself and again members

5   of the ATF Martinsburg Field Office, we did a

6   controlled monitoring with the CI and with ATF

7   undercover Special Agent Rebecca Tomlinson.

8        Q.   And Rebecca Tomlinson then was the friend of

9   the CI that was going to accompany him into --

10       A.   That's correct.

11       Q.   -- Frazier's Pawn Shop?  Okay.  What happens

12  when they go into Frazier's Pawn Shop?

13       A.   Again, the recording device was placed on the

14  CI.

15       Q.   And, again, was this audio and video?

16       A.   This was just audio, audio recording.

17       Q.   Audio recording.  And that audio recording is

18  again part of Government Exhibit 5?

19       A.   That's correct.

20       Q.   Okay.

21       A.   And, again, my synopsis will not be a

22  verbatim or transcribed account of this controlled

23  monitoring.

24       Q.   Sure thing.  So just in your own words then,

25  what happens when Mr. Hoffman goes -- or excuse me,

1    when the CI goes back in with the agent?

2         A.   Agent Rebecca Tomlinson will be referred to

3    here as the UC.  So the CI and UC entered the store and

4    approached the firearms counter and greeted Mr. Hoffman

5    at the firearms counter.  The CI informed Mr. Hoffman

6    that they had told him previously on the 23rd that they

7    would be back and that they had brought a friend.

8         Q.   Okay.  Referring back to that conversation

9    then on October 23rd when the CI was in there with his

10   own friend; is that correct?

11        A.   September 23rd, yes.

12        Q.   September 23rd.

13        A.   That's correct.

14        Q.   Excuse me.  What happened then?

15        A.   The CI told Mr. Hoffman that it took an arm

16   and a leg to get the UC there to purchase a firearm for

17   him and that he had to buy the UC lunch and dinner.

18   Mr. Hoffman asked the UC if she hit the CI up hard for

19   lunch and dinner.  The UC stated that, yes, since she

20   had to come all the way out here.  So there was some

21   more exchange about the arrangement between the CI and

22   the UC, and Mr. Hoffman asked the UC where she was

23   from, and she stated Arlington, Virginia.  Mr. Hoffman

24   then discussed gun laws and gun control in Virginia,

25   Maryland, and New York with the CI and the UC.

35

1     Q.   So the point of this conversation, then, is

2  the CI making it clear to Hoffman that he was prepared

3  to purchase a firearm?

4     A.   Yes, that she is there to purchase a firearm

5  for the CI, yes.

6     Q.   For the CI.  But the CI would be the actual

7  buyer?

8     A.   That's correct.

9     Q.   Okay.  After they have this conversation then

10  and Hoffman discusses the various gun laws in Virginia,

11  Maryland, and New York, what happens?

12     A.   The CI asked Mr. Hoffman if the UC having a

13  Virginia driver's license was going to be a problem.

14  Mr. Hoffman advises that handguns would have to be

15  transferred to a FFL in Virginia, but that the UC could

16  buy any long guns, which are rifles, shotguns, that she

17  wanted, and Mr. Hoffman then began showing the CI

18  different rifles at varying prices.

19     Q.   Is that, in fact, the case?  Can a member who

20  is from out of state purchase a handgun in --

21     A.   No, they cannot.

22     Q.   Okay.  But can they purchase a long gun?

23     A.   If the state that they're coming from, if

24  it's not a violation of state law, yes, they can

25  purchase long guns.  So in this case, a Virginia

1  resident can come into West Virginia to a FFL in West

2  Virginia and purchase a long gun.

3      Q.   Okay.  So, again, Hoffman accurately then

4  relayed the -- stated the law?

5      A.   That's correct.

6      Q.   What happened then?

7      A.   The CI stated that they don't want to spend

8  more than $600, asked Mr. Hoffman if Mr. Hoffman could

9  work with them, and this would be with regard to AR-15

10 type rifles that were there present at the shop.

11 Mr. Hoffman stated that he could not come down that low

12 on price on AR-15s.

13          The CI then asked about a Hi-Point rifle.

14 This Hi-Point rifle was going to be a model 4595, .45

15 caliber rifle with serial number R55185.  So the CI

16 chose that rifle, and then they -- Mr. Hoffman obtained

17 the box for that rifle, and the CI and Mr. Hoffman then

18 arranged for pricing for ammunition and for the rifle.

19     Q.   I see.  And so the discussion over the Hi-

20 Point rifle then is between Hoffman and the CI?

21     A.   That's correct.

22     Q.   And the undercover agent is simply standing

23 by?

24     A.   That's correct.

25     Q.   Okay.  At some point, did the CI inform

1   Hoffman that he wanted to purchase it?

2      A.   Yes, he did.

3      Q.   Okay.  And what happened at that point?

4      A.   The CI, again they negotiated a price for the

5   rifle and ammunition.  The CI goes over to the cashier

6   and pays cash for the rifle, and Mr. Hoffman then has

7   the UC complete the ATF 4473.

8      Q.   All right.  And does the undercover agent

9   fill out the Form 4473?

10     A.   Yes, she does.

11     Q.   All right.  And what happens after that?

12     A.   Mr. Hoffman goes and calls in the FBI NICS

13  background check on the UC for the firearm purchase and

14  then comes back out and tells the UC -- calls the UC by

15  her undercover name.  The CI asked Mr. Hoffman if the

16  UC was good.  Mr. Hoffman then stated that she was

17  good.

18     Q.   Who actually went over to the cash register

19  and paid for the rifle?

20     A.   The CI did.

21     Q.   Okay.  And did the cashier accept the CI's

22  money and complete the transaction?

23     A.   Yes, they did.

24     Q.   All right.  What happens after the

25  transaction is complete and he comes back?

1        A.   At the conclusion, the CI picks up the rifle

2   and begins to walk out with it.  Mr. Hoffman stated

3   that the rifle was in the UC's name and indicated that

4   the UC is the one that needed to carry it out of the

5   store.  The CI says that the rifle is heavy for the UC,

6   and Mr. Hoffman stated that the UC doesn't look that

7   helpless.  So the CI gives the UC the rifle, and the UC

8   carries the rifle out into the parking lot.

9        Q.   And as on previous occasions, does the CI and

10  UC return to this office?

11       A.   That's correct.  They returned to this

12  office.  I collected the evidence and the recordings

13  and again debriefed the CI.

14       Q.   Now, before moving on, during this visit, did

15  the CI also mention that he still wanted to buy a

16  pistol?

17       A.   That's correct.  During the exchange, the CI

18  does indicate that they would like to buy a pistol,

19  yes.

20       Q.   Okay.  All right.  Then do you send the CI

21  back into Frazier's Pawn Shop?

22       A.   Yes.  On October 24, 2017.

23       Q.   Okay.  And tell us about that.

24       A.   Again, this is with the CI and another ATF

25  undercover special agent.  Her name is Sabrina Hager,

1    and she will hereafter be referred to as the UC.  So,

2    again, we sent the CI and the UC into Frazier's Pawn

3    Shop on October 24, 2017.  This is a controlled

4    monitoring.  There is a recording device on the CI, and

5    this was facilitated by myself and agents here at the

6    Martinsburg Field Office.

7         Q.   Okay.  And, again, was this audio,

8    audio/video?

9         A.   This was audio and video which both are

10   included in Exhibit 5.

11        Q.   In Government Exhibit 5.  All right.  What

12   happens when the CI and the UC agent goes into

13   Frazier's Pawn Shop?

14        A.   When they go in, they again make contact and

15   are greeted by Mr. Hoffman at the firearms counter.

16   The CI states to Mr. Hoffman that the rifle that they

17   had purchased on October 18, 2017 works pretty good,

18   but it felt like it was trying to jam after a few

19   rounds.  So the CI had to oil the rifle.  Mr. Hoffman

20   replied that there is a break-in point on most

21   firearms, and Mr. Hoffman had an exchange and greeted

22   the UC.  So if there's any question on the previous

23   encounter on October 18th of whether the CI actually

24   came into possession of that firearm, that would have

25   been cleared up at that time, correct?

1      A.   That's correct.

2      Q.   Okay.  Did the CI then state that he's

3   interested in purchasing a pistol as he had done

4   previously?

5      A.   Yes, that's correct.

6      Q.   And what happens after that?

7      A.   The CI asked Mr. Hoffman to show them a

8   pistol that would be easy to work with and asked if

9   Mr. Hoffman had any holsters.  Mr. Hoffman stated that

10  he had holsters for some of the pistols, and

11  Mr. Hoffman asked the CI if it was for home defense.

12  The CI stated that they would need a pistol to starting

13  running a cab service in the Martinsburg/Hagerstown

14  area.

15     Q.   Okay.  Now, was the CI, in fact, starting up

16  a cab service in Martinsburg?

17     A.   No, they were not.

18     Q.   Okay.  Was this a ruse then?

19     A.   That's correct.  Yes.

20     Q.   Okay.  And had this been agreed upon before

21  the visit, or is this --

22     A.   No, this is something that the CI had

23  mentioned -- on their own to solicit conversation.

24     Q.   How did Hoffman reply to this?

25     A.   Again, the CI explained to Mr. Hoffman that

1   they were going to start a cab service and run it out

2   of Martinsburg and Hagerstown.  Mr. Hoffman replied to

3   the CI that they cannot carry a firearm in Hagerstown,

4   but here in Martinsburg, they could constitutionally

5   carry.  The CI stated that they weren't too worried

6   about Martinsburg, but here is where they were going to

7   make the money in the Martinsburg area for this cab

8   service.  Hoffman stated that if the CI got caught up

9   in Hagerstown, that that's an instantaneous 5 years.

10  The CI started to inform Mr. Hoffman that and began

11  saying that if they get caught anywhere -- Mr. Hoffman

12  interrupted the CI and made a shush gesture or a

13  shushing gesture.

14      Q.   So when you say the CI mentioned getting

15  caught anywhere, did you take that to mean the CI is

16  saying if I get caught possessing a firearm anywhere?

17      A.   Alluding to I'm a convicted felon, if I get

18  caught anywhere, I'm in trouble, and again, Mr. Hoffman

19  interrupted the CI with a shush gesture.

20      Q.   I understand.  What happens after that?

21      A.   The CI stated that they don't want to get

22  into a cab and have someone pull a gun on them, which

23  is why they wanted the pistol.  Mr. Hoffman asked the

24  CI for a price range.  The CI advised that they would

25  like to get a pistol and hold and a box of ammunition

1   all together.  Mr. Hoffman explained and they were

2   looking -- while this exchange was going on, the CI was

3   looking at a particular firearm, and Mr. Hoffman

4   advised that the CI would have to order a holster

5   online, and the CI informs Mr. Hoffman that they don't

6   want to go over 8, which is insinuated as $800.

7   Mr. Hoffman says that gives the CI lots of options, and

8   Mr. Hoffman showed the CI several pistols at that

9   point.

10      Q.   Okay.  And at that point then, Hoffman and

11   the CI go through a number of firearms, correct?

12      A.   That's correct.

13      Q.   And, again, this conversation is happening

14   between Hoffman and the CI?

15      A.   That's correct.

16      Q.   And it's the CI who is expressing interest in

17   purchasing the firearm?

18      A.   Yes, that's correct.

19      Q.   Does the CI eventually decide on a firearm

20   that he wishes to purchase?

21      A.   Yes, they do.

22      Q.   And what happens at that point?

23      A.   The CI and Mr. Hoffman come to an agreement

24   on a Springfield pistol, model XD9, 9mm with serial

25   number GM979645, two magazines, and a box of Federal

1   9mm caliber ammunition.

2       Q.   Does the CI at that point fill out the Form

3   4473?

4       A.   No.  Prior to that though, Mr. Hoffman asked

5   the UC to try something.  The UC asked what do you want

6   me to do?  Mr. Hoffman hands the UC the pistol, and the

7   UC says it's going to hurt her nails -- is it going to

8   hurt her nails?  Mr. Hoffman replied no.  Mr. Hoffman

9   basically asks that the UC pull the slide action back

10  to the rear and stated now you know how to use the

11  pistol.

12      Q.   All right.  And then was it the UC, did she

13  state she had an interest in the firearm?

14      A.   No, the UC states she is a knife girl and

15  doesn't know anything about firearms.

16      Q.   Nevertheless, at that point, does the UC fill

17  out the Form 4473?

18      A.   Yes, and again, as in the previous

19  transaction, the CI goes over to the cashier, pays for

20  the firearm while the UC completes the ATF Form 4473

21  with Mr. Hoffman's assistance.

22      Q.   And as the UC begins to fill out the Form

23  4473, or just before, the CI actually makes a comment

24  to the undercover agent, correct?

25      A.   Makes a comment to them.

1    Q.   Yes, the CI says to --

2    A.   Oh, yes.  As Mr. Hoffman hands the UC the ATF

3  Form 4473, the CI looks at the UC and says, this is

4  your job, honey.

5    Q.   Loud enough, and Hoffman is there?

6    A.   That's correct.

7    Q.   All right.  And as done on the previous

8  occasions, does the CI actually go to the cash register

9  and complete the transaction?

10   A.   Yes, that's correct.

11   Q.   And does Hoffman call in the background

12  check?

13   A.   Yes.  At this time, Hoffman went into a

14  backroom, out of view, and based on the CI and the UC's

15  statement, Mr. Frazier walks back with Mr. Hoffman.

16   Q.   At any point, did you -- following

17  Mr. Hoffman going into the backroom, he comes back out,

18  correct, Hoffman?

19   A.   That's correct.

20   Q.   At any point in time did you find out or

21  learn more about this conversation or if anything

22  happened in the backroom with Mr. Hoffman and

23  Mr. Frazier?

24   A.   Yes, we did later, yes.

25   Q.   Okay.  Can you tell us about that?

1     A.   In subsequent interviews with Mr. Hoffman, by

2   myself, Mr. Hoffman advised us that Mr. Frazier had

3   accompanied Mr. Hoffman back into a back room there at

4   the shop, that Mr. Hoffman had informed Mr. Frazier

5   that the CI had a criminal record and that the UC was

6   purchasing the firearm for the CI and was given a

7   proceed by Mr. Frazier to continue with the firearm

8   transaction.

9     Q.   Given the green line in other words?

10    A.   That's correct.

11    Q.   All right.  So Hoffman comes back out then,

12  and what happens upon his return to the store?

13    A.   The CI makes a mention to Mr. Hoffman that

14  they would want one more firearm.  They would like a

15  shotgun with a pistol grip.  Mr. Hoffman says that it

16  had been a while -- it had been a long time since he

17  had come across one of those.  Once Mr. Hoffman comes

18  out, he informs them that the sale or that the UC is

19  good as far as the background check, and Hoffman

20  returned to the counter and handed the UC a receipt.

21  Hoffman tells the undercover agent to have the CI go

22  get her nails done.  The CI and UC then depart with the

23  UC carrying the pistol out of the shop and return here

24  to this office.

25    Q.   And as done previously, they turn into you

46

1   then the recording device?

2        A.   That's correct.  And the evidence associated

3   with the purchase.

4        Q.   Now, you don't send the CI into Frazier's

5   Pawn Shop again, correct?

6        A.   No, that's correct.

7        Q.   Do you send in an undercover agent or two at

8   a later point?

9        A.   Yes.

10       Q.   Okay.  And then tell us a little bit about

11  that.

12       A.   So what we wanted to establish was that

13  Mr. Hoffman wasn't just solely dealing with our

14  confidential informant, that he was willing to deal

15  with other people as far as straw purchases.  So on

16  January 18, 2018, we sent in Special Agent Nasir

17  Sessoms and Special Agent Sabrina Hager to Frazier's

18  Pawn Shop to conduct a multiple sales straw purchase,

19  and when I say multiple sales, that's two pistols with

20  between -- with Agent Sabrina Hager posing as she is

21  the one that's going to complete the ATF Form 4473 but

22  that the firearms are going to Agent Sessoms.

23       Q.   Okay.  And Agent Hager then, is she a

24  resident of West Virginia?

25       A.   Her undercover driver's license shows that

47

1   she is a resident of West Virginia.

2        Q.   Okay.  And how about Agent Sessoms and his

3   undercover driver's license?

4        A.   Agent Sessoms's undercover driver's license

5   shows him to be a resident of Maryland.

6        Q.   And so what happens?  You again use a

7   transmitter recording device when sending them in?

8        A.   Yes, that's correct.

9        Q.   And this time it's audio and visual as done

10  previously?

11       A.   Yes.  The audio recording device was places

12  with Agent Hager, and the video recording device was

13  with Agent Sessoms.

14       Q.   Okay.  And are both of those recordings

15  included on Government Exhibit 5?

16       A.   Yes, that's correct.

17       Q.   Okay.  Let's just have you then summarize for

18  us what happens when the two agents go in on January

19  18, 2018.

20       A.   If I could please correct.  The video

21  recording of this transaction, so Agent Sessoms had a

22  video recording device on him.  Agent Hager had a

23  transmitting device that we could listen to but was not

24  recording.  So on Exhibit 5 is only a video recording

25  of this transaction.

```
 1        Q.   Okay.

 2        A.   I apologize.

 3        Q.   Okay.  But is there -- there's no audio to --

 4        A.   There is audio on the video recording.

 5        Q.   I see.

 6        A.   Yeah.

 7        Q.   Okay.  What happens when they go in?

 8        A.   The two UCs go in and are at the firearms

 9   counter.  Mr. Frazier is present.  He's having a

10   conversation with the cashier.  He then ends that

11   conversation, walks over, ask the UCs if they needed

12   some help.  Agent Hager replied she was just looking

13   around.  Frazier then asks the UCs if they were waiting

14   on Mr. Hoffman, and they replied that they were.

15        Q.   Okay.  At that point or at some point

16   thereafter, does Mr. Hoffman come over and talk with

17   the undercover agents?

18        A.   Yes.  Mr. Hoffman comes over and speaks with

19   both of the UCs.

20        Q.   Okay.  And Hoffman asks the UCs something to

21   the effect of what you looking for today, correct?

22        A.   Yes, that's correct.  And Agent Hager replied

23   she was looking for some handguns while using hand

24   gestures to say that they were -- that Mr. Hoffman

25   needed to speak with Agent Sessoms with regard to the
```

49

1    firearms.

2         Q.   Okay.  Now, Special Agent Hager, had she been

3    in there before?

4         A.   That's correct.  She was in there with the CI

5    on the previous transaction.

6         Q.   I see.  But she indicated again that she

7    would be there again purchasing a firearm for the other

8    agent?

9         A.   That's correct.

10        Q.   All right.  What happens after this happens,

11   the gesture's made?

12        A.   Agent Sessoms than at that point points to a

13   FN 9mm handgun.  There is some exchange between Agent

14   Sessoms and Hoffman about the functionality of the

15   firearm, and Agent Sessoms then also points to a

16   Springfield .45 caliber handgun which is located in the

17   display case.

18        Q.   Okay.  At some point, does it become clear to

19   Hoffman that Agent Sessoms is not from the state of

20   Virginia or not a resident of the state of West

21   Virginia, excuse me?

22        A.   Yes.  Mr. Hoffman asks Agent Sessoms where

23   are you from, and Agent Hager then interjects and says

24   that she would be handling the transaction.  Hoffman

25   then basically demands that the UCs listen to him and

1   explained to them and wanted them to understand he was

2   basically giving them some cautionary advice and

3   explained that -- again asks Agent Sessoms where he was

4   from.  Agent Sessoms advises Mr. Hoffman he is from

5   Maryland.

6          Mr. Hoffman then warns Agent Sessoms that if

7   he gets it under Agent Sessoms's name or -- I'm sorry.

8   He looks at Agent Hager and says, if you get the

9   firearm under your name and you give it to Agent

10  Sessoms and it's not registered in Maryland, that it's

11  a felony in Maryland and that it has to be at some

12  point transferred to him as a Maryland resident.  And

13  if it isn't transferred to him as a Maryland resident,

14  he turned and then looked at Agent Hager and said,

15  that -- or I'm sorry -- Agent Sessoms and says, if you

16  get caught with it and it's unregistered, you're going

17  to jail for a long time in Maryland.

18          He then turned back to Agent Hager and said

19  if you buy it, it is classified as a straw purchase,

20  and then if he gets caught with it and it's under your

21  name, you are looking at 10 years.

22      Q.   So, again, based on this cautionary note that

23  Hoffman tells the two undercover agents, does he

24  accurately capture the law?

25      A.   That's correct.

1    Q.   Okay.

2    A.   They --

3    Q.   What happens after -- yeah.

4    A.   They have some more exchange of the legality

5  and the consequences of illegal firearm transfers.  At

6  the conclusion of that, Mr. Hoffman asks Special Agent

7  Sessoms what do you want to do today with the fact that

8  I just explained all this to you, and Agent Hager

9  looked over at Agent Sessoms and said, are you

10 satisfied with the firearms previously chosen?  And

11 Agent Sessoms said yes or, you know, responded in

12 affirmation of that, in the presence of Mr. Hoffman.

13 And so then Agent Hager then advised Mr. Hoffman that

14 she wanted to purchase the two firearms chosen by Agent

15 Sessoms.

16    Q.   Okay.  Based on the recording and your

17 watching the recording, watching the encounter, was it

18 clear to you that the individual who was going to be

19 purchasing them, the actual buyer was going to be Agent

20 Sessoms?

21    A.   That's correct.

22    Q.   And that would have been made clear to

23 Mr. Hoffman?

24    A.   Yes, it was.

25    Q.   Nevertheless, Agent Hager fills out the Form

```
 1   4473?

 2        A.   That's correct.

 3        Q.   And the transaction is completed as before at

 4   the cash register?

 5        A.   Yes, it was.

 6        Q.   With Hoffman shouting out the price?

 7        A.   Yes.

 8        Q.   Okay.  And on that occasion, who pays for the

 9   two firearms?

10        A.   Agent Sessoms pays for the firearms, and to

11   note, that the employee that was the cashier and rang

12   up Agent Sessoms was Kevin Kidrick, an employee of

13   Frazier's Pawn Shop.

14        Q.   Okay.  What happens after, you know,

15   completing the transaction?

16        A.   The agents leave with the firearms, and

17   again, Agent Sessoms attempts to take possession of the

18   firearm cases, and Hoffman advises that Agent Hager

19   needs to carry the firearms out of the store because

20   she was the purchaser of record, and so Agent Hager

21   then took possession of the firearms, and they exited

22   the store.  Once outside, Agent Hager then hands Agent

23   Sessoms the firearms, they're placed in the vehicle,

24   and they both depart Frazier's Pawn Shop.

25        Q.   Now, was Mr. Frazier around at all during
```

53

1  this transaction?

2       A.   Yes, he was.

3       Q.   And can you tell us about that?

4       A.   The undercover agents advised that

5  Mr. Frazier was in the vicinity of where the

6  transactions were occurring, and they felt that

7  Mr. Frazier would have been able to have heard what was

8  taking place.  And also to note, too, in a subsequent

9  interview with Kevin Kidrick, the cashier, Kevin

10 Kidrick admitted that he identified this transaction as

11 a straw purchase but did nothing to stop it.

12      Q.   All right.  And so following this, at some

13 point you conducted a search warrant at Frazier's Pawn

14 Shop; is that correct?

15      A.   Yes.  I obtained a federal search warrant

16 through the U.S. Magistrate Court here in Martinsburg,

17 West Virginia, and on January 24, 2018, we executed a

18 federal search warrant of Frazier's Pawn Shop.

19      Q.   All right.  And was anything seized during

20 that search warrant?

21      A.   Yes.  Numerous items in support of this

22 investigation were seized from the business premises to

23 include 11 firearms, ammunition, computers, cellular

24 telephones, and FFL records and documents.

25      Q.   And you had an opportunity then to go through

1    those records that you had seized?

2         A.   Yes, I did.

3         Q.   Okay.  And did you have an opportunity to

4    examine whether all the firearms that were there were

5    correctly annotated and included on their acquisition

6    and disposition record?

7         A.   Yes, I was.

8         Q.   And were there any firearms there at

9    Frazier's Pawn Shop that were not included on what's

10   known as the A&D book?

11        A.   So the Industry Operations part would be

12   better able to answer that question.  I can tell you

13   from my examination, the Industry Operations

14   investigators did a much thorough check of that, but

15   there were two firearms that I identified that I was

16   able to show were taken in just prior to the execution

17   of the federal search warrant that were not documented

18   on the acquisition and disposition books that should

19   have been within a timely manner.

20        Q.   Okay.  You also identified another 4473

21   that -- or a couple of 4473s that gave you some

22   concern.

23             MR. BOYER:  And I'll include this as

24   Government Exhibit 6.  This is a two-page document --

25   I'm sorry.  It's an eight-page document which contains

1   two complete Form 4473s and the receipts associated

2   with those transactions.  I'm handing a copy of

3   Government's Exhibit 6 to the Hearing Officer, to Mr.

4   Frazier, and the court reporter.

5           HEARING OFFICER FRONCZAK:  Government's

6   Exhibit 6 is accepted into the record.

7   **(Government's Exhibit 6 marked and received in**

8   **evidence.)**

9           BY MR. BOYER:

10      Q.   And, Agent Martin, I'll allow you to take a

11   look at Government Exhibit 6 as well.  Do these look

12   familiar to you?

13      A.   Yes, they do.

14      Q.   What are these?

15      A.   These are two ATF Form 4473s that we

16   discovered during a thorough examination of

17   Mr. Frazier's FFL records, and what had brought it to

18   our attention was both of these ATF Form 4473s were

19   completed in Mr. Hoffman's name.  However, there were

20   handwritten receipts showing that these firearms went

21   to other individuals.

22      Q.   I see.  Did you have an opportunity to ask

23   Mr. Hoffman about these transactions?

24      A.   Yes, I did.  So for the ATF Form 4473 with a

25   transaction record number of 5446, that's involving the

1    sale of a Remington Model 870, 20-gauge shotgun with

2    serial number C925158.  That transfer date to

3    Mr. Hoffman was on April 21, 2017.  When confronted

4    with this -- and there was a handwritten receipt that

5    was made out for this firearm to a Michele Crews.

6              When confronted with this, Mr. Hoffman

7    advised that Michele Crews at the time was his

8    girlfriend, that she had came in to Frazier's Pawn

9    Shop, had paid for the firearm and was given a

10   handwritten receipt, and that Mr. Hoffman later

11   completed the ATF Form 4473 in his name and went

12   through the NICS background check and then gave the

13   firearm to Mrs. Crews.

14        Q.   Okay.  And did he also, Mr. Hoffman, speak to

15   the other number, the 5632, this other --

16        A.   Yes.  So the other ATF Form 4473 with a

17   transaction number of 5632, that was involving a Glock

18   pistol, Model 19, 9mm, with serial number AMCS728.

19   That was transferred to Mr. Hoffman on July 29, 2017.

20   There was a handwritten receipt that was for this

21   firearm to an Audrea Crews.  Mr. Hoffman advised that

22   Audrea Crews was Michele Crews's daughter.  Mr. Hoffman

23   identified her as like a stepdaughter and advised that

24   Audrea Crews was 18 years old at the time of this

25   purchase and that she paid for half the firearm, that

1   Mr. Hoffman completed the ATF Form 4473 for this

2   firearm, went through the background check, and then

3   gave it to Audrea Crews.

4        Q.   So Audrea Crews is underage and is unable

5   then to lawfully purchase a handgun?

6        A.   That's correct.  At 18 years of age, this is

7   a violation of federal law, yes.

8        Q.   And because she is underage, then Hoffman

9   says that he was then putting his name down as the

10  actual purchaser?

11       A.   That's correct.

12       Q.   When, in fact, he was not?

13       A.   That's correct.

14       Q.   And did Mr. Hoffman say that Mr. Frazier was

15  aware of these transactions?

16       A.   Yes.  In subsequent interviews, Mr. Hoffman

17  says that any time there were any kind of transactions

18  at the pawn shop there involving employees, that those

19  transactions had to go through and be approved by

20  Mr. Frazier so that there wasn't any, you know, low

21  pricing or to ensure that it was beneficial for the

22  pawn shop.

23       Q.   So that makes sense.  You don't want to give

24  your employees an incredible deal on firearms.

25       A.   That's correct.  So Mr. Hoffman advised both

58

1    of these firearm purchases that we just described, that

2    Mr. Frazier were aware of them and approved them.

3         Q.   Okay.  And did he mention other occasions

4    where he had talked to Mr. Frazier about, you know,

5    concerns that he may have had or other transactions

6    that may have been questionable?

7         A.   So in subsequent interviews, Mr. Hoffman

8    advised that Mr. Frazier was aware and facilitated all

9    the firearms transactions at Frazier's Pawn Shop.

10   Mr. Hoffman explained that during the first purchase on

11   October 18th, when he went to the back office -- now

12   Mr. Hoffman explains this, but based on our recordings

13   and based on our undercover agents' testimonies, we

14   believe it's going to be -- that he's mistaken and it

15   is the second firearms straw purchase that we did on

16   October 24th.

17        Mr. Hoffman says again that when they went to

18   the back, Mr. Frazier came back with him.  Hoffman

19   advised Mr. Frazier that the CI had a record and that

20   the female undercover agent was purchasing the firearm.

21   Mr. Frazier directed Mr. Hoffman to still proceed with

22   the firearm sale.

23        Mr. Hoffman says approximately 20 times over

24   the course of his employment there at Frazier's Pawn

25   Shop, that he asked Mr. Frazier for guidance on

1  questionable firearms transactions and that Mr. Frazier

2  always gave Mr. Hoffman a proceed.  Mr. Hoffman advised

3  that Mr. Frazier at no point during his employment

4  there, when he came to him with these questionable

5  firearms transactions, that at no point did Mr. Frazier

6  decline a firearm sale.

7          MR. BOYER:  That's all the questions I have

8  for you, Agent Martin.

9          HEARING OFFICER FRONCZAK:  At this time, do

10 you have any questions that you would like to ask --

11         MR. FRAZIER:  Yeah, maybe a couple.

12         HEARING OFFICER FRONCZAK:  -- regarding

13 Exhibit 5 and Exhibit 6?

14         MR. FRAZIER:  Five and six.

15         HEARING OFFICER FRONCZAK:  Five is the --

16         MR. FRAZIER:  Five is --

17         HEARING OFFICER FRONCZAK:  Right.

18         MR. FRAZIER:  A lot of this is just news to

19 me as far as recordings and everybody coming in here,

20 besides everybody coming in on the 24th of '18 with a

21 search warrant, a lot of this stuff.

22         And I do see that it looked like Bill bought

23 this first rifle that he's got a receipt to -- I guess

24 it's Michele somebody.  He personally -- it look like

25 he bought it in April of '17, and then why he would

 1   have a receipt, July of '17, that's kind of weird to

 2   me.  I mean he bought the gun himself in his name and

 3   then the receipt is 3 months later.  And as far as what

 4   he's saying is news to me also.

 5          But a couple of -- and I apologize for not

 6   having paper and pen to write on, to write questions

 7   down.  I'm trying to recall from memory.  Once again, I

 8   didn't know this was going to be a hearing.  I thought

 9   it was going to be a hearing, well, like previous

10   hearings in the past where I went in and talked about

11   the violations.  Anyways.

12                    **CROSS-EXAMINATION**

13          BY MR. FRAZIER:

14      Q.   But you had mentioned one that Bill was

15   selling guns out of the back.  Did you mean out of the

16   back of the building, out on the back parking lot, or

17   out of the back somewhere else?

18      A.   So when I indicated that there was

19   information that there were firearm sales that were

20   taking place out the back door, that is not me being

21   specific of literally at the rear entrance of the shop

22   or in the rear parking lot.  But it was -- the

23   information obtained was that there were basically

24   firearm transactions that were occurring there with, as

25   I explained earlier, off the books with no completion

1    of an ATF Form 4473 or NICS background check.  So

2    that's what I meant by that.

3         Q.   Did I guess Mr. Hoffman say where those guns

4    came from?

5         A.   As far as the off-the-book transactions?

6         Q.   Right.

7         A.   The only thing, and has been testified to

8    earlier, that during the exchange with the confidential

9    informant, all Mr. Hoffman said was that he would

10   occasionally get firearms off the streets.  He

11   references that he would get a firearm with no

12   contacts, and that if he came across one of those

13   firearms, that he would sell the firearm again off the

14   books to the informant.  That's all he referenced.

15        Q.   But he never said he sold them out of the

16   building off the books where the gun would -- he's

17   selling it to someone else, one of the pawn shop's

18   personal guns that came in through the system?

19        A.   So your question is he's saying that he would

20   be selling the firearm that didn't come in and wasn't

21   entered into your acquisition and disposition books or

22   a part of your inventory?

23        Q.   Yes.

24        A.   Yes, that's what we assumed he was referring

25   to.

1              MR. FRAZIER:  Besides that, I don't have any

2    questions right now.

3              HEARING OFFICER FRONCZAK:  I just wanted to

4    add one thing.  A hearing brochure describing the

5    hearing was provided you on February 14 of 2019.  It

6    described the whole procedure, what was going to take

7    place.

8              MR. FRAZIER:  Yeah, and like I say, I just --

9    when I talked, and I don't remember who I talked to,

10   whether it was you or it could have been, just that you

11   had said it would be an informal hearing, and I mean I

12   guess at this point, I'm thinking it's not an informal

13   hearing.  I probably would have brought an attorney if

14   I thought it was like this, but yeah.

15             HEARING OFFICER FRONCZAK:  Informal hearing

16   means it's not a court proceeding.  It's not a court

17   proceeding.  It's just an informal hearing.

18             BY MR. FRAZIER:

19        Q.   I guess I have one more question about Bill.

20   And he's saying that I personally knew of all the

21   transactions that went through there.  When did he give

22   you that information?

23        A.   He gave me this information in several

24   interviews throughout the course of this investigation.

25        Q.   You don't have the time frame?

                    Free State Reporting, Inc.
                     1378 Cape St. Claire Road
                        Annapolis, MD 21409
                         (410) 974-0947

1    A.   It's -- so we interviewed him -- let me see

2  here.  I can tell you when we sat down with him.  So I

3  sat down with him here on July 11th at this office and

4  interviewed Mr. Hoffman, and then I sat down with him

5  again on March -- so July 11 of -- let me see here.

6  Bear with me.  I apologize.  July 11 of 2018, I sat

7  down with Mr. Hoffman for an interview, and then March

8  20, 2019, we sat down with Mr. Hoffman here in an

9  interview.  And so most of what I stated that

10 Mr. Hoffman provided us was during the course of those

11 interviews.

12    Q.   But when he said that I personally knew that,

13 you don't know which date it was, whether it was March

14 or July?

15    A.   He definitely -- that part he stated was on

16 March 20, 2019.  During that interview, he stated to us

17 that you were aware of these transactions.

18         HEARING OFFICER FRONCZAK:  Anything else?

19         MR. FRAZIER:  No, sir.

20         MR. BOYER:  Just very quick follow-up if I

21 can.

22              **REDIRECT EXAMINATION**

23         BY MR. BOYER:

24    Q.   Sir, as far as this conversation of what was

25 relayed to you by Mr. Hoffman concerning Mr. Frazier's

64

1    knowledge of these transactions, was that, in fact,

2    corroborated by the undercover agent that was within

3    the store during that transaction?

4        A.   What was corroborated was that Mr. Frazier

5    went back with Mr. Hoffman into a back office or an

6    area outside of view from the shop area and at the time

7    of the transactions.

8        Q.   At the time Mr. Hoffman was going back to run

9    the NICS background check for that particular

10   transaction?

11       A.   That's correct.

12           MR. FRAZIER:  And for the record, just so you

13   know, that I have another office for another business

14   that goes through that office, and that's where I would

15   have been heading in the first place.

16           HEARING OFFICER FRONCZAK:  Does anybody need

17   to take a break at this time?

18           MR. VANN:  Why don't we take a break and

19   we'll get --

20           HEARING OFFICER FRONCZAK:  At this time at

21   11:22, we'll be off the record.

22           (Off the record at 11:22 a.m.)

23           (On the record at 11:36 a.m.)

24           HEARING OFFICER FRONCZAK:  It is 11:36, and

25   we are back on the record.

65

 1          MR. BOYER:  Before we jump into it, I

 2  understand the court reporter had some additional

 3  questions in terms of spelling for the witness.

 4          COURT REPORTER:  FLETC is one.

 5          THE WITNESS:  That is the Federal Law

 6  Enforcement Training Center, FLETC.

 7          MR. BOYER:  FLETC.

 8          THE WITNESS:  Yep.

 9          COURT REPORTER:  NICS.

10          THE WITNESS:  Is N-I-C-S.

11          COURT REPORTER:  Okay.

12          THE WITNESS:  And that stands for National

13  Instance Background Check System.

14          COURT REPORTER:  Rebish.

15          THE WITNESS:  Rebish is R-e-b-i-s-h.

16          COURT REPORTER:  You mentioned parts of the

17  trigger.  Sear.

18          THE WITNESS:  Yeah, sear is s-e-a-r.

19          COURT REPORTER:  Okay.  That's good.  Thank

20  you.

21          THE WITNESS:  Okay.

22          COURT REPORTER:  Tomlinson.  T -- Tomlinson.

23          THE WITNESS:  Yeah, and her spelling is T-o-

24  m --

25          MR. VANN:  l-i-n-s-o-n.

66

```
 1                  THE WITNESS:  -- l-i-n-s-o-n.

 2             MR. VANN:  Yeah.

 3                  THE WITNESS:  I couldn't remember if there

 4   was a B there.

 5             COURT REPORTER:  Hager.

 6                  THE WITNESS:  Is H-a-g-a-r or no wait, e-r,

 7   I'm sorry, e-r, yeah, Hager, H-a-g-e-r.

 8             COURT REPORTER:  And then there was Nasir --

 9                  THE WITNESS:  And his first name spelling is

10   N-a-s-i-r, and his last name spelling is S-e-s-s-o-m-s.

11             COURT REPORTER:  Kidrick, Kevin.

12             THE WITNESS:  Yes, it's K-i-d-r-i-c-k.

13             COURT REPORTER:  And Cruz, C-r-u-z?

14             THE WITNESS:  Yes, oh, I'm sorry.  Crews

15   is -- the receipt is -- I think it's C --

16             MR. BOYER:  C-r-e-w-s.

17             THE WITNESS:  Yes, that's it.

18             COURT REPORTER:  Okay.  That's good.  Thank

19   you.

20             MR. BOYER:  Yeah, Hearing Officer, I just

21   wanted to ask just clarification with Agent Martin here

22   concerning the firearms that were initially recovered

23   as part of the search warrant, seized as part of the

24   search warrant at Frazier's Pawn Shop but were not

25   properly annotated within the acquisition and
```

67

```
 1   disposition book.

 2             BY MR. BOYER:

 3        Q.   Agent Martin, let's go back and hit upon that

 4   real quick.  Initially, there were 10 firearms; is that

 5   correct?  That initially did not appear on Frazier's

 6   acquisition and disposition book?

 7        A.   That's correct.

 8        Q.   All right.  And were you able to find out

 9   when those were taken into his inventory?

10        A.   So I can speak for the eight firearms that we

11   showed.  The other two firearms, we eventually found in

12   the A&D book.  We had to do some checking though to

13   find those.

14        Q.   Okay.

15        A.   So after a review of the FFL records and

16   computer evidence --

17        Q.   Well, before going through this specific

18   phase, let me just --

19        A.   Yes, sir.

20        Q.   -- ask.  The search warrant was performed

21   when?

22        A.   On January 24, 2018.

23        Q.   Okay.  Were any of those then taken into

24   inventory let's say 30 days prior to the execution of

25   the search warrant?
```

1       A.   Yes, that's -- yes.

2       Q.   Okay.  How soon in time would any of those

3  have been brought into inventory?

4       A.   The soonest was January 10, 2018.

5       Q.   So that's outside of the 30-day window,

6  right?

7       A.   No, those two were not.

8       Q.   Okay.  I'm sorry.  Okay.  So were any of them

9  taken in the prior 2 days?

10      A.   Yes, yes, they were.  All 10 were taken in 2

11  days before, or longer than 2 days.

12      Q.   Longer than 2 days?

13      A.   Yes.

14      Q.   That's what I'm going for.  All of these were

15  at the outside of the 2-day window?

16      A.   That's correct.

17      Q.   And then just a clarification, initially

18  there were 10 but then 2 were later identified or --

19      A.   That's correct.

20      Q.   -- accounted for?

21      A.   Yes.

22      Q.   And can you tell us about that?

23      A.   So with a review of the FFL records, and

24  particularly the acquisition and disposition books, and

25  with the computer evidence that we seized, the Pawn

69

1   Master Program, we were able to determine that it was

2   just a matter of two of the firearms were accounted in

3   the acquisition and disposition books but just like off

4   dates.  So those were accounted for that were showing

5   in the book.

6        Q.   I see.  But eight of them were not accounted

7   for within those within those --

8        A.   Yes, eight firearms were not properly

9   recorded in Frazier's Pawn Shop acquisition and

10  disposition books.

11           MR. BOYER:  Thank you, Agent Martin.

12           HEARING OFFICER FRONCZAK:  For my

13  clarification purposes, you're talking about a 2-day

14  window.  Can you please explain that 2-day window?

15           MR. BOYER:  Absolutely.  So I didn't do that

16  very artfully.  So let me try that again.

17           BY MR. BOYER:

18       Q.   Were any of these firearms taken into

19  inventory for the first time within 2 days of the

20  execution of the search warrant?

21       A.   No, they were not.

22       Q.   All of the firearms then, these 10 firearms

23  that we're referring to, would have been taken into

24  inventory well before the execution of the search

25  warrant?

1      A.   That's correct.

2           MR. BOYER:  And so, Mr. Hearing Officer, the

3    specific reference and the reason why that's pertinent

4    for the hearing is that referring to 27 C.F.R.

5    478.125(e), which requires that any firearms basically

6    have until the close of the next business day when

7    taking firearms into the inventory to annotate them

8    within their A&D book.

9           That's all the questions we have.

10   Mr. Frazier, any follow up?

11                    **RECROSS-EXAMINATION**

12          BY MR. FRAZIER:

13     Q.   The firearms that are in question, you're

14   talking about the 10 firearms.  Two of those you found

15   in the logbooks like they were supposed to be, and the

16   other eight, they were not in the logbooks but they

17   were in our Pawn Master Program, where we bought and

18   had a contract on.  That's correct, right?

19     A.   Honestly, I cannot say which -- but, yes, I

20   believe most of them were.  I don't think that there

21   were any firearms that weren't.  I honestly cannot

22   recall, to answer your question, which firearms out of

23   these eight were in your Pawn Master Program.  All I

24   can say is that based on my review of your FFL records,

25   along with that computer evidence, that these eight

71

1    firearms were not properly recorded in the acquisition

2    and disposition books.  But to say which ones were in

3    that Pawn Master Program and not in your A&D books at

4    this time, I can't answer that with what I have in

5    front of me.

6         Q.   And just a couple of questions previously,

7    when you said earlier that when Mr. Hoffman bought a

8    handgun for his stepdaughter, is a father allowed to

9    buy a gun for someone under 21 that is at least 18 and

10   give as a gift?

11        A.   A biological parent can buy a pistol for a

12   child, but in this particular case, based on the

13   circumstances, this was not a gift.  Mr. Hoffman

14   admitted that Audrea Crews paid for half of the

15   firearm, and Mr. Hoffman admitted that he conducted

16   that transaction in his name because she could not go

17   in and legally purchase the pistol at the age of 18.

18   But I believe under West Virginia state law, that a

19   parent can provide their biological child a pistol for

20   the purposes of, you know, farming and that nature, and

21   that they can possess it, but as we've indicated

22   earlier though, this transaction would have been -- is

23   a violation of federal firearms laws.

24        Q.   Was he charged with any one of those and his

25   girlfriend or his stepdaughter?

1        A.   I recommended charges for those two

2   transactions to the U.S. Attorney's Office, but he was

3   not charged with that, no.

4        Q.   One more question about Christopher Rebish.

5        A.   Yes.

6        Q.   You had said earlier that he had said he had

7   bought quite a few guns from I guess out the back.  As

8   far as did he say, was it -- did he come in the

9   building to get those guns, or did he buy them just

10  from Bill Hoffman somewhere else?

11       A.   He didn't indicate a specific location.  He

12  did indicate though that he did purchase firearms there

13  at the pawn shop, but he didn't indicate a specific

14  location like in the back parking lot or where exactly

15  on the premises, but he just stated that he had

16  purchased several firearms off the books with no

17  paperwork in a 3-year time frame from Frazier's Pawn

18  Shop.

19       Q.   Did he have any records of that, what he

20  bought?

21       A.   No.

22            MR. FRAZIER:  Okay.  That's all I've got

23  right now.

24            HEARING OFFICER FRONCZAK:  Thank you.

25            MR. BOYER:  Just to clarify, Mr. Hearing

1    Officer, I just want to note that those transactions

2    that were mentioned as part of Agent Martin's testimony

3    relating to Rebish and off-the-book sales are not part

4    of the revocation, are not part of the notice for the

5    denial of application, renewal application.

6            HEARING OFFICER FRONCZAK:  Noted.  Thank you.

7            MR. BOYER:  That's all we have.

8            (Witness excused.)

9            MR. BOYER:  Should we call our next witness?

10           HEARING OFFICER FRONCZAK:  Sure.  Go right

11   ahead.

12   (Whereupon,

13                        **EILEEN VALLS**

14   was called as a witness by and on behalf of the

15   Government and was examined and testified as follows:)

16                     **DIRECT EXAMINATION**

17           BY MR. BOYER:

18      Q.   Can you please state your full name and

19   occupation for the record?

20      A.   Eileen Valls.  Do you want me to spell my

21   last name?

22      Q.   Please.

23      A.   V as in Victor, a-l-l-s as in Sam, and my

24   occupation is Industry Operations Investigator.

25      Q.   Okay.  What is an Industry Operations

                    Free State Reporting, Inc.
                    1378 Cape St. Claire Road
                       Annapolis, MD 21409
                        (410) 974-0947

74

1  Investigator?

2       A.   I go out and perform compliance inspections

3  as well as qualifications on federal firearms

4  licensees, people who want federal firearms licenses or

5  who want federal explosive licenses and permits.

6       Q.   Then are you employed by the Bureau, Alcohol,

7  Tobacco and Explosives?

8       A.   Yes, that's right.

9       Q.   Okay.  How long have you been with ATF?

10      A.   I've been with ATF since 1992.  I've been in

11 my current position since 2001.

12      Q.   Prior to assuming this current position in

13 2001, did you receive any training?

14      A.   Yes, I did.

15      Q.   And what did that training entail?

16      A.   They sent us to the Federal Law Enforcement

17 Training Center in Glynco, Georgia, for 8 weeks, and

18 then we had on-the-job training after that.

19      Q.   Did a portion of either the training received

20 at FLETC or this on-the-job training include training

21 on federal firearms laws and regulations?

22      A.   Yes, it did.

23      Q.   Can you speak -- I know that's very broad,

24 but can you speak generally to the training that you

25 received as it pertained to laws and regulations?

75

1      A.   In FLETC, they went over mock compliance

2  inspections, they went over the regulations in detail,

3  they gave us the regulations book.  We went through it

4  and had tests on it.  We had to pass with a certain

5  GPA.  Otherwise, we wouldn't graduate from FLETC.  When

6  we did on-the-job training, we also extensively had to

7  go through the regulations, read them, get to know them

8  so that we could apply them in our position.

9      Q.   In the course of your time then as an IOI,

10  since 2001, how many, and again this is not a firm

11  figure but just an estimate, how many inspections have

12  you performed?

13      A.   Thousands.  I couldn't even begin to guess.

14      Q.   All right.

15      A.   Thousands.

16      Q.   And what does -- there are two types of

17  inspections, right?  If an individual applies for an

18  application, is that going to involve an inspection

19  or --

20      A.   It's qualifications.  So we're going to

21  basically qualify that they have a business premises,

22  what they're going to be doing with their license, that

23  they actually have a valid business.  That would be the

24  qualification.  And the compliance inspection would be

25  if they currently hold a license, we would go in and

76

1    complete an inventory, review forms and give violations

2    if there are any, and also go over the rules and

3    regulations at the end of each inspection.

4         Q.   All right.  So whether it's a qualification

5    inspection or a compliance inspection, then you engage

6    with the individual or the licensee what the federal

7    firearms laws and regulations are?

8         A.   Absolutely, yes.

9         Q.   And you go over them in detail?

10        A.   Yes.

11        Q.   And how is it that you can -- is there a way

12   to account for the fact that you've gone over these

13   federal firearms laws and regulations with them?

14        A.   Yes.  ATF has an acknowledgement form that we

15   go over, and everything that applies to that particular

16   licensee, I will go through and I will check off each

17   one of them as I'm talking about it, and then both the

18   licensee and I will sign at the bottom of the second

19   page.

20             MR. BOYER:  Great.  I'm going to go ahead and

21   admit Government's Exhibit 7.  So it will be the

22   acknowledgement of the federal firearms regulations.

23   It's a two-page document, dated on the second page June

24   30, 2009.  I'm giving a copy to the Hearing Officer,

25   Mr. Frazier, and to the court reporter.

77

1   **(Government's Exhibit 7 marked and received in**

2   **evidence.)**

3            BY MR. BOYER:

4       Q.   As well as I'll show you a copy of

5   Government's Exhibit 7 as well.  Is this the form that

6   you are referring to?

7       A.   This is.  This was not one of mine, but this

8   is, yes.

9       Q.   Okay.  And I notice here on the left, are you

10  able to -- well, you said it's not yours.  Are you able

11  to tell from the document whose it is?  There's a

12  signature there.  It's hard to make out.

13      A.   I really don't know whose signature that is.

14  I could guess, but I don't know for sure.

15      Q.   Okay.  And, likewise, there's an applicant's

16  licensee signature.  Are you able to make that out at

17  all?

18      A.   Not particularly.

19      Q.   Okay.  Okay.  But on the front page, it looks

20  like under licensee name --

21      A.   Yes.

22      Q.   -- that indicates that you've got David

23  Frazier among those who are on this?

24      A.   That's correct.

25      Q.   Okay.

                    Free State Reporting, Inc.
                    1378 Cape St. Claire Road
                    Annapolis, MD 21409
                    (410) 974-0947

78

1    A.   Yes.

2    Q.   And taking a look on, I notice on the front

3  page, there are boxes right next to each term there.

4  What are those, and what is the handwritten notes in

5  each of them?

6    A.   The handwritten that's in the boxes, the

7  boxes I usually just check as I go through.  This one

8  actually looks to be initialed, and the initials are

9  DF.  So that would be David Frazier.

10   Q.   And included in those I notice that there is

11  under 2, there's also a box and there is straw

12  purchase.

13   A.   Yes, that's correct.

14   Q.   All right.  And in preparation for this

15  hearing today, you assisted me in tracking this

16  document down.

17   A.   That's correct, yes.

18   Q.   Where did you find this document?

19   A.   We requested it from the Licensing Center,

20  from Kim Rowland who is one of the supervisors at the

21  Licensing Center.

22   Q.   And did it come from Frazier's Pawn Shop's

23  official file?

24   A.   As far as I understand.  I received it from

25  Kim Rowland.  So she would have had to go into his file

79

1   to get that in microfiche.

2        Q.   But you requested that they go into his

3   official file --

4        A.   Yes.

5        Q.   -- and retrieve this document for you?

6        A.   Yes.

7        Q.   All right.  Fantastic.  And you've had

8   some -- you're aware of Frazier's Pawn Shop?

9        A.   Yes.

10       Q.   Okay.  And would this date then, this 2009,

11  does that correspond with when the qualification and

12  inspection would have occurred?

13       A.   I believe so.

14       Q.   Okay.  He received his --

15       A.   I'd have to check my files, but I believe so.

16       Q.   He received his license in 2009?

17       A.   Yes.

18       Q.   Okay.

19            HEARING OFFICER FRONCZAK:  I have one.  I

20  have a question.  Mr. Frazier, is that your signature

21  on page 2?

22            MR. FRAZIER:  Yes.

23            HEARING OFFICER FRONCZAK:  Thank you.

24            MR. BOYER:  Mr. Hearing Officer, I'll admit

25  Government Exhibit 8.  Again, a two-page document.

1   This again is an acknowledgement of federal firearms

2   regulations, dated on the second page, signature, ATF

3   Investigator Katherine Lang dated May 7, 2010.  And,

4   again, that will be Government Exhibit 8.  A copy for

5   the Hearing Officer.

6              HEARING OFFICER FRONCZAK:  Government Exhibit

7   8 is entered for the record.

8              MR. BOYER:  Court reporter and Ms. Valls.

9   **(Government's Exhibit 8 marked and received in**

10  **evidence.)**

11             BY MR. BOYER:

12      Q.   Again, it looks similar to the Government

13  Exhibit 7.  Again, is this the same form that is gone

14  through on a compliance inspection?

15      A.   Yes, this is the same form.

16      Q.   Okay.  And who is -- do you know Katherine

17  Lang?

18      A.   I do.

19      Q.   Okay.  Who is Katherine Lang?

20      A.   She is an Industry Operations Investigator as

21  well.

22      Q.   And, again, on the front page, those initials

23  then indicate DF.

24      A.   They do.

25      Q.   Okay.  And the licensing name listed on this

81

1    is David Frazier?

2          A.    Yes, it is.

3          Q.    Okay.

4                HEARING OFFICER FRONCZAK:  I have a follow-up

5    question, too.  Mr. Frazier, that's your signature on

6    page 2 again?

7                MR. FRAZIER:  Yes.

8                HEARING OFFICER FRONCZAK:  Thank you.

9                MR. BOYER:  Mr. Hearing Officer, I'm marking

10   Government Exhibit 9.  This is another acknowledgement

11   of federal firearms regulations, a two-page document,

12   second page dated March 14, 2012.  I'm handing a copy

13   to the Hearing Officer, Mr. Frazier, and to the court

14   reporter.

15               HEARING OFFICER FRONCZAK:  Government Exhibit

16   Number 9 is accepted into the record.

17   **(Government's Exhibit 9 marked and received in**

18   **evidence.)**

19               BY MR. BOYER:

20         Q.    And Ms. Valls.  Ms. Valls, does this look

21   familiar to you?

22         A.    Yes, it does.

23         Q.    What is this?

24         A.    This is an acknowledgement of federal

25   firearms regulations that I completed on one of the

 1   compliance inspections, one of Mr. Frazier's compliance

 2   inspections.

 3        Q.   And how do we know that this was -- how do

 4   you know that this is one that you completed?

 5        A.   It has my signature on the bottom of the

 6   second page.  It's also my handwriting on the first

 7   page.

 8        Q.   All right.  And you had mentioned before, you

 9   said, and it looks like there's a handwritten note

10   there in the licensing name.

11        A.   Yes.

12        Q.   Is that your handwriting --

13        A.   It is.

14        Q.   -- written in, David Frazier?

15        A.   Yes.

16        Q.   Okay.  And you had mentioned earlier these

17   slashes through these boxes.  What is that?

18        A.   As I go through and I cover each topic with

19   the licensee, I make a slash mark so that I know that

20   I've already covered that topic.

21        Q.   Okay.  Meaning that you would have talked in

22   detail about each one of these provision?

23        A.   Yes, and I also have handouts that I give

24   them as well.  So, yes.

25        Q.   And do you recall having this conversation

```
 1  with Mr. Frazier?

 2      A.   I've had several of these conversations with

 3  Mr. Frazier.

 4      Q.   Okay.

 5      A.   So, yes.

 6      Q.   So you have discussed with him in the past

 7  his responsibilities as it pertains to federal firearms

 8  regulations?

 9      A.   Yes, many times.

10      Q.   Okay.

11           HEARING OFFICER FRONCZAK:  And, again,

12  Mr. Frazier, that's your signature on page 2?

13           MR. FRAZIER:  Yes.

14           HEARING OFFICER FRONCZAK:  Thank you.

15           BY MR. BOYER:

16      Q.   And this was -- I'll note, this was in --

17  this Government Exhibit 9, dated 2012.

18      A.   Yes.

19      Q.   Was there a compliance inspection done around

20  2012?

21      A.   Yes.

22      Q.   Okay.  And did you perform that inspection,

23  or were you involved in that inspection?

24      A.   I was the lead for it, yes.

25      Q.   Okay.  What did you find in your inspection?
```

84

```
 1          A.   I may have to go check my report of

 2    violations for that.

 3          Q.   Okay.  Well, I guess without --

 4          A.   I can't tell you off the top of my head.

 5          Q.   Were there any violations noted in your

 6    inspection?

 7          A.   Again, I'd have to go check.

 8          Q.   Okay.  I'm going to go ahead and show you

 9    what's been marked as Government's Exhibit 1.

10               MR. BOYER:  Mr. Frazier, you've got a copy of

11    Government Exhibit 1 already.

12               MR. FRAZIER:  Yes.  Sorry.

13               BY MR. BOYER:

14          Q.   Okay.  Ms. Valls, if you would, this is the

15    Notice to Deny Application that was issued to

16    Mr. Frazier.  Would you mind taking a quick moment.

17    You'll notice on page 3, it starts compliance

18    inspection.

19          A.   Page 2, compliance inspection.

20          Q.   I'm sorry.  Well, on the top, it's marked

21    page 2, but it's, in fact, for the exhibit, page 3.

22          A.   It is, yes.

23          Q.   But if you would, take a minute and review

24    the compliance inspection.

25          A.   We're talking about the 2012 inspection,
```

85

 1   correct?

 2        Q.   Correct.

 3        A.   Okay.  So on page -- well, there's 4 at the

 4   top.  Number 7, this would be March 14, 2012 --

 5        Q.   Um-hum.

 6        A.   -- which should correspond with the -- I'm

 7   sorry -- March 14, 2012, which corresponds with your

 8   acknowledgement of federal firearms regulations, and it

 9   does say that Mr. Frazier was provided with a copy of a

10   report of violations.  So there was a report of

11   violations given at that inspection.

12        Q.   Okay.

13        A.   Yes.

14        Q.   And can you give us an idea, and you

15   certainly don't need to read them all from the exhibit,

16   but there's a list of violations there on that page.

17        A.   Yes.

18        Q.   Can you give us an idea of some of the

19   violations that were noted?

20        A.   We have acquisition/disposition violations,

21   as well as 4473 violations that we found during that

22   inspection.

23        Q.   As a result of this inspection and on finding

24   these violations, did ATF take action?

25        A.   Yes, we held a warning conference with

1    Mr. Frazier.

2              MR. BOYER:  All right.  I'm going to mark

3    this as Government Exhibit 10.  This is a six-page

4    document, making up three two-page letters, the first

5    letter dated July 11, 2012, second letter July 10,

6    2012, third letter included within this exhibit is June

7    20, 2012.  I'll hand Government Exhibit 10 to the

8    Hearing Officer, one to Mr. Frazier --

9    **(Government's Exhibit 10 marked for identification.)**

10             HEARING OFFICER FRONCZAK:  What are these

11   exhibits specifically?

12             MR. BOYER:  It's all in one.  So these three

13   letters will make up Government Exhibit 10.

14             HEARING OFFICER FRONCZAK:  So Government

15   Exhibit 10 will be --

16             MR. BOYER:  It will be a six-page document.

17             HEARING OFFICER FRONCZAK:  -- a six-page

18   document.  What is the document of -- relating to?

19             MR. BOYER:  Oh, I'm sorry.  It's related to

20   the warning conference.  And a copy to Ms. Valls.

21             BY MR. BOYER:

22        Q.   If you could, Ms. Valls, for us --

23             HEARING OFFICER FRONCZAK:  Can you pause one

24   second?

25             MR. BOYER:  Yes.

HEARING OFFICER FRONCZAK: Government Exhibit 10 is accepted into the record.

**(Government's Exhibit 10 received in evidence.)**

MR. BOYER: Okay. I'm sorry.

BY MR. BOYER:

Q. Ms. Valls, can you kind of help us out here? So is this first letter here, do you recognize that?

A. Yes.

Q. What is this letter?

A. This is a letter that we send as a follow-up to a warning conference. It basically memorializes that we had a warning conference and what was discussed at that warning conference.

Q. All right. And this indicates that the warning conference was held on July 10, 2012, at this location here?

A. That is correct.

Q. All right. Did you participate in that --

A. Yes, I did.

Q. -- warning conference?

A. Yes.

Q. Who else was there? Was Mr. Frazier there?

A. Mr. Frazier was there, and my supervisor was there. I don't recall anybody else being there.

Q. Okay. And what was -- do you remember what

88

1   was discussed during that warning conference?

2       A.   We would have discussed the report of

3   violations that we gave him, any corrective actions

4   that he's taken at that point in time, and how he's

5   going to move forward.

6       Q.   Okay.  Now, I notice that page 3 of this

7   exhibit, right, the letter's dated July 10th.  This

8   appears to be a warning letter.

9       A.   Correct.

10      Q.   Was that -- so a warning letter was issued in

11  addition to the warning conference?

12      A.   That's correct, yes.

13      Q.   Okay.  And finally the third letter there,

14  that appears to be informing the notification of the

15  warning conference; is that correct?

16      A.   Yes.

17      Q.   That would have been sent to Mr. Frazier?

18      A.   Yes, that's correct.

19      Q.   All right.  Understanding then that this one

20  went to a warning conference, was there any history or

21  compliance problems prior to this warning conference?

22      A.   Yes.

23      Q.   Okay.  Can you speak to that?

24      A.   Going back to the original letters that we're

25  talking about, in Exhibit 1 --

89

1    Q.   Government Exhibit 1.

2    A.   -- it does have all of the compliance history

3 in here.  So we did have an inspection in 2010, and he

4 was cited for various violations dealing with 4473s and

5 the A&D book.  That was 2010.  In 2011, it looks like

6 we also did an inspection in 2011.  He was also cited

7 for violations of the A&D and 4473.

8    Q.   And that actually is the one here --

9    A.   Yes.

10   Q.   -- the warning conference that came following

11 that 2011 compliance inspection; is that correct?  Or,

12 no, 2012.

13   A.   2012.

14   Q.   Yeah.

15   A.   So, yeah.  This would be before we had the

16 warning conference.

17   Q.   Okay.

18   A.   2012 was the warning conference.  Generally,

19 we do a warning letter first, and then if they have

20 repeats and violations, more instances, then we go to a

21 warning conference.

22   Q.   I see.  And so just to clarify, there was

23 this 2010 compliance inspection?

24   A.   It looks to me there was a 2010 and a 2011

25 compliance inspection, and then we went back again in

90

1    2012.

2        Q.   Okay.  And as a result of the 2010 compliance

3    inspection, did ATF take any action?

4        A.   It looks like he received a warning letter

5    per the compliance history.

6        Q.   Is that one of the reasons why a warning

7    conference was held following the 2012 inspection?

8        A.   That would be correct.  If he had repeat

9    violations, if he had higher instances of violations,

10   we would have proceeded to a warning conference, yes.

11       Q.   Within the warning letter, is part of the

12   intention to put the federal firearms licensee on

13   notice that additional violations could potentially

14   lead to revocation of the license?

15       A.   Yes, that's correct.

16       Q.   Would that have also been the similar intent

17   and purpose of the warning conference?

18       A.   Yes, absolutely.

19            MR. BOYER:  And I'm going to mark this again

20   Government Exhibit 11.  This is a two-page document,

21   and once again, this is going to be an acknowledgement

22   of federal firearms regulations, this one dated

23   November 4, 2014.  And a copy to the Hearing Officer,

24   Mr. Frazier, court reporter, and to Ms. Valls.

25            HEARING OFFICER FRONCZAK:  Government Exhibit

 1    11 is accepted into the record.

 2    **(Government's Exhibit 11 marked and received in**

 3    **evidence.)**

 4            BY MR. BOYER:

 5        Q.   Ms. Valls, do you recognize this document?

 6        A.   Yes, I do.

 7        Q.   Similar to what we've see, the previous

 8    Government Exhibits 9 and 8 and 7?

 9        A.   Yes.

10        Q.   And is this your signature on the second

11    page?

12        A.   Yes, it is.

13        Q.   All right, 2014 did this also then accompany

14    an inspection?

15        A.   Yes, it did.

16        Q.   Okay.  And you participated in the inspection

17    of Mr. Frazier's pawn shop?

18        A.   Yes, I did.

19        Q.   And as before, it looks like you had gone

20    through and acknowledged that you had discussed each of

21    the requirements under the federal firearms regulations

22    with Mr. Frazier?

23        A.   Not with Mr. Frazier.  This is signed by Bill

24    Hoffman.

25        Q.   Okay.  Who is Bill Hoffman?

1          A.   He is the firearms manager.  I'm not sure

2     exactly what his title was, but he was the one who was

3     doing all the firearms transactions at that time.  So

4     Mr. Frazier had delegated him to actually participate

5     in the compliance inspection and go over the rules and

6     regulations with me.

7          Q.   Okay.  And this would be a notice here on the

8     second page then.  The signature then, that's of

9     William Hoffman, Bill Hoffman?

10         A.   That's correct, yes.

11         Q.   Okay.  That's 11.  I'm handing you one more

12    document in case you didn't have enough already.

13              MR. BOYER:  I'm marking this Government

14    Exhibit 12.  Government Exhibit 12 is going to be a

15    one-page document titled documents provided to and

16    reviewed with the FFL.  I'm handing a copy to the

17    Hearing Officer, Mr. Frazier, court reporter.

18              HEARING OFFICER FRONCZAK:  Government Exhibit

19    12 is accepted into the record.

20    **(Government's Exhibit 12 marked and received in**

21    **evidence.)**

22              BY MR. BOYER:

23         Q.   I'm handing it to you, Ms. Valls.  Ms. Valls,

24    do you recognize this document?

25         A.   Yes, I do.

1    Q.   What is this?

2    A.   This is a listing of all the documents that

3    we -- the hard copy documents that we provide to the

4    FFL or their representative.

5    Q.   Okay.  And I note here, it looks like -- so

6    these were the documents then that would have been

7    issued to Frazier's Pawn Shop --

8    A.   That's correct.

9    Q.   -- if I'm reading it right, the licensee's

10   name?

11   A.   Yes.

12   Q.   And, again, whose signature do we have at the

13   bottom?

14   A.   William Hoffman.

15   Q.   And he is signing it in his capacity as it

16   says industry member?

17   A.   Yes.  Mr. Frazier gave him permission to go

18   ahead and do the compliance inspection with us and sign

19   on his behalf.

20   Q.   Okay.  And if you can, it looks like there's

21   checkmarks in each of these boxes.

22   A.   Yes.

23   Q.   What are the checkmarks, and what is this

24   indicating?

25   A.   We marked off every document that we gave to

94

1    him that's on the list.  The backward checks are mine

2    because I'm left handed.

3         Q.   Okay.

4         A.   So I completed it.

5         Q.   All right.  And why do you, I guess, have

6    this form?

7         A.   Just so that we can document that not only we

8    went over the acknowledgement, but we also gave them

9    the forms that were related to the acknowledgement of

10   federal firearms regulations.

11        Q.   Okay.  All right.  Ms. Valls, I'm going to

12   fast forward in -- well, let's see here.  Before I go

13   there, 2014 inspection that you participated in that.

14   Were there any violations noted in your inspection in

15   2014?

16        A.   Yes.

17        Q.   Take a look at Government Exhibit 1.

18        A.   Yes, there were.

19        Q.   Okay.  Can you generally speak to the

20   violations?

21        A.   Again, just acquisition/disposition

22   violations as well as 4473 violations.

23        Q.   Okay.  And did ATF take any action following

24   that inspection?

25        A.   We sent him a warning letter.

95

1    Q.   And in that warning letter, as done

2   previously, would Mr. Frazier have been put on notice

3   that any potential further violations could lead to

4   revocation of his license?

5    A.   Yes.

6    Q.   Now, fast forwarding in time, I understand

7   that you received a call on May 3, 2017, from

8   Mr. Hoffman, Bill Hoffman.

9    A.   That's correct.

10    Q.   All right.  And what was that call?

11    A.   Mr. Hoffman called because he said that he

12   had taken in a firearm, I'm not sure if was on pawn or

13   they purchased it, but he took in a firearm and he said

14   that he did not think that the firearm was configured

15   correctly, that it had a part that shouldn't be on it.

16   So he said that he had taken the part off of the

17   firearm, but he wanted an agent to come by to look at

18   the firearm to determine if that part was supposed to

19   be on it or not be on it.

20    Q.   Um-hum.  Did he mention that he had sold the

21   firearm?

22    A.   No, he did not.

23    Q.   Okay.  What did you do after receiving this

24   phone call?

25    A.   I referred the call over to Special Agent

96

1  Martin and let him know what I talked about with

2  Mr. Hoffman and asked him if he could go out and look

3  at the firearm that Mr. Hoffman had.

4      Q.   Now, of course, this eventually became a

5  criminal investigation?

6      A.   Yes.

7      Q.   And you're aware of that?

8      A.   Yes.

9      Q.   All right.  So this was May 3, 2017, that you

10 received this call.  There was a search warrant

11 actually that was performed the following year, right,

12 in March --

13     A.   That's correct.

14     Q.   -- of 2018?

15     A.   Yes.

16     Q.   All right.  Did you have any involvement in

17 that search warrant or reviewing the records that were

18 recovered as a part of that search warrant?

19     A.   Yes.

20     Q.   Can you tell us about that?

21     A.   There was a team of IOIs that were put

22 together, including our supervisor, and we went in with

23 our purpose of doing inventory to see if there was

24 anything, any firearms they had on the premises that

25 were not logged into their books.

97

1      Q.   Okay.  Did you find any firearms that were

2  not logged into their books?

3      A.   Initially we found 10 firearms that were not

4  logged into their books, and later we found that there

5  were 2 in the book that were not in the correct order.

6  So we didn't find them initially.  So we ended up

7  having eight firearms on the premises that were not yet

8  logged into the A&D book when we were there.

9      Q.   And just to be clear, I understand per our

10  regulations that a licensee has until the end of the

11  next business day to log those firearms into their A&D

12  book?

13      A.   That's correct.

14      Q.   Were any of those firearms, you know,

15  received into Mr. Frazier's inventory during that time

16  frame?

17      A.   I have no way of knowing that.

18      Q.   Okay.

19      A.   Yeah.

20      Q.   To your knowledge, were any of those firearms

21  received within that short 24-hour period?

22      A.   Not to my knowledge.

23      Q.   Okay.  All right.  And then did you also

24  participate in the review of the records that were

25  recovered from Mr. Frazier's shop?

98

```
 1        A.   I did.

 2        Q.   And there were a number of violations that

 3   were noted; is that correct?

 4        A.   That's correct.

 5             MR. BOYER:  Mr. Hearing Officer, I'm marking

 6   Government Exhibit 13.  This is going to be an 87-page

 7   document consisting of 29 4473s and 51 number of

 8   violations identified therein.  I'm handing a copy to

 9   the Hearing Officer, Mr. Frazier, the court reporter.

10             HEARING OFFICER FRONCZAK:  Government Exhibit

11   Number 13 is accepted into the record.

12   (Government's Exhibit 13 marked and received in

13   evidence.)

14             BY MR. BOYER:

15        Q.   Ms. Valls, I'm handing you a copy of

16   Government Exhibit 13 as well.

17        A.   Okay.

18        Q.   Now, Ms. Valls, this is some of the records

19   that were recovered during the search warrant from

20   Mr. Frazier's pawn shop.  And if I go through, I note

21   on page 3, for example, of Government Exhibit 13, there

22   is a box around number 29.

23        A.   That is correct.

24        Q.   What is that box?

25        A.   That box indicates an error.  We go through
```

1    the 4473s looking for errors.  And so when we make

2    copies of them to put them into our databases, we put a

3    box around whatever we found to be wrong.  In this

4    case, it's blank.

5        Q.   Okay.  And so I was going to say, what is the

6    error?  It's blank.  What should be within this box?

7        A.   It should be the written out number of how

8    many firearms were sold in this transaction.  So in

9    this case, there was one sold as shown above.  So they

10   should have o-n-e written out as one.

11       Q.   Okay.  And is that a violation of federal

12   firearms regulations?

13       A.   That's correct, yes.

14       Q.   Okay.  Let's move to the next 4473.  It looks

15   like this one would be on the second page --

16       A.   Yes.

17       Q.   -- of that one.  I notice on the bottom there

18   are two boxes there.

19       A.   Um-hum.

20       Q.   Again, does that indicate a violation?

21       A.   Yes, because it's blank, and it should have

22   had a date and a signature there.

23       Q.   Okay.  And by not including -- and the

24   signature would be for the transferee or the buyer's

25   signature --

 1          A.    That's correct.

 2          Q.    -- as well as the recertification date?

 3          A.    Yes.

 4          Q.    All right.  And in not having the transferee

 5     or buyer sign, is that a violation of the federal

 6     firearms regulations?

 7          A.    Yes.

 8          Q.    Okay.  I'm not going to go through all 87

 9     pages, but let's go -- I would like to go through just

10     one more here.  And it looks like on the next -- so

11     this would be the third -- each Form 4473 I should note

12     is three pages each; is that correct?

13          A.    It's actually more because it has

14     instructions, but the pages that you write on are three

15     pages, yes.

16          Q.    And we've only included the pages that you

17     write on in the Government exhibit?

18          A.    That's correct.

19          Q.    Okay.  So this would be moving then to the

20     third 4473 that we've included here.  It looks like

21     we've got the same error for that or same violation?

22          A.    Yes, that's correct.

23          Q.    Here, where the transferee or buyer did not

24     sign?

25          A.    Yes.

1      Q.   All right.  And you had an opportunity, again

2  you don't need to go through all of them, but you've

3  gone through and identified all the errors and

4  violations contained in these 4473s, correct?

5      A.   Yes.

6      Q.   And each of those have been indicated with a

7  box?

8      A.   Yes.

9      Q.   Okay.  I would also note that I had said when

10 introducing the exhibit, that there were 29 4473s.  The

11 number of violations were 51.

12     A.   That's correct.

13     Q.   Can you explain why that might be?

14     A.   Well, each form may have multiple.  So the

15 second one we looked at, it was missing a signature and

16 a date.  So that would be two on one form, two errors

17 on one form.

18     Q.   Okay.  Very good.

19          MR. BOYER:  I'll mark this Government Exhibit

20 14.  This will be a 111-page document consisting of 37

21 ATF Form 4473s and indicating 64 violations.  I'm

22 handing a copy to the Hearing Officer, Mr. Frazier, the

23 court reporter.

24          HEARING OFFICER FRONCZAK:  Government Exhibit

25 14 is accepted into the record.

1

2     **(Government's Exhibit 14 marked and received in**

3     **evidence.)**

4              BY MR. BOYER:

5        Q.   Ms. Valls, I'll continue to add to your

6     stack.  Again, as previously indicated, these were

7     records that were recovered from Frazier's Pawn Shop.

8     And, again, it appears to have been compiled the

9     written portions of the Form 4473, correct?

10       A.   That's correct.

11       Q.   Okay.  Let's take a look then at a few of

12    these here then.  So on the second page, in this case,

13    there is information written within here, the box is

14    around the certification date, but there is a date in

15    there.  Why would that date or why would that be

16    indicated as a violation?

17       A.   That date is 1/30/2016, and if you look down

18    at 19.a, which would be the date that the background

19    check was called in, that is 1/20/2017 which also

20    corresponds with number 37 on the next page which is

21    1/30/2017.  So they have the incorrect date in the one

22    that is boxed.

23       Q.   So the date that should be listed there in

24    block 15 should be the same as that listed in box 19.a

25    as well as in block 37?

103

```
 1        A.   In this case, yes.

 2        Q.   Okay.  That's what -- it should be the same.

 3        A.   It should be.

 4        Q.   In this instance, it's not.

 5        A.   In this case, it's not.

 6        Q.   And is that a violation of the federal

 7   firearms regulations?

 8        A.   Yes.

 9        Q.   The next 4473, transaction number it looks

10   like 5433, also we've got a marker around block 15, and

11   is that for the same problem, same violation?

12        A.   It has an incorrect date.  It actually has

13   the purchaser's birth date.

14        Q.   Which was not --

15        A.   The date in there.

16        Q.   -- April 13, 2017?

17        A.   No.

18        Q.   All right.  The next one, let me see if I --

19   and it looks like the next -- okay.  And that continues

20   throughout the remainder of the Government Exhibit 14;

21   is that correct?

22        A.   It appears so.  On 5471 is not a date issued,

23   but there is an error on it.

24        Q.   Yeah.

25        A.   You want to do that one?
```

104

1     Q.   Yeah, maybe let's do that just to clarify the

2   record.  There's 12.a on transaction number 5471.

3   You've highlighted that --

4     A.   Yes.

5     Q.   -- right?  Why would that be -- is that the

6   same type of violation as that of listing the wrong

7   date in block 15?

8     A.   It's the same citation --

9     Q.   Okay.

10     A.   -- in the federal firearms regulations, yes.

11     Q.   Okay.  And so in this case, what should be

12   listed?

13     A.   They should have marked their country of

14   citizenship, and that is blank, the purchaser of the

15   firearm.

16     Q.   Okay.  Now, is the -- and I should note that

17   the violations, so when going through, you know, you're

18   acknowledgement form and your inspections, when

19   speaking to the licensees, would you have informed them

20   that they needed to ensure that the transferee or the

21   buyer completely fill out 4473?

22     A.   Yes, and actually as we go through it, and we

23   find errors, we usually take the forms to them and

24   explain to them, you've got a bunch that are blank on

25   this number, or you've got a bunch of incorrect dates.

1    So you need to make sure that you really look at those

2    pieces of information for the next time.

3        Q.   And is that what you, in fact, did for

4    inspections that you participated in, in 2012 and 2014

5    with Mr. Frazier?

6        A.   Yes, that's standard operating procedure for

7    us.

8        Q.   You would have informed them not only of the

9    violation but followed that up with the 4473 that shows

10   them what the error is?

11       A.   Yeah, we usually show them the form as we do

12   the inspection, and then when we go over the

13   violations, we'll say, okay, remember we showed you

14   these numbers were not correct, and that's how we would

15   do it, yes.

16       Q.   And were some of the violations that you

17   noticed, as you're going through the records that were

18   recovered pursuant to the search warrant, were some of

19   the violations noted repeat violations?

20       A.   Yes.

21       Q.   Okay.  In other words, they had been

22   violations noted on previous inspections, but they

23   continued to have the same problem?

24       A.   That's correct.

25            MR. BOYER:  The next exhibit, Government

1   Exhibit 15, is going to be a 15-page document

2   consisting of five 4473s with five violations.  For

3   clarification, I think I left this off previously for

4   the record, but Government Exhibit 13 would be for

5   violation of 478.21(a).  Government Exhibit 14 was a

6   compilation of those 4473s that included violations of

7   478.124(c)(1).  Government Exhibit 15 is going to be a

8   compilation of those 4473s that include violations of

9   478.124(c)(3)(i).

10          And, again, I'm marking Government Exhibit

11  15.  A copy for the Hearing Officer --

12  **(Government's Exhibit 15 marked for identification.)**

13          THE WITNESS:  Well, that's the whole stack

14  you gave me.

15          MR. BOYER:  Oh, did I give you the whole

16  thing?  Hand a copy to Mr. Frazier and to the court

17  reporter.

18  **(Government's Exhibit 15 received in evidence.)**

19          BY MR. BOYER:

20      Q.   And, Ms. Valls, you have a copy as well?

21      A.   I do.

22      Q.   Okay.  Let's take a look at this one.  On the

23  second page there, there is a block 18.a, and it's

24  around the information listed under expiration date of

25  identification.

1    A.   That's correct.

2    Q.   What is the -- why is that highlighted?

3    A.   It's an expired driver's license at the time

4  of this transaction.  So we have in number 15, a

5  certification date of 4/24/17, and we also have a 19.a,

6  4/24/17.  So this license was expired at the time of

7  this transaction.

8    Q.   All right.  And is that -- in not having or

9  not using an expiration date, is that a violation of

10  478.124(c)(3)(i)?

11    A.   That's correct.

12    Q.   Okay.  It appears on the second 4473, which

13  would be transaction number 5443, we have the same

14  information highlighted in block 18.a.

15    A.   That's correct.

16    Q.   And can you tell us, is that for the same

17  reason?

18    A.   They put a birth year instead of putting the

19  correct year of expiration.  So we don't know if this

20  license was expired or not.  It was an incorrect date.

21    Q.   Certainly the date, if we go by the date

22  alone, the date is well expired?

23    A.   Yes, absolutely.

24    Q.   Of that license.

25    A.   Yes.

 1      Q.   The next one would be it looks like

 2  transaction number 5536.  We've got two boxes that are

 3  highlighted on that page, and that's going to be in

 4  block 18.a as well as in 19.d.  Same problem in 18.a

 5  with the expiration date?

 6      A.   Yes.

 7      Q.   Okay.  We don't know if that is the actual

 8  date that is listed on the license.  Certainly if it

 9  was, that's an expired date?

10      A.   That's correct, yes.

11      Q.   Okay.  Indicate that the license is expired.

12  And then 19.d, why is that highlighted?

13      A.   Well, that is not a violation of the current

14  ones that we're talking about, 124(c)(3)(i).

15      Q.   Okay.

16      A.   This is a different violation, but this one

17  is a violation because it is blank.  We have in 19.c,

18  marked a delayed response, but we don't have a final

19  response which would be marked in 19.d.

20      Q.   Okay.  And so when we go through then and we

21  go through the other exhibits, we may see this Form

22  4473, transaction number 5536, under that --

23      A.   That's correct.

24      Q.   -- specific violation?

25      A.   Yes, that's correct.

1    Q.   So each 4473, if they have multiple, could

2    potentially contain not only multiple variations of the

3    same code, but different provisions of the regulations?

4    A.   Yes.

5    Q.   And that's the case here?

6    A.   Yes.

7         MR. BOYER:  I'm marking Government Exhibit

8    16.  That's going to be a 96-page document consisting

9    of 32 Form 4473s with 32 -- indicating 32 violations of

10   478.124(c)(3)(iv) or 4.  Government Exhibit 16, I'm

11   handing a copy to the Hearing Officer, Mr. Frazier,

12   court reporter.

13        HEARING OFFICER FRONCZAK:  Government Exhibit

14   16 is accepted on the record.

15   **(Government's Exhibit 16 marked and received in**

16   **evidence.)**

17        BY MR. BOYER:

18   Q.   Ms. Valls, going through -- start on the

19   first page of Government Exhibit 16, note down here,

20   block 12.a is highlighted.

21   A.   Correct.

22   Q.   And we've seen that before.  This is where

23   the transferee or buyer should be marking country of

24   citizenship?

25   A.   That's correct.

1      Q.   And by not including that information, would

2   this be considered a violation of 478.124(c)(3)(iv)?

3      A.   It would be considered a violation, but I

4   can't tell you if it would be that one because, like I

5   said, we had multiple on the forms.

6      Q.   Right, right.

7      A.   I believe the (c)(3)(iv) is more under the

8   background check section.

9      Q.   Right, which if we turn to the second page

10  then, we've got 19.c is highlighted.

11     A.   That's correct.

12     Q.   And why is it highlighted?

13     A.   That would be the initial response that they

14  receive from NICS when they call in the background

15  check, and it's blank.  So we don't know what the

16  answer actually was or if it was a delayed response or

17  what have you.

18     Q.   Okay.  And what's the point of -- why the

19  requirement to have the licensee fill this information

20  out?

21     A.   So we know if the transaction was immediately

22  proceeded, whether it was delayed, if it was denied.

23  The only way we have of knowing now is that we have a

24  number up here for our next transaction number, but we

25  don't know if it was delayed or if it was unapproved.

1    Q.   And by not including that information, is

2    that a violation of 478.124(c)(3)(iv)?

3    A.   Yes.

4    Q.   Looking at the next 4473, which would be

5    transaction number 5696, it appears we have the second

6    page of that 4473, the same problem with 19.c?

7    A.   That's correct.

8    Q.   And, again, same issue?

9    A.   Yes.

10   Q.   We don't know whether that was given as a

11   result of the next background check received, delayed,

12   denied?

13   A.   That's correct.

14   Q.   And finally the next 4473, again not going

15   through all of them, but this would be for transaction

16   5739, 19.c again is missing the information?

17   A.   That's correct.

18   Q.   Okay.  And the remaining 4473s, I know

19   previously and in preparation for this hearing, you had

20   an opportunity to go through and review the

21   information?

22   A.   Yes.

23   Q.   It does, in fact, contain 32 violations.  So

24   each Form 4473 would contain a violation --

25   A.   That's correct.

Free State Reporting, Inc.
1378 Cape St. Claire Road
Annapolis, MD 21409
(410) 974-0947

1        Q.   -- of this provision?

2        A.   Yes.

3             MR. BOYER:  I'm marking as Government Exhibit

4   17 a three-page document consisting of one Form 4473

5   indicating one violation of 478.124(c)(4).  I'm handing

6   a copy to the Hearing Officer, to Mr. Frazier, the

7   court reporter, and to Ms. Valls.

8   **(Government's Exhibit 17 marked for identification.)**

9             BY MR. BOYER:

10       Q.   Ms. Valls, looking at this, if I go to the

11  third page, I note that there is a box, and let's see,

12  under block 27, around the word "pistol."

13       A.   That's correct.

14       Q.   Why would that be highlighted?

15       A.   This was the firearm that was sold, that they

16  are listing out the information for the firearm, and if

17  you look at number 16, they have marked off long gun,

18  and also from my experience, it being a Remington 870,

19  it is a long gun as well as number 38 saying it's a 12-

20  gauge, which would indicate a long gun as well.  So

21  they wrote the incorrect type of firearm that they

22  sold.

23       Q.   And by not listing the correct firearm sold,

24  that would be a violation of 478.124(c)(4)?

25       A.   Yes.

1          Q.   And, again, this would have been part of your

2     discussion with the licensee when going over his

3     requirements under the federal firearms regulations?

4          A.   Yes.

5               MR. BOYER:  If you will, just give me one

6     moment here.

7               HEARING OFFICER FRONCZAK:  While you're

8     taking a moment, I'll mention that Government Exhibit

9     17 is accepted into the record.

10    **(Government's Exhibit 17 received in evidence.)**

11              BY MR. BOYER:

12         Q.   And I know I haven't done this for all of

13    them, but I would note, so if you refer back to

14    Government Exhibit 1 --

15         A.   Um-hum.

16         Q.   -- and you look at page 4 of the exhibit,

17    number 3 is listed on top.

18         A.   Okay.

19         Q.   And you've got in subparagraph 1(g),

20    violation of 27 C.F.R. 478.124(c)(4)?

21         A.   Yes.

22         Q.   All right.  Same provision that we're talking

23    about here?

24         A.   That's correct, yes.

25         Q.   Okay.  And in that instance, so as part of

114

1   the 2010 inspection, then you had three instances of

2   noncompliance?

3        A.   That's correct.

4        Q.   And so this would be a repeat violation?

5        A.   Yes.

6        Q.   Okay.  I know I haven't done that with every

7   single one.

8             MR. BOYER:  I'm marking as Government Exhibit

9   18 a 12-page document consisting of four Form 4473s,

10  containing four violations of 478.124(c)(5).  I'm

11  handing a copy to the Hearing Officer, Mr. Frazier, the

12  court reporter, Ms. Valls.

13            HEARING OFFICER FRONCZAK:  Government Exhibit

14  18 is accepted into the record.

15  **(Government's Exhibit 18 marked and received in**

16  **evidence.)**

17            BY MR. BOYER:

18       Q.   Ms. Valls, I'm looking at the first Form 4473

19  which would be transaction number 5695.  If I look on

20  page three, block 37 appears to have a bold block

21  around the date listed there.

22       A.   Yes.

23       Q.   Why is that?

24       A.   That date is incorrect.  If you look at

25  number 15, it is dated 8/23/17, and 19.a is also dated

1  8/23/17.  Therefore, the date of the transaction cannot

2  be the day before those dates.  That date would be

3  incorrect.

4       Q.  So if you go strictly by the dates, this

5  would suggest that the firearm was transferred prior to

6  completion of the -- well, prior to the certification

7  date as well as the date listed in 19.a?

8       A.  Correct.

9       Q.  And is not having that date accurate, is that

10  a violation of 478.124(c)(5)?

11       A.  Yes.

12       Q.  Moving to the next Form 4473, it would be

13  transaction 5213.  It appears this again, block 37 has

14  the incorrect date, and can you tell us why that is

15  highlighted?

16       A.  Again, if you go back to 15, block 15, the

17  date is 1/26/17.  The date is also 1/26/17 for 19.a.

18  And the date in block 37 is 1/25/17.

19       Q.  All right.  And the next 4473, that would be

20  transaction number 5909.  It, too, contains the same

21  issue in block 37?

22       A.  That's correct.

23       Q.  Just give me one moment.  Referring then

24  back, Ms. Valls, to Government Exhibit 1, this would be

25  subparagraph 1(h), indicate there the violation of

1    178.124(c)(5) [sic], correct?

2         A.    That's correct, yes.

3         Q.    In that instance, there was five violations

4    noted?

5         A.    Yes.

6         Q.    Okay.  So, again, this would indicate a

7    repeat violation?

8         A.    Yes.

9         Q.    And it appears in 2011, down at the bottom of

10   that page, 5(c).

11        A.    Yes.

12        Q.    Same violation?

13        A.    Yes.

14        Q.    And to paragraph 9(f), same violation?

15        A.    Yes.

16             MR. BOYER:  I'm marking Government Exhibit

17   19.  It's going to be a nine-page document consisting

18   of three Form 4473s and consisting of two violations of

19   478.126(a).  I'm handing a copy to the Hearing Officer,

20   Mr. Frazier, the court reporter, and Ms. Valls.

21   **(Government's Exhibit 19 marked for identification.)**

22             BY MR. BOYER:

23        Q.    All right.  Ms. Valls, I guess let's go to

24   the third page of Government Exhibit 19.  That would be

25   for transaction number 5407.

1    A.   Wait a minute.  I have 5239 on top.  Is this

2    part of -- the bottom part of somebody's.  I have two

3    on the bottom.  Let me check.  5239 --

4         MR. BOYER:  Yeah, it should be.  If everybody

5    could do a count.

6         THE WITNESS:  Yeah, 5239 should be on the

7    bottom.  So somebody's missing a 5239.

8         MR. BOYER:  Let me check.  Maybe the court

9    reporter.  I believe I shortchanged the court reporter.

10        HEARING OFFICER FRONCZAK:  While you're doing

11   that, I'm just going to say Government Exhibit 19 is

12   accepted into the record.

13   **(Government's Exhibit 19 received in evidence.)**

14        MR. BOYER:  I'm handing a complete copy of

15   Government's Exhibit 19 to the court reporter.

16        BY MR. BOYER:

17    Q.   Ms. Valls, looking then -- let's start this

18   over.  So I've got transaction number 5407.

19    A.   Correct, yes.

20    Q.   And if I turn to the third page, I've got

21   here a block around information there at the top of the

22   page.  What's the block indicate?

23    A.   It indicates the firearms that were sold to

24   this particular individual, and in this case, these are

25   two handguns that were sold on the same day to the same

1  individual.

2      Q.   All right.  And why would that information be

3  highlighted?

4      A.   The licensee is required to report multiple

5  sales of handguns, which means that they have sold more

6  than one handgun to the same individual within a 5-day

7  period.  In this case, it was on the same day.  And we

8  did not find any corresponding multiple sale form

9  filled out, nor did we have any on our trace history

10  reports.

11     Q.   Would that failure to notify then at the

12  multiple sale be a violation of 478.126(a)?

13     A.   Yes, that's correct.

14     Q.   All right.  And then I note that -- so we've

15  got only two violations but we've got two more 4473s?

16     A.   That's correct.

17     Q.   And can you explain why that is the case?

18     A.   On Form 5244, we have a handgun that was sold

19  to a Rodney Ruppenthal on February 10, 2017, and then

20  we also have a firearm, a handgun, that was sold to

21  Rodney Ruppenthal, same address on both forms, on

22  2/8/17.  So this indicates that it was more than one

23  handgun sold to the same individual within a 5-day

24  period that a multiple should have been filled out for.

25     Q.   And none was actually filed?

1      A.   We did not find any in Frazier's files, nor

2   did we find any on our trace history report, no.

3      Q.   Referring back then to Government Exhibit 1

4   and looking on the sixth page of that exhibit, number 5

5   listed up top.

6      A.   Yes.

7      Q.   It appears that this would be -- the same

8   violation was noted in 2014 --

9      A.   That's correct.

10      Q.   -- during that inspection?

11      A.   Yes.

12      Q.   So, again, in this we have another repeat

13   violation?

14      A.   Yes.

15           MR. BOYER:   I'm marking as Exhibit 20 a

16   three-page document consisting of one Form 4473

17   containing three violations of 478.102(a).  And a copy

18   for the Hearing Officer, Mr. Frazier, and to the court

19   reporter, Ms. Valls.

20           HEARING OFFICER FRONCZAK:   Government Exhibit

21   20 is accepted into the record.

22   **(Government's Exhibit 20 marked and received in**

23   **evidence.)**

24           BY MR. BOYER:

25      Q.   And as indicated, there were three violations

1    here.  Can you speak to those three violations?

2        A.   Well, the first on 12.a is not actually part

3    of 102(a).

4        Q.   Oh, okay.

5        A.   But they failed to answer that question.  It

6    is blank, and that's why that one is a violation, but

7    it is not part of 102(a).

8        Q.   Okay.

9        A.   So 102(a) is on the second page where we have

10   19.b and 19.c blank, 19.b being the NICS transaction

11   number when the licensee is given when they call in a

12   background check and get a proceed.  And then 19.c

13   would be where they would indicate whether they got a

14   delayed response, proceed response, or denied response.

15   In both cases, they are blank, and we have nothing to

16   indicate that a background check was actually called

17   in.  And I will also add that on 21 in West Virginia,

18   we do have something that will override the background

19   check.  So we will look at number 21 to see if the

20   purchaser provided anything, and in this case, they did

21   not.  So we have nothing to show that they were

22   approved to get this firearm.

23       Q.   Okay.  And when you say 21, that's block 21

24   on --

25       A.   Block 21, yes.

121

1      Q.   Okay.  That's where it would be annotated

2  that there's an exception to this?

3      A.   That's correct.

4      Q.   Okay.  And by not listing that information,

5  there's no way that again a background check was

6  performed?

7      A.   There's no way that we can tell if a

8  background check was performed, no.

9      Q.   Okay.  And if there's no way to confirm that

10 one was done and that, in fact, one wasn't done, would

11 that be a violation of 478.102(a)?

12     A.   Yes, that's correct.

13     Q.   So I'd note then that would be a single

14 violation.

15     A.   Well, it depends on how you look at it.  Two

16 blocks are technically blank.

17     Q.   Okay.

18     A.   In this case, it's 102(a), which is different

19 than not filling out a form.  This is actually a sale

20 that shouldn't have taken place.

21     Q.   I see.

22     A.   So it is one instance with these two blocks

23 that would be put together.

24     Q.   I understand.  That's all the questions I

25 have for you, Ms. Valls.

Free State Reporting, Inc.
1378 Cape St. Claire Road
Annapolis, MD 21409
(410) 974-0947

```
 1        A.   All righty.

 2             HEARING OFFICER FRONCZAK:  Mr. Frazier, do

 3   you have any questions of Ms. Valls?

 4             MR. FRAZIER:  A couple.

 5                     CROSS-EXAMINATION

 6        BY MR. FRAZIER:

 7        Q.   Referring back to the gun that was supposed

 8   to be a machine gun, do you know when Bill called in?

 9   Did you know?  Did he call in, do you know if it was

10   the same day he got the gun in or a month later?

11        A.   I don't know.

12        Q.   Did anybody tell him not to sell the gun?

13        A.   Not that I'm aware of.

14             MR. FRAZIER:  Okay.  That's all my questions.

15                    REDIRECT EXAMINATION

16        BY MR. BOYER:

17        Q.   And just for clarification, again for the

18   record, I would note that that particular transaction

19   turns up what Hoffman related to Ms. Valls and was

20   later passed onto Special Agent Martin, is not a

21   violation that is noted nor included in the notice to

22   deny the new application.

23        A.   That's correct.

24             (Witness excused.)

25             HEARING OFFICER FRONCZAK:  Thank you.  At
```

123

1  this time, we're ready to proceed with your

2  presentation of anything you may have.

3          MR. VANN:  Actually, before we start --

4          HEARING OFFICER FRONCZAK:  Do we need a

5  break?

6          MR. VANN:  -- let's take a break.  It's

7  12:56.  I need 20 minutes from 1 to 1:20 at most for a

8  conference call that I just can't get out of.  Can we

9  reconvene at 1:20?

10          HEARING OFFICER FRONCZAK:  Is that okay with

11  everybody else?

12          MR. VANN:  1:20.  That gives him 20 minutes

13  to look through this stuff anyway because I feel that's

14  appropriate at this moment.

15          HEARING OFFICER FRONCZAK:  Absolutely.

16          MR. VANN:  So you can look through it because

17  there's quite a volume of material.

18          HEARING OFFICER FRONCZAK:  Okay.  So at

19  12:26, we will be off the record, and we'll resume in

20  20 minutes.  Okay.  Thank you.

21          (Off the record at 12:56 p.m.)

22          (On the record at 1:17 p.m.)

23          HEARING OFFICER FRONCZAK:  Okay.  It is 1:17,

24  and we are back on record.

25          Mr. Frazier, it's your turn to present

1   evidence and anything -- any discussion you want to

2   have regarding why your federal license renewal should

3   not be denied.

4          MR. FRAZIER:  The first thing I want to say

5   is that obviously it appears that probably 99 percent

6   of the paperwork is under William Hoffman.  You know, I

7   guess I just relied on him, being him working at other

8   gun shops in the past, and he told me he knew what he

9   was doing and he knew all about the paperwork and what

10  needed to be done.  Obviously, that wasn't factual.

11         I also brought with me stuff that I have been

12  doing to make sure all the paperwork is right and would

13  get stuff in.  I'll give you my Exhibit 1, and it's six

14  pages.

15         You get a copy of that, correct?

16  **(Applicant's Exhibit 1 marked for identification.)**

17         MR. BOYER:  And just to be clear,

18  Mr. Frazier, so would this be actions that you've taken

19  since --

20         MR. FRAZIER:  Since Bill's been gone.  Since

21  he's not working there.

22         MR. BOYER:  Since Bill's been gone.  Okay.

23  So I understand and appreciate you taking the effort.

24         I would object to the admission of these

25  exhibits simply because this hearing is simply based on

125

1   the violations and during that I guess that led up to

2   recovery of the documents and the violations that were

3   noted therein.  And so in case law, unfortunately, you

4   know, rules against the licensee in terms of remedial

5   action or corrective actions that have been taken

6   since, it's not a matter for consideration for purposes

7   of these hearings.

8           HEARING OFFICER FRONCZAK:  I'll take that

9   into consideration, but I am going to allow it to be

10  entered into the record as Exhibit 1 for the FFL.

11  **(Applicant's Exhibit 1 received in evidence.)**

12          MR. FRAZIER:  Thank you.  Anybody else gets a

13  copy?

14          MR. BOYER:  Yeah, yeah, make sure.  He's the

15  most important one.

16          HEARING OFFICER FRONCZAK:  I just want to be

17  clear, too, for Exhibit 1, this is showing what

18  exactly?

19          MR. FRAZIER:  It's a six page -- what it is,

20  the first page is a contract that when we put a gun in,

21  it goes into our computer system.  This is a copy of

22  the contract.  And then there's checkmarks beside each

23  firearm.  That is me personally noting that I logged

24  those into the book.

25          The second page is a page from our computer,

1   but I did not know that it would print out all the guns

2   in and out, and if you look at, it's got checkmarks by

3   each side.  On the first column, this is just backing

4   up the contract, that each gun gets logged in, in the

5   book and with a name, which is in response to this that

6   we print out that we can make sure all these are

7   loaded in.

8           And then the next four pages is an actual

9   4473.  Then there's two checkmarks at the top, that's

10  one, me, that I've logged it out and the second

11  checkmark is that I've went over everything, making

12  sure everything's in, and also the very last page, we

13  copy a driver's license to keep with all the paperwork

14  now also, and if they have a concealed carry form, we

15  copy that also.

16          And the second exhibit, Number 2, is just

17  our -- everything that we've -- I printed this out back

18  in March of this year, when I knew the hearing was

19  coming up, just kind of showing the percentage of

20  business we do.  If you look on page 9, and this is

21  just showing how much percentage of guns that we do,

22  why it's kind of pertinent that I keep my license.  If

23  you look at it, just on page 9, if you add it up, the

24  principal involved, all four percentage, is 38.44

25  percent of our business just in buys of firearms, and

127

1   then the pawns is actually 28 -- it looks like 21.57

2   percent in pawns.

3   **(Applicant's Exhibit 2 marked for identification.)**

4           MR. BOYER:  And the pawns, I'm sorry.  The

5   pawns are firearms only or --

6           MR. FRAZIER:  Yes, just firearms.

7           MR. BOYER:  Okay.

8           HEARING OFFICER FRONCZAK:  So basically what

9   you're saying then is that 59 percent of your total

10  business conducted is a combination of firearm sales

11  and pawned firearms?

12          MR. FRAZIER:  I do not know if that

13  percentage totals, but pawns and that is 59 percent.  I

14  would say of all our stuff that we buy in -- this was

15  from January through December of 2018, this log, of all

16  the things that we bought throughout that year, 38.44

17  percent was purchase of handguns or purchase of

18  firearms, and then of the pawns, it's 21.57 percent of

19  the pawns.  So I would think that it was separated

20  between buys and pawns, not a total together.

21          HEARING OFFICER FRONCZAK:  I accept

22  Licensee's Exhibit 1 into the record.

23  **(Applicant's Exhibit 2 received in evidence.)**

24          HEARING OFFICER FRONCZAK:  But I'm also going

25  to let Government counsel look at it.

```
 1              MR. FRAZIER:  You can have my copy if you
 2   want.
 3              MR. BOYER:  I make the same objection to
 4   Applicant's or Licensee's Exhibit Number 2 on the same
 5   basis, just the fact that we're -- it goes outside the
 6   scope of the hearing, the reason why we're here today,
 7   your evidence.  What I may do is just burn a quick
 8   copy, you know, when we're done.
 9              MR. FRAZIER:  You can have mine.
10              MR. BOYER:  Yeah.
11              MR. FRAZIER:  I don't need it.
12              MR. BOYER:  Okay.  Yeah.  All right.
13              MR. FRAZIER:  I don't need it.
14              MR. BOYER:  I'll do that.
15              MR. FRAZIER:  And that's all I brought.
16              HEARING OFFICER FRONCZAK:  Do you have
17   anything else you'd like to say --
18              MR. FRAZIER:  Just that --
19              HEARING OFFICER FRONCZAK:  -- or state?
20              MR. FRAZIER:  Just the same thing that I've
21   iterated before, that as I stated, just going through,
22   skimming through 99 percent of this, the violations
23   were William Hoffman's responsibility.  And as far as
24   the transactions he did, selling -- making straw
25   purchases, whatever he has done, is solely on him.  I
```

1    had nothing to do with it.  If he said that I did, he's

2    a liar.  I never knew he was selling guns.  He didn't

3    come to me and say, hey, should we sell this or not

4    because I told him before, like I told any other guys

5    that work for me, if you think it's an issue, just tell

6    me, no, you're not licensed to sell it to them.  And

7    I've always told everybody that.  That's all I have.

8            MR. VANN:  We have a few questions then for

9    Mr. Frazier.

10   (Whereupon,

11                   **DAVID M. FRAZIER II**

12   was called as a witness by and on behalf of the

13   Government and was examined and testified as follows:)

14                   **DIRECT EXAMINATION**

15           BY MR. VANN:

16       Q.   Mr. Frazier, I just want to get a few things

17   straight.  Number one, you do understand your

18   obligations as a firearms dealer, correct?

19       A.   As far as --

20       Q.   Your obligations, what you're required to do,

21   writing the 4733s, keeping A&D book --

22       A.   Yes, sir.

23       Q.   -- those types of things?  You understand

24   that's issues?

25       A.   Um-hum.

1      Q.    You've been briefed on those --

2      A.    Yes, sir.

3      Q.    -- and you acknowledge those; is that

4  correct?

5      A.    Yes, sir.

6      Q.    So you know what your duties are and what

7  your responsibilities are as a licensee to sell guns?

8      A.    Yes, and like I said, when I hired Bill, I

9  thought that he was going to handle all that.

10     Q.    But you still understand as well, right?  I

11  mean you're continuing to do it now.

12     A.    Yes.

13     Q.    And you've taken steps to ensure that there's

14  going to be compliance with those?

15     A.    Yes, sir.

16     Q.    And you know what to comply with?

17     A.    Yes.

18     Q.    Do you have access to resources that would

19  help you with that as well?  Do you have a White Book?

20     A.    A White Book?

21     Q.    Uh-huh.

22     A.    No, I never heard of a White Book.

23     Q.    The Federal Firearms Manual that they give

24  you.

25     A.    Oh, I'm sorry.  I mean they gave it to me

```
 1   when I first got my license.

 2        Q.   So you got it?

 3        A.   Yes.

 4        Q.   And you've also had some dealings with IOIs,

 5   correct?  With the investigators?

 6        A.   Eileen, yes.

 7        Q.   With Eileen?

 8        A.   Um-hum.

 9        Q.   And you've got her phone number.  You can

10   call her if you've got a question.

11        A.   Yes, and I have before, yes.

12        Q.   And you have called her?

13        A.   Um-hum.

14        Q.   Okay.  So if you had a question about what to

15   do properly, you would call her?

16        A.   Yes.

17        Q.   Okay.  And you do also understand that you

18   have responsibility for your employees?

19        A.   Yes.

20             MR. VANN:  Okay.  No further questions.

21             (Witness excused.)

22             HEARING OFFICER FRONCZAK:  Nothing else?  Do

23   you have anything else?

24             MR. FRAZIER:  No, sir.

25             HEARING OFFICER FRONCZAK:  Okay.  So I want
```

1   to thank everyone.  I believe we have all the

2   information that I need.  I will make my final decision

3   based on the information provided at the hearing today

4   and the record that was presented before me.

5            If the decision is that the Licensee's

6   application will not be denied, you will receive a

7   written notice of that decision.  In the event that

8   it's determined that the Licensee's application will be

9   denied, you will receive a final notice of denial of

10  application.  You will also receive a copy of my

11  findings and conclusions.  If you receive a final

12  notice, you may file a request in federal District

13  Court in the district where you conduct business under

14  the provisions of Section 923(f)(3), Title 18, United

15  States Code, for a de novo hearing.  This request must

16  be submitted within 60 days of the receipt of the final

17  notice.

18           At this time, as I just mentioned before, is

19  there anything else anyone would like to add to the

20  record?

21           MR. BOYER:  None from the Government.

22           MR. FRAZIER:  None from me.

23           HEARING OFFICER FRONCZAK:  Okay.  If there is

24  nothing further to add, the time is 1:27 p.m.  This

25  hearing is officially closed.

133

 1                    (Whereupon, at 1:27 p.m., the hearing in the

 2   above-entitled matter was closed.)

 3

 4

 5

 6

 7

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

                        Free State Reporting, Inc.
                        1378 Cape St. Claire Road
                           Annapolis, MD 21409
                             (410) 974-0947

1              **CERTIFICATE**

2    This certifies that the attached proceeding before the

3     BUREAU OF ALCOHOL, TOBACCO, FIREARMS, AND EXPLOSIVES

4    IN THE MATTER OF:        DAVID FRAZIER II dba

5                            FRAZIER'S PAWN SHOP

6    PLACE:                  Martinsburg, WV

7    DATE:                   August 21, 2019

8

9    was held according to the record, and that this is the

10   original, complete, true and accurate transcript which

11   has been compared to the recording accomplished at the

12   hearing.

13

14

15

16

17   _____

18                            Bradley Weirich

19                            Court Reporter

20

21

22

23

24

25